# EXHIBIT A

July 31, 2025


Jack L. Jaffe, Attorney at Law
411 W. 13 Mile Rd.
Suite 150
Madison Heights, Michigan 48071


Re:   Akiva Dovid Shenkman

Dear Mr. Jaffe:

I had an opportunity to conduct a psychiatric evaluation on Akiva Dovid Shenkman on July 3, 2025.  He was referred to me by your office for the purpose of performing a psychiatric evaluation relative to criminal charges that he is facing.

In addition to conducting a psychiatric evaluation, I have had an opportunity to review documentation as follows:

    1.    Discovery packet.
    2.    "Email from friend".
    3.    Extensive conversation from Mr. Shenkman's uncle, Yitschak Shkop.

At the time of the evaluation I obtained the following history.

**History:**

Akiva Dovid Shenkman was born September 12, 1985.  He is a 39 year-old, white male who is currently working in his own service business in Heating Ventilation & Air Conditioning, and has been doing so for the last 15 years.

He is currently residing in the Milan Federal Correctional Facility after entering a guilty plea for possession of child pornography.  He understands that he is facing a sentence range of 5 to 20 years.

He describes his current circumstance, "I was caught coming in from Canada...I had child pornography on my phone...I ended up here".  He describes that his interest in graphic sexually oriented imagery of prepubescent children goes back "as long as I can remember", and as a child he states he was "always into it".

His background is coming from a "Orthodox family", a strictly observant Jewish family.  He was born in Detroit.  His father although strictly observant did not come from a family of that orientation.  His father's parents were associated with religious organizations.  His mother's family was always observant and his mother's maiden name was Lev. His mother was 7th generation observant Jewish of Hasidic sect.

His parents divorced when he was 3 years old.  He states that he has limited recollection of the circumstances of their relationship, but understands that they were always "fighting", and that there were numerous episodes where the police were called because of violence in the home.  He has a vague understanding of his father's employment, "I think he was in the insulation business", stocks and investments.

He stayed with his mother after the divorce, and he attended a religious school as a child. After the divorce he moved to Chicago at age 5 or 6 studying in a religious school. He states that his school performance was "okay". He describes that in the 4th grade, "I was beaten up by the Principal". He states that it was on a Friday. His mother promised to take him to buy new shoes. The Principal of the school said something to him about staying late and he responded, "I'm not gonna stay late...I'm going to buy shoes with my mother", and the Principal reprimanded him physically.

He moved to New York in the 4th grade. He attended a religious school in New York and then a school in New Jersey. He then went to study in Israel for three to four years and returned to the United States at age 18. His academic career was somewhat limited and he states that he was not really learning or progressing in his education.

He then initially states that he has no recall of the development of this sexuality or his interest in anything that might have provoked sexual arousal. He recalls being a young adolescent at about age 12 having a conversation with one of the Rabbis who was teaching him in the religious school. The Rabbi asked about sexual experiences and masturbation. Mr. Shenkman initially states that he did not participate in the discussion and initially denied everything, and then spoke about masturbation and about an experience watching a neighbor taking a shower. Mr. Shenkman expressed and described his interest at that time as adult females. He describes looking at Sears catalogs and looking at print material with images of women advertising lingerie or underwear as an object of arousal.

He states that although it was "never about kids", later on when he developed an interest in images of children in sexual situations, "I couldn't listen to the sound". He described that on occasion he would cry when he saw the images and that surprised him, but it had an appeal to him. His tears were provoked by seeing an adult harming a child. It appears he was more identified with the child than the adult.

He has a recollection of having a toy gun that would vibrate and he would use that to stimulate himself. He also described coming out of the shower and tying a towel around his neck "like Superman". He would dry off over a heating vent and play with a towel and put it on like a diaper when he was a young adolescent.

He was then asked about a childhood experience with a babysitter that he described occurring when he was a child - that he had been stimulated by a babysitter when he was a small child. He states that that was "not real" and that he was just "talking to someone to get more stuff".

Mr. Shenkman then describes that when he came from visiting a friend in Canada, coming through Customs in the United States at the Detroit entry point, he was on a "watch list". He states that it may be due to an app that he was using for about 10 years looking at graphic sexual material of children. He states that he found them fascinating and arousing, but associated with strong ambivalent feelings of shame and embarrassment.

Mr. Shenkman describes his activities of daily living. He will get up every morning. He would watch some graphic sexual material "to get out of bed", attend to his personal hygiene, do morning prayers, work for a full day, watch television in the evening. His television viewing was somewhat varied - Reacher (an action series mystery), Family Guy and South Park (adult cartoon satires), Simpsons (adult cartoon satire), Resident Alien (a situation comedy), and Super Hero movies.

His social contacts were limited, and he would meet people on-line using a dating app

called Tinder or J-Swipe, sometimes Facebook. He would meet adult women and "hang out", watch movies, and occasionally having intimate contacts. He was not particularly discriminating in seeking out those contacts "whoever answered".

His preference was for a woman who was "decent looking", not overweight, not sloppy, smaller breasts. He prefers longer hair - either red or dark hair. Most of the contact would last for one or two encounters. One encounter lasted for a few months. She was a nurse, Asian with black hair. He described her as nice, smart. They would watch movies together and occasionally have sex. His preference on sexual encounters was missionary position, occasionally oral performed on each other "if they want it".

He describes his longest relationship as "on and off" for two to three years. He is somewhat guarded as providing any personal information about this particular partner. They were of the same religion. They would observe the Sabbath together, have meals together, and he states, "I didn't want it to be serious". He could not explain why, but he was very limiting in the degree of disclosure and intimacy that they experienced.

He has an interest in marrying, but can't articulate his intentions. He states that he has never acted on a child or an adolescent, that his object choice in real human contact is adult females. When explored his image of marriage is very traditional, but he admits that he is somewhat confused by this because he had no basis for seeing a traditional marital relationship.

He describes ongoing disturbances with sleep "not well at all", and he describes racing thoughts at night. He has worries, "I'm getting older". He looks at his life with some regrets "that I do everything right". He describes difficulty falling asleep and frequent wakening. He has dreams but can't remember the content of his dreams. He is 5 ft. 8 inches tall and weighs 190-195 lbs. His usual weight was 220 lbs. before entering custody. He denies problems with his bowels.

In terms of his intimate relationships, he has never had a "real girlfriend". He states that the lengthy relationship that he had became more of a friendship than that of an intimate partner, and he is somewhat ashamed or embarrassed in some of the connections that he made through dating apps.

He states that he attempted to masturbate to some of the graphic pictures that he had downloaded, but "it didn't really work too well". Most of the videos were underage females but "not all of them", and he describes a "broad range" of graphic material. He describes that as he progressed he was looking for "more", and when asked why he felt that he was looking for "more weird stuff" his response was, "I wanted to feel something", and he describes a sense of detachment in situations that demanded intimacy.

**Personal History:**

By way of personal history, Mr. Shenkman was born in Detroit. He attended religious schools in Detroit, New York, New Jersey, Chicago, and Israel. He has never earned a formal high school diploma or a GED.

He is the fourth in a sibship of five. He has two older brothers - one of whom drives a school bus, and one of whom speculates in real estate and has a CBD marijuana business. An older sister is a homemaker, and a younger sister lives in New Jersey and is a homemaker. His oldest brother was a kidney donor. His second oldest brother may have been in psychiatric treatment for "anger issues". He denies any substance abuse history in his siblings. He is not particularly close to them, although with his criminal charges his

siblings have been supportive of him and he is ambivalent stating he is not certain that he wanted them to know about what happened to him.

Mr. Shenkman's mother is 70 years old and in good health. She owned a dress shop in Detroit. He describes her as a good mother. She worked hard and she was a good cook and took good care of him. When asked about the divorce, he states that he heard that his father had "anger issues", and that his paternal grandparents were "not easy to deal with", although he can't characterize what that meant.

His father is currently in his late 70's. he suffers from kidney stones, gout and is overweight, and was hospitalized for a bowel obstruction. Mr. Shenkman took care of him while he was in the hospital for 1-1/2 weeks. He owns a company called City Service Insulation and lives in New Jersey. They have never been close.

He does have male figures in his family, an uncle who lives in Chicago and his maternal grandfather who lived in New York. He describes them as very traditional and that they may have been "born in the wrong century", and that learning and studying religious matters were "everything". He characterizes his grandfather stating, "Whenever you asked him a question he always knew the answer".

He described himself as struggling with the educational system "I just floated through", and he had trouble understanding what was expected of him by authority, and was picked on by his peers. His social circles were quite limited.

### Prior Employment History:

By way of prior employment history, when he returned to the United States from studying in Israel he spent about one year withdrawn and watching television without structure, and then learning Heating Ventilation & Air Conditioning and worked in that business. He sold cell phones for "an Israeli guy", worked as a locksmith, and installed low voltage lighting systems. He speculates that he may have been fired from the cell phone job and he doesn't remember why, perhaps he had trouble with sales. He has never collected Workers' Disability Compensation benefits. He has never been arrested before, although in Israel there was a "public fight" he was in the area as an observer when taken into custody and released. He has never been a plaintiff in litigation.

### Past Medical History:

By way of past medical history, Mr. Shenkman has no primary care physician. He was hospitalized for a kidney stone. He takes no medicines. He had been prescribed Flomax after his kidney stone and pain medication when he passed the stone.

He smokes cigarettes "on and off". He drinks alcohol rarely, only on ritual occasions. He denies the use of drugs of abuse or marijuana "never". He saw a therapist in New York. He is uncertain as to when. He states he entered treatment "because my mother forced me". He considered it a "waste of time" because he didn't know why he was there. He states it was when he returned from Israel and he "wasn't doing anything", and he had "no energy", and he speculates that he may have been depressed. In Israel his mother also made arrangements for him to see a therapist. He is uncertain as to whether it was helpful. He denies any drug allergies.


### REVIEW OF DOCUMENTATION
Review of documentation reveals a Discovery packet that describes the circumstances of

his arrest and some of the graphic nature of the material found in his possession. He was interviewed and was initially circumspect and denying any involvement and then acknowledged involvement.

There are text messages where he is seeking graphic material, and where he alleges that he was molested by a babysitter as a child, and that that may have determined his interest in child-adult graphic material. He described encounters where he acted on a female child at the contact with either a "crackhead mother" or when changing the diaper of an infant who was then "calmed down when her mother blew crack in her face." He denied acting on these fantasies. (He reports this as a ploy to obtain additional material) Some of his interactions portray him as an active seeker of this material, and is consistent with his description of an interest that was escalating and non-conventional. (He describes his response to this material was initially arousing, but the response would diminish and he would actively seek mor varied, unconventional graphic material. The material would be arousing at first, and the response would diminish with time.)

A discussion with his uncle, the male figure that he described in the history that he provided me - Yitschak Shkop, who is married to Mr. Shenkman's mother's sister, describes the traditional Orthodox family and notes that Mr. Shenkman's mother suffered from the physical handicap that the marriage was arranged and difficult to arrange.

He characterized Mr. Shenkman's father as unpredictable, angry, hostile, and aggressive in the family - being abusive of Akiva, unpredictable in his behavior, and intimidating to Akiva - emphasizing the ongoing traumatic nature of that relationship and characterizing Mr. Shenkman's mother as being somewhat victimized by her husband before their divorce both physically and emotionally. He characterized the family atmosphere prior to the divorce and even subsequent to the divorce, and Akiva's contacts with his father as being brutalized and intimidated.

A document "from a friend" describes Mr. Shenkman as suffering from "significant trauma related psychological distress". The informant is a physician psychiatrist, and she also describes Mr. Shenkman as suffering from a Neurodevelopmental Disorder with deficits in cognition and communication.

She endorses and describes Mr. Shenkman's childhood as characterized by "instability and trauma" - his father being described as "erratic and violent", and as a child being witness to encounters with the significant physical violence towards family members including children. He was exposed to "sexually explicit material" from a very young age. She also characterized his difficulty in recalling some of his childhood experiences or "details of his upbringing". She invokes "traumatic dissociation" - a defense mechanism often seen in individuals exposed to chronic and early life trauma.

She goes on to describe his social withdrawal from "daily life", and describes the year that he returned from Israel as being spent in "near total isolation" with compulsive watching of television, withdrawing into fantasy, and screen use that continued into adulthood. This is consistent with Mr. Shenkman's characterization of his preferences in television viewing that are at best adolescent and in many respects childish.

This informant also attests to the fact that Mr. Shenkman "does not exhibit a sustained sexual interest in minors", and that there is no evidence of "predatory intent or contact offenses".

## RISK ASSESSMENT:
There are several instruments used to assess risk of acting in individuals who have

expressed an interest in child exploitative graphic sexual material. These instruments look at actuarial and demographic factors in subjects, and compare the subject to groups of similar offenders who re-offend and those who do not. The statistical demands of the evaluation of these "tests" measure there utility in predicting and assessing the likelihood of re-offending within a threshold of accuracy.

The study of these "tests" must involve large samples of subjects and span time to assess future conduct. All of the instruments have some validated standardized utility. Validity refers to whether the instrument does measure that which it purports to measure. Standardization refers to the application of the instrument to large sample sizes. Reliability refers to the instrument's ability to predict with greater than chance results. Reliability focuses on whether a study's findings can be reproduced when repeated under the same conditions

The Hare Psychopathy Checklist is a group of historical and actuarial factors that indicate a subject lacks empathy and is capable of exploitation of victims without guilt or remorse. It has been studied and is generally accepted in the scientific community and a screening tool for prospective law enforcement candidates. Dr. Hare's work has been used to evaluate candidates for law enforcement agencies and has been applied to large sample s of subjects. The instrument is also used in correctional settings to assist in screening for tendencies toward recidivism in criminal offenders during sentencing and for return to the community. On this instrument, Mr. Shenkman generated 19 of 22 factors in the negative. He had 1 item in "possibly present" - "early behavioral problems." He described that as a child he was bullied and occasionally would respond. He was in a particularly rigid educational milieu with strict external controls. He had 2 "present" responses - Lacking in emotional depth and "alcohol or drugs not a direct cause of antisocial behavior" Overall his profile did not indicate Psychopathy or a tendency to re-offend or exploit victims due to a lack of empathy or inability to experience remorse.

The Child Pornography Offender Risk Tool is another well studied instrument. The CPORT is a risk assessment tool designed to predict any sexual recidivism for men convicted of child pornography offences. It consists of 7 items:

1. Age at time of investigation
2. Any prior criminal history
3. Any contact sexual offending
4. Any failure on conditional release
5. Indicators of sexual interest in child pornography material or prepubescent or pubescent
   a.     children
6. More boy than girl content in child pornography
7. More boy than girl content in other child depictions

If present, each item is worth one point.

From the CASIC Developers, the methodology for evaluating validity and reliability fot the CPORT is described (Seto and Eke, 2015):

> It was developed from a sample of 286 adult men convicted of a least one child pornography offences using information available in Canadian police files, meaning that other criminogenic factors could not be examined. The legal definition for child pornography in Canada was used, where images of nude or partially dressed children are not illegal if there is no sexual activity and/or focus on the genital and anal regions.

The development study found the CPORT had acceptable predictive accuracy for any sexual recidivism (AUC=.74) and contact sexual recidivism (AUC=.74). The CPORT was found to significantly predict sexual recidivism for internet offenders with other types of offending (bar contact offences) (AUC=.69) and those with histories of contact offending (AUC=.80); although it did not significantly predict sexual recidivism for those with only internet offences. The development samples were amalgamated with a new sample of 80 individuals with internet offences to give an overall sample of 346 men with internet offences.

It is recommended that the CASIC scale developed to assess pedohebephilia, (sexual interest in children) is used in conjunction with the CPORT tool. In the description of the CPORT tool from the authors reporting to the National Institute of Health (Seto and Eke):

Recent research on a risk assessment tool for child pornography offending suggests that admission of sexual interest in children is a risk factor for any sexual recidivism. Admission is easily vulnerable to lying, however, or to refusals to respond when asked about sexual interests. This may become a particular issue when individuals are concerned about the potential impact of admission of sexual interest on sentencing and other risk-related decisions. In this study, we identified the following behavioral correlates (coded yes/no) of admission of sexual interest in children in the risk tool development sample of 286 men convicted of child pornography offenses: (a) never married (54% of sample), (b) child pornography content included child sexual abuse videos (64%), © child pornography content included sex stories involving children (31%), (d) evidence of interest in child pornography spanned 2 or more years (55%), (e) volunteered in a role with high access to children (7%), and (f) engaged in online sexual communication with a minor or officer posing as a minor (10%). When summed, the average score on this Correlates of Admission of Sexual Interest in Children (CASIC) measure was 2.21 (SD = 1.22, range 0-6) out of a possible 6, and the CASIC score was significantly associated with admission of sexual interest in children, area under the curve (AUC) = .71, 95% CI [ .65, .77]. The CASIC had a stronger relationship with admission in a small cross-validation sample of 60 child pornography offenders, AUC = .81, 95% CI [.68, .95]. CASIC scores may substitute for admission of sexual interest in risk assessment involving those with child pornography offenses.

Mr. Shenkman's score on the CPORT indicated only one risk factor - "Indication of sexual interest in child pornography or children" and all other items were assessed in the negative indication minimal to no risk of re-offending.

The Correlates of Admitted Sexual Interest in Children score had two pertinent negatives - No volunteering in a role with high access to children, and No engaging in online communications with a minor or undercover officer posing as a minor. He was however candid in disclosing his interest in material, and his arousal was quickly extinguished with exposure. This is consistent with his assertion that he was becoming "numb" to the stimuli, and is also consistent with the steady progression of the theme of the material he was seeking as "more shocking" so he could "feel something."

The Sexual Violence Risk Assessment (SVR-20) was indicative of low to no risk, as was the Historical Clinical Risk Management (HCR-20)t.

As regards the SVR-20, its development and standardization is described in:

> a meta-analysis by Hanson and Morton-Bourgon (2009) found that structured judgements made on the basis of the SVR-20 guidelines were the most accurate of all risk assessment approaches for sexual offenders, using three of the studies that had a combined sample of 245.

As regards the HCR-20, it refers to the Historical-Clinical-Risk Management-20, a widely used violence risk assessment tool based on a Structured Professional Judgment (SPJ) approach. The HCR-20 assesses 20 specific risk factors across three domains:

> Historical (past behavior)
> Clinical (current symptoms)
> Risk Management (future concerns)

To guide professionals in predicting and managing future violence risk. It provides a structured framework rather than relying on algorithms, helping professionals formulate risk judgments and develop management plans in forensic and mental health settings. The British Psychiatry Journal Bulletin offers a critical review of the use of this tool. The limitation of the test, as well as the use of tests to assess risk and the possibility of future behavior must be used in a systematic and standardized manner by experienced qualified clinicians. On this test, Mr. Shenkman's history shows only interest without action. His clinical condition is one of a chronic mood disorder that directs him inward, with voyeuristic interest and no history symptoms of acute forms of depression and no history of self harm. Future concerns are determined by a strong will to face consequences, an apprehension about lengthy confinement and a community that can provide close monitoring and firm external controls (an orthodox observant Jewish community).

**MENTAL STATUS EXAMINATION:** On mental status examination, the patient presents the following picture:

**General Attitude and Behavior:** He is a well-developed, well-nourished, white male who appears his stated age. He is pleasant in his interactions. His speech is somewhat halting, and when questions are put to him he is pensive. He has difficulty characterizing his childhood, his day to day existence, and his history - having difficulty recalling the names of schools that he attended, or the ages at which he attended particular institutions. He does tolerate confrontation well. He speaks with a well-modulated voice, and makes good use of hand gestures. He is able to maintain eye contact, and when talking about some of the conduct that led to his criminal charges or some of the material that was in his possession, he reacts with appropriate embarrassment and shame.

**Stream of Mental Activity:** Although Mr. Shenkman is goal-directed, when questions are put to him his initial answers are vague and brief. With repeated confrontation he is able to generate narrative answers, however the depth of information that he is able to convey is limited and he needs firm encouragement. His thinking is not disordered, but his flow of thought is markedly diminished.

**Emotional State and Reactions:** The patient's affect is full and rich in depth and constricted in range. The mood appears to be markedly depressed. This is persistent throughout the course of the interview. Affect remains appropriate to thought content.

**Mental Trend and Content of Thought:** Mr. Shenkman characterizes himself as being

somewhat socially isolated, and he experiences great difficulty in reflecting on himself when self-observation is required. He is somewhat concrete in his formulations and understanding, and he speaks of having no feeling or feeling removed from emotional situations. He has experienced a family life where unpredictable impotent rages and physical abuse were common experiences, and he characterized his reactions as either to withdraw into fantasy or to "block out" those experiences. He describes a very isolative social milieu as an adult with random contacts on dating apps for sexual encounters with adult women, and then using adolescent entertainment contact to distract himself. He is compulsive in his work habits. He has experienced weight loss, diminished libido, and disturbed sleep with racing thoughts and ruminative thoughts. He denies any secondary psychotic symptoms and has not experienced any hallucinations, delusions, or pseudoperceptual events.

**Sensorium Mental Grasp and Capacity**: These are intact to gross testing in that the patient is alert and oriented to time, person, place, and situation. However the depth of his thinking and his ability to engage in self-observation is more limited.

## DIAGNOSTIC IMPRESSION:

Axis I:     Persistent depressive disorder as a consequence of childhood trauma.

Axis II:    Neurodevelopmental Disorder.

Axis III:   No physical condition is diagnosed.

Axis IV:    Psychosocial Stressors - Legal difficulties.   Cultural and social isolation. Traumatic childhood environment.

Axis V:     Highest level of functioning over the past year - (GAF: 62).

## DISCUSSION

Akiva Dovid Shenkman is currently in Federal custody having pled guilty to possession of graphic child pornography. He describes a history of growing up in a very strict rigid cultural milieu with significant social isolation in a family with a handicapped mother, multiple older siblings, limited social relationships. His mother was handicapped and preoccupied with caring for the patient and his siblings, and his father was characterized as being unpredictably angry, physically abusive, and engaging in impotent rages.

Mr. Shenkman grew up as an intimidated child withdrawn into fantasy with repressed emotions and repressed memories, professing to have limited recollection of his childhood experiences, and only being able to produce them when actively and aggressively confronted with the demand that he do so. This is a common reaction in individuals who grow up in a traumatic environment, and the most primitive line of defense is that of denial or "blocking out" memories of unpleasant experiences and uncomfortable affects. This tends to create an emotional "numbing" as described in the trauma literature. In an effort to overcome the emotional numbing, victims often become attracted to experiences of excitement - skydiving, auto racing, extreme sports, risk taking, and graphic sexual material. In the latter, excitement is not as closely associated with the risks of harm associated with other extreme physical endeavors. The arousal of graphic sexual material occurs remotely, without risk and in isolation.

He has never had a model of an appropriate adult reciprocal relationship, and his attempts at engaging in such relationships are limited and conducted at a distance. He states that he was exposed to graphic images when he was quite young, and his quest was for graphic images that were more and more unconventional "so I could feel something", which appears to be an attempt to block through the repression and denial that he used to deal with the chaotic environment in which he was raised.

He does not meet the diagnostic criteria for paraphilia or pedophilia, and by his descriptions all of his intimate contacts have been adult and heterosexual, and he has never acted on any of his interests. His interests do not seem to be specific or preoccupied in a paraphilic manner, but only the result of a quest to find material that would be "shocking" to arouse some feelings and to break through the defensive repression and denial.

Based upon the examination I have performed and the documents I have reviewed, I would conclude that Akiva Dovid Shenkman is a chronically depressed victim of a rigid subculture with an unpredictably violent father who engaged in impotent rages and physical abuse. He has no history of violence, and no history of harm to others. He has never used his fists, an automobile, or a weapon to harm another person. He has never had a physical encounter in the "real world" with a sexually inappropriate object, and his primary goal in his limited attempts to establish intimacy have always been with adult women.

He represents no risk to the community if provided the opportunity to engage in a therapeutic relationship. It is clear that he would benefit from such. His ability to tolerate aggressive confrontation during the course of his evaluation with me is also a good prognostic sign, and indicates that he is not likely to lose his composure or resort to violence when confronted or in a situation of desperation. His participation and involvement in a community that has close integration within the group as well as firm external controls that have to some extent been internalized by Mr. Shenkman is also a positive prognostic sign.

His chronic depression has affected his cognition and his ability to access memories of his childhood and take in information and record it, and engage in the educational process. His ability to function in a very traditional educational system such as is found in Orthodox Judaism was very limited, and he described that he only "floated through" these educational experiences as a child. As an adult, he is more capable of forming a mentoring relationship within his community.

I believe these are all representations of his reaction to the traumatic family life that he experienced as a child, and have led to him being chronically withdrawn, experiencing problems with low energy, and difficulty initiating activities. This would be the opposite of a Paraphilic Disorder with any predatory risk. My findings in this area are consistent with his performance on risk measurement tools. The validity and reliability of those tools is discussed at length above. His assessment on those tools is encouraging and a positive prognostic sign.

If he were returned to his community which would be supportive of him, he would be a candidate for an ongoing intensive therapeutic experience, and if he were in such a situation I believe that he could benefit. I do not believe that Mr. Shenkman or the community would benefit from prolonged confinement.

If you have any further questions regarding my evaluation, diagnosis, or recommendations, please feel free to contact me at my office address.

Very truly yours,


Gerald A. Shiener, M. D.
Diplomate of the American Board of Psychiatry and Neurology
Added qualifications in Addiction, Forensic and Geriatric Psychiatry, Psychosomatic Medicine and Brain Injury Medicine

Medical Director Integrated Care and Consultation Liaison Services
Wayne State University Physicians Group

Chief of Psychiatry
Sinai Grace Hospital of Detroit

Professor of Psychiatry and Behavioral Neurosciences
Wayne State University School of Medicine

GAS/rll

# EXHIBIT B

## Introduction and Purpose of Mitigation Report-Explanation Not Excuse

Psychological mitigation reports play a crucial role in providing the court with an informed understanding of the defendant, not to excuse criminal conduct, but to contextualize it within a fuller developmental and emotional history. According to established forensic practice, the goal of mitigation evaluations is to assist legal decision-makers in weighing the human factors that may impact legal rulings and/or inform appropriate sentencing. Such reports often address multidimensional histories including trauma, mental health, and social adversity, matters that directly relate to the individual's psychological functioning and decision-making processes (Barnett, Brodsky, & Neal, 2011). Moreover, legal scholarship highlights that presenting well-substantiated mitigation is predictive of more individualized, equitable sentencing decisions, and that courts increasingly rely on scientifically grounded characterization of defendants beyond guideline-based offense descriptions (Meixner, 2022).

Accordingly, this mitigation report reviews empirically grounded developmental factors specific to Akiva that might help the Court to understand the underlying dynamics of his inappropriate and illegal behavior: domestic violence exposure, sexual abuse history (especially in the context of Orthodox Judaism), absence of a stable father figure, and gaps in mental health care that emerged from the psychological evaluation and collateral family interviews.

This contextualization of early adversity is critical not to minimize the seriousness of child sexual abuse material (CSAM) offenses, which remain deeply harmful and morally reprehensible, but rather to provide the Court with a rigorous understanding of how these adverse experiences may have shaped the trajectory that culminated in the offense. By illuminating these pathways, the report aims to assist the Court in balancing accountability with treatment and rehabilitation needs.

I.      <u>**Childhood Sexual Abuse Within the Context of Orthodox Judaism**</u>

In order to fully appreciate the specific dynamics that childhood sexual abuse (CSA) has on males in the Orthodox Jewish community (OJC), a brief examination of this particular ethnic/religious group is needed. Orthodox Jews are described as a branch of Judaism that places strong emphasis on family, community, and strict adherence to biblical and Rabbinic precepts in a manner that permeates most (if not all) acts of daily functioning (Lightman & Shor, 2002).

The OJC has many complexities and is far from homogeneous. For instance, some subsets within the OJC promote secular education (Modern Orthodox) while others ban it completely (Chassidic) (Fagin, 2015). Indeed, "the main object of this group is to maintain itself in isolation" (Poll, 2006). As such, some communities within the OJC develop an insulated, self-sustaining community where "all the institutions, including the economic activities of the group, are such that they are conducive to a… 'way of life'" (Poll, 2006).

The concept of personal modesty is a defining characteristic of OJC communities and takes the form of external appearance and action, communal structure and activity, and of course, sexual activity and views of sexuality. As mentioned, communally, boys and girls, men and women, are socialized and educated in separate institutions. Additionally, with regards to sexuality, pre-marital sex is seen as an egregious offense, and typically, there is no public discussion of sexuality with unmarried men and women. Masturbation for men is seen as a severe religious offense. Consequently, boys and girls are brought up to quell sexual desire until they are married. As such, even sexual talk is frowned upon. Therefore, and without direct intent, a culture is created where sexual abuse prevention is typically not spoken about by children in stricter OJC communities, as they are afraid and embarrassed to speak about sexual matters with adults; and, should abuse take place, there is no language to share this with adults (Fagin, 2015).

It is within this cultural context that we can better understand the dynamics of sexual abuse that take place within the OJC.

*Impact of CSA on Males in the General Population*

The breadth and depth of the impact of Childhood Sexual Abuse (CSA) is heavily supported in the professional literature. Correlations between CSA and mental health issues, subsequent perpetration, various addictions, sexual orientation conflicts, difficult family dynamics, decreased physical health, and diminished spiritual connectedness have all been thoroughly explored (Pelcowitz, 2011).

Childhood Sexual Abuse has been correlated with a significant increase in levels of depression and bi-polar disorder (Draghinda, 2009; Fletcher, 2009; Humphreys & Lee, 2009), post-traumatic stress disorder (Alvarez et al., 2009; Marmion & Lundberg-Love, 2008), anxiety (Gibb et al., 2007), and psychotic disorders (Thompson et al., 2009). It has also been associated with increased rates of sexual addiction (Hunt & Kraus, 2009), pornography addiction (Freeman-Longo, 2000), alcohol abuse (Klanecky et al., 2008; Widom et al., 2007), substance abuse (Kingston & Raghavan, 2009; Schneider, Cronkite, Timko, 2008), gambling disorders (Schneider, Burnette, Timko, 2008) and future offending behavior (Fagin, 2015).

Briere, Hodges, and Godbout (2010) found that the impact of sexual abuse is often manifested in some sort of mental health and/or sexual dysfunction, meaning a sexual behavior that is impulsive, compulsive, and/or aggressive which interferes "with a person's social interactions and relationships at home, in school, or at place of employment" (Youngstrom et al., 2008, p. 195). For example, as teenage survivors get older, there can be an increase in the use of pornography, both internet and traditional; sexual videos/DVD's; phone sex, and sext-messaging (text messages with sexual content). This activity will often sustain itself well into the adult years

4

(Briere & Elliot, 2003). Other sexual issues that develop in adolescents are voyeurism and exhibitionism (Finkelhor, 2009). Additionally, research indicates that when a child's first exposure to sexuality was traumatic in nature, a correlation in the child's mind and body between sexuality and shame, guilt, anger, and confusion is established (Hodges et al., 2013, p. 767). Left untreated, a pattern of only finding pleasure in sexuality can become ingrained in the child (Friedrich et al., 2001).

In addition to the mental health issues reviewed above, many victims of abuse suffer from family and social functioning deficits (Alaggia & Kirshenbaum, 2005). Coxell and King (2010) conducted a meta-analysis of the international literature on male sexual abuse and found that many victims suffer from feelings of isolation, mistrust, and alienation. Victims often find it extraordinarily hard to trust in a relationship and are reluctant to engage in meaningful relationships with others. Some survivors discuss having a high need for control in interactions with people, and it is quite common for survivors to appear stubborn and rigid in their interactions. Often, survivors report extreme and intense swings in their need for closeness as they also experience distance with other people.

Sexual abuse has also been correlated to several medical issues, such as gastro-intestinal issues (Leserman & Drossman, 2007), sexual dysfunction such as erectile dysfunction or premature ejaculation (Tucker et al., 2004), migraines or other headaches, nausea, high blood pressure, chest pains, difficulty in urinating or voiding bowels, and shaky hands (Hulme, 2004). Additionally, CSA seems to impart a cumulative and deleterious impact on physical brain development, such as by impacting the prefrontal cortex's ability to regulate limbic responses and sensory input (Singer, 2010).

Finally, sexual abuse has been associated with conflict relating to spiritual and religious feelings and beliefs (Guido, 2008; Mikele, 2009). Findings suggest that sexual abuse affects the essential beliefs about oneself, establishes estrangement from G-d, and interferes with the capacity to develop individual import in life. This research also found that individuals who reported sexual abuse were more disbelieving in their worldview, showed a more contentious spiritual existence, and showed a more distant impersonal conception of G-d (Pritt, 1998). All of these aforementioned impacts of abuse can contribute to our understanding of how sexual abuse victims can often become sexual offenders.

*Prevalence and Impact of CSA on Orthodox Jewish Males*

A dissertation study conducted by this writer (Fagin, 2015) examined the prevalence and multi-layered impact of CSA on adult male victims within the OJC. Specifically, the study examined how the experience of CSA impacts the mental health, addiction potential, perceived levels of family and communal cohesion, and communal attitudes of respondents. The study found that over one-quarter of the sample reported being abused prior to age 18 (26.5%; n=27). This percentage is consistent with other previously studied populations, indicating that the level of abuse with the studied population is neither better nor worse-off than other populations. Second, the study showed that those individuals who were abused more frequently had the highest rates of Posttraumatic Stress Disorder (PTSD).

Additionally, those individuals with a history of sexual abuse show the highest rates of hypersexual activity (Fagin, 2015). The primary theory as to why sexual abuse will often lead to hypersexual behavior relates to the structural impact that abuse can have on the developing brain of a child. CSA impacts the prefrontal cortex's ability to regulate limbic responses and sensory input (Singer, 2010) and may contribute to adverse brain development in these areas (De Bellis

et al., 2011). Consequently, individuals with a history of sexual abuse, and the associated potential structural impact on their developing brains, will certainly be at greater risk for hyper-sexual behavior, as the area of the brain negatively impacted by the abuse is the same area that is responsible for sexual regulation (Fagin, 2015).

Rosmarin and colleagues (2018) researched the prevalence and impacts of CSA in the general Jewish population as well. The study included 372 participants who ranged across the spectrum of Jewish religious affiliation. Findings showed that "all Jewish religious groups reported equivalent levels of sexual abuse" and that the "prevalence of any form of childhood sexual abuse was statistically equivalent to national rates, except that females reported less involuntary penetration" (Rosmarin et al., 2018). Similarly, Katzenstein and Aronson-Fontes (2017) note that although there is an under-reporting of abuse rates in the OJC in national statistics, the rates seem to be similar to those of the general population. Rosmarin and colleagues (2018) also found that "sexual abuse was associated with increased likelihood of psychiatric diagnosis" and mental distress. Further, Benyovits (2013) researched individuals within the OJC that exhibit a comorbidity of being a victim of sexual abuse and having "organic vulnerabilities" (such as a low IQ) and concluded that these two factors are key in understanding potential pedophilic interests of CSA victims from the OJC.

In short, Akiva's early experience of being sexually abused by his babysitter, as well as the broader context of how sexually is framed and discussed in the OJC could be seen as a mitigating factor in his offence. As there is no indication that this abuse was ever processed or addressed, it seems highly likely that it contributed to his viewing of CSAM material.

## II.     <u>Impact of Domestic Violence on Child Development</u>

By all accounts, Akiva's early development was marked by exposure to domestic violence. Decades of research consistently shows that exposure to domestic violence has profound effects on children's development. Meta-analyses demonstrate that children who witness violence between caregivers exhibit higher rates of anxiety, depression, aggression, and trauma symptoms than their peers. These difficulties can persist into adolescence and adulthood, affecting both emotional regulation and social functioning (Evans, Davies, & DiLillo, 2008; Kitzmann, Gaylord, Holt, & Kenny, 2003).

Longitudinal studies confirm that children exposed both to domestic violence and direct child abuse are at especially high risk for internalizing and externalizing problems, with effects that are additive and long-lasting (Moylan et al., 2010). Critically, research emphasizes that "witnessing" violence is not benign. Children who observe violent interactions in the home display developmental problems comparable in severity to those who are directly abused.

In sum, domestic violence disrupts children's sense of safety, increases emotional distress, and fosters patterns of withdrawal or aggression. These impacts can persist well beyond childhood and create enduring vulnerabilities.

*Domestic Violence in Orthodox Jewish Communities*

Studies conducted within Orthodox Jewish communities highlight unique cultural factors that shape the experience and impact of domestic violence. Survivors and community professionals describe barriers to disclosure, reliance on rabbinic authority, and a communal emphasis on secrecy and reputation management (Murugan, 2023; Band-Winterstein & Freund, 2018; Band-Winterstein & Tuito, 2018). These dynamics may prolong children's exposure to unsafe homes and limit their access to outside help or validation.

Although domestic violence is not exclusive to any culture, the way it is understood and managed within a community can affect its developmental consequences. In Orthodox Jewish communities, deeply held values such as maintaining family harmony ("shalom bayit"), reliance on rabbinic authority, and fear of communal shame can impede help-seeking and encourage victims, especially children, to remain silent. This dynamic often reinforces self-blame and internalized shame, potentially increasing the long-term emotional impact on young people and undermining healthy emotional coping and support-seeking. (Ringel & Bina, 2007).

*Domestic Violence and Future Sexual Deviance*

Research indicates that exposure to interparental hostility and family violence can distort attachment and sexual development in later life. Studies with college populations show that interparental hostility predicts sexual aggression perpetration, mediated by insecure attachment patterns and distorted sexual norms (Sutton & Simons, 2015). Other studies demonstrate that men who witnessed violence are more likely to engage in sexual coercion in their own relationships (Craft & Serovich, 2005). Childhood emotional abuse, which often accompanies domestic violence, has also been identified as a unique predictor of later sexual aggression perpetration and victimization (Zurbriggen, Gobin, & Freyd, 2010).

Taken together, these findings suggest that children raised in violent homes may internalize maladaptive models of intimacy. They may come to view relationships through the lens of control, fear, or secrecy, which can set the stage for later sexual maladjustment. This does not mean that domestic violence causes sexual deviance in a deterministic way, but rather that it increases the likelihood of maladaptive patterns that can interact with other vulnerabilities.

*Domestic Violence and the Development of CSAM Interest*

The available literature does not show a direct, isolated pathway from childhood domestic violence to later interest in CSAM. To date, no peer-reviewed study demonstrates a specific causal link between witnessing domestic violence and later CSAM offending. However, research on online CSAM offenders shows that many report adverse childhood experiences, including abuse, neglect, and family dysfunction. These adversities are consistently over-represented among CSAM offenders compared to general populations (Babchishin, Hanson, & Hermann, 2011; Babchishin, Hanson, & VanZuylen, 2014; Chopin, Fortin, & Paquette, 2022).

In this sense, domestic violence is best understood as one part of a broader cluster of adverse childhood experiences that undermine emotional regulation and increase reliance on maladaptive coping. A child who grows up in an unpredictable and frightening household may later seek out increasingly extreme forms of stimulation as a way to overcome chronic emotional blunting. For some, this pathway includes progression to deviant sexual material, including CSAM.

Reviews of recidivism and risk factors emphasize that while deviant sexual interest is the strongest predictor of CSAM offending, trauma, emotional numbing, and social isolation are commonly observed vulnerabilities (Paquette, Beauregard, & Lussier, 2024). In short, exposure to domestic violence in childhood is a well-established risk factor for long-term emotional, behavioral, and relational difficulties. Within Orthodox Jewish communities, communal norms and barriers to disclosure may intensify these risks by prolonging children's exposure and limiting support. Research demonstrates that such early environments can distort attachment and sexual development, raising vulnerability to maladaptive sexual behaviors. While the scientific literature does not show a direct causal pathway from witnessing domestic violence to CSAM

offending, it does establish that adverse childhood experiences, including domestic violence, are common among CSAM offenders and can contribute to maladaptive coping through fantasy, secrecy, and compulsive behaviors.

Recognizing this developmental context does not reduce the gravity of CSAM offending. It does not excuse or diminish responsibility. Rather, it provides a framework for understanding how a serious crime can emerge from a history of trauma and developmental disruption. This perspective can help the Court balance accountability with appropriate treatment and rehabilitation considerations.

### III.   Impact of Not Having a Healthy or Present Father Figure in Early Development

*Overview*

Across the developmental literature, consistent and supportive paternal involvement is associated with better socioemotional, behavioral, and psychological outcomes, whereas disrupted, low-quality, or absent fathering is linked with modest but reliable elevations in risk for adjustment problems. A systematic review of longitudinal studies found that greater father engagement predicts improved social/behavioral and psychological outcomes across childhood and adolescence (Sarkadi, Kristiansson, Oberklaid, & Bremberg, 2008). Broader parenting scholarship similarly emphasizes that fathers are consequential caregivers whose cognitive and emotional inputs contribute uniquely to children's regulation, social competence, and learning, reinforcing that "fathers are parents, too" in developmental models (Cabrera, Tamis-LeMonda, Bradley, Hofferth, & Lamb, 2018). Patterns of father involvement also show measurable heterogeneity, and profiles characterized by lower engagement are associated with less favorable behavioral and developmental indicators, particularly in families facing socioeconomic stressors (Yoon, Bellamy, Kim, & Yoon, 2021).

Father absence rarely occurs in isolation; it often co-occurs with interparental conflict and broader family stressors that collectively shape child outcomes. Meta-analytic work on parental divorce demonstrates small-to-moderate decrements across academic, behavioral, and emotional domains for children of divorce compared with controls, with conflict explaining a notable share of variance, underscoring that it is both the absence and the surrounding climate that matter for development (Amato & Keith, 1991). Together, these findings support a cautious but well-supported inference: when a father figure is unavailable or the father-child relationship is low in warmth and reliability, children face elevated risks for problems in self-regulation, internalizing/externalizing symptoms, and social functioning (Sarkadi et al., 2008; Cabrera et al., 2018; Amato & Keith, 1991).

*Cultural considerations in Orthodox Jewish communities*

Within Orthodox and ultra-Orthodox (Haredi) contexts, fathers often carry distinct spiritual, educational, and communal responsibilities, and community members themselves identify paternal presence and guidance as salient to child adjustment. Qualitative work with Haredi parents in Israel documents that fathers are positioned as central religious and behavioral guides, with community-defined notions of "risk" and "protection" shaping expectations for paternal leadership in children's daily life (Tsfati & Ben-Porat, 2018). Empirical research further indicates that paternal involvement and acceptance among ultra-Orthodox fathers vary with identifiable predictors, highlighting measurable heterogeneity in father–child relationships within this population and reinforcing the developmental relevance of paternal availability and relationship quality (Okun & Ne'eman, 2018). Recent work capturing fathers' perspectives in ultra-Orthodox communities similarly portrays paternal roles as consequential for children's coping and socialization, consistent with broader developmental findings while embedded in a

distinctive cultural framework (Gemara, Leventhal, & Iskak-Leibovich, 2023). In settings where fathers are culturally assigned core spiritual/educational functions, disruptions in healthy paternal availability or relationship quality may therefore carry amplified developmental costs for children's regulatory and relational development (Tsfati & Ben-Porat, 2018; Okun & Ne'eman, 2018; Gemara et al., 2023).

*Links to Later Sexual Offending (non-CSAM specific)*

In offender research, disrupted caregiving, poor parent–child bonding, and low-quality parental relationships, particularly involving fathers, recur as developmental risk markers (not determinants) for later sexual offending. A comprehensive review concludes that paternal influences are most evident where sons witness paternal violence or sexual aggression (social-learning pathways) and where father–son attachment is poor; demographic traits of fathers are less predictive than relationship quality and modeled behavior (Sitney & Kaufman, 2021).

Consistent with attachment-based pathways, juvenile sexual offenders tend to report especially poor caregiver relationships relative to non-sexual offenders and community controls, with lower relationship quality when the primary caregiver is male, underscoring the salience of early caregiving stability and father–child relationship quality (Sitney & Kaufman, 2019/2020). Earlier empirical comparisons likewise found deficits in perceived parental care/bonding among child molesters relative to other offender groups, again implicating compromised early attachment as a developmentally relevant risk factor (Craissati, McClurg, & Browne, 2002). These findings support a circumscribed inference: unhealthy or unavailable fathering can contribute to attachment insecurity and maladaptive models of intimacy/control that are over-

represented among some sexual-offending subgroups (Sitney & Kaufman, 2021; Sitney & Kaufman, 2019/2020; Craissati et al., 2002).

Akiva's case history reflects longstanding social withdrawal, limited age-typical dating, and reliance on fantasy. Developmentally, intimacy deficits and loneliness are repeatedly observed among sexual-offending groups and are theorized to distort sexual learning and coping, especially when paired with poor self-regulation (Marshall, 1989; Ward & Beech, 2006). Reviews focused on online/CSAM offending similarly note socio-affective difficulties (e.g., loneliness, intimacy problems) in a meaningful subset of offenders and highlight that online offenders often present with a different profile: less general antisociality but more sexual-deviance markers than contact offenders (Houtepen, Sijtsema, & Bogaerts, 2014; Babchishin, Hanson, & VanZuylen, 2014). In such contexts, social immaturity and isolation can reduce opportunities to develop healthy attachment templates and make fantasy-based coping more reinforcing, thereby increasing the likelihood of persistent CSAM use when other motivational factors are present—again, not as exculpation but as clinically relevant context for risk formulation and treatment planning (Ward & Beech, 2006; Houtepen et al., 2014).

*Evidence related to CSAM offending specifically*

The peer-reviewed CSAM literature does not establish a direct, isolated causal link between "father absence" per se and later CSAM use. Instead, comparative and meta-analytic studies show that people convicted of online child sexual exploitation material offenses, as a group, report higher rates of adverse childhood experiences and psychosocial adversities than general population samples and differ in several respects from contact offenders, all suggesting partly distinct pathways that include deviant sexual interests, opportunity structures online, and

14

social isolation (Babchishin, Hanson, & Hermann, 2011; Babchishin, Hanson, & VanZuylen, 2014; Houtepen, Sijtsema, & Bogaerts, 2014). Narrative and quantitative reviews emphasize heterogeneity and caution against over-interpreting any single family-of-origin variable; the most defensible framing is that early attachment disruptions and broader adverse caregiving experiences are among several developmental vulnerabilities observed in some online/CSAM offending profiles, without implying determinism or excuse (Houtepen et al., 2014; Babchishin et al., 2014; Christensen, Tsagaris, & Elbert, 2020). Accordingly, unhealthy father–child relationships may contribute to background vulnerability through effects on attachment and regulation (Babchishin et al., 2011; Houtepen et al., 2014; Christensen et al., 2020).

## IV.   Impact of Untreated/Unaddressed CSAM Interest on Escalation of Use and Increased Risk-Taking

Unaddressed deviant sexual interests and offense-supportive cognitions can sustain and intensify offending patterns when opportunity and disinhibiting "facilitators" (e.g., anonymity, self-regulation problems) are present. In the Motivation–Facilitation Model, sexual interest in children combined with such facilitators increases the likelihood of continued or riskier offending unless these factors are actively managed in treatment (Seto, 2019).

Patterns in how people use CSAM are also relevant to escalation. Mixed-methods work with adjudicated CSAM users indicates that novelty-seeking and diversification of content categories can emerge with continued, unmanaged use. Behaviors linked to building larger, more varied collections and to riskier acquisition practices are common (e.g., trading, seeking rarer material) (Steel, Newman, O'Rourke, & Quayle, 2021). Although not every user follows this trajectory,

observed movement toward novelty/diversity is consistent with a drift toward greater risk-taking when underlying motivations and cognitions remain unaddressed (Steel et al., 2021).

Specific to Akiva, his psychological record describes longstanding depressive symptoms and emotional blunting. Contemporary affective-neuroscience shows that major depression is characterized by anhedonia (diminished reward sensitivity and reduced reactivity to ordinary positive stimuli) driven by disruptions in mesocorticolimbic reward circuits; these deficits are robust across behavioral and neuroimaging paradigms (Pizzagalli, 2014; Admon & Pizzagalli, 2014). In clinical populations, such blunting can foster compensatory, sensation-seeking behaviors aimed at "feeling something," particularly when emotion regulation is poor (Pizzagalli, 2014). In parallel, work on problematic pornography use repeatedly links emotion-regulation difficulties and negative affect to escalation and persistence of use (Cardoso et al., 2022; Vescan et al., 2024). Within the Motivation–Facilitation Model of sexual offending, depressed mood, emotional numbing, and dysregulated coping function as facilitators that increase the probability of continued online sexual offending when deviant interest or opportunity is present, unless specifically addressed in treatment (Seto, 2019). Seen through this framework, the behavior here is better understood as maladaptive self-medication of chronic dysphoria and numbing, not as predation, while fully preserving the seriousness and accountability attached to CSAM offenses (Seto, 2019; Pizzagalli, 2014).

Risk-assessment research underscores that dynamic factors: sexual deviance, offense-supportive beliefs, and self-regulation problems—are predictive of recidivism among men adjudicated for CSAM offenses; without targeted intervention, these same dynamic risks persist. In a CSAM-specific validation, risk tools significantly predicted recidivism; most sexual

recidivism in online-only cases took the form of further CSAM offenses, i.e., persistence and potential intensification in the same domain when risks are not addressed (Babchishin, Dibayula, McCulloch, Hanson, & Helmus, 2023). Temporal-order analyses also identify a subgroup who escalate from CSAM to contact offending; those who escalated had higher risk profiles (including more substance-use problems), suggesting that unmanaged facilitators contribute to more hazardous behaviors over time (Babchishin, Lee, Eke, & Seto, 2022).

Specific to Akiva**,** Dr. Sheiner notes that Akiva "does not meet the diagnostic criteria for paraphilia or pedophilia," that "all of his intimate contacts have been adult and heterosexual," and that his online behavior reflected a "quest to find material that would be 'shocking' … 'so I could feel something'," indicating an attempt to break through trauma-related emotional numbing rather than a predatory fixation. He further records that "his arousal was quickly extinguished with exposure," a pattern consistent with numbing rather than sustained deviant arousal. Finally, all risk measures utilized show low risk for recidivism. In this context, untreated depressive/anhedonic states and maladaptive coping can facilitate persistent online offending, whereas targeted intervention (mood treatment, emotion-regulation work, offense-specific CBT, and external controls) directly addresses the modifiable mechanisms sustaining use.

*Treatment Impact*

Results from Dr. Sheiner's risk assessment indicates that Akiva would be a positive candidate for intensive outpatient treatment. Properly delivered treatment can reduce sexual recidivism risk and, for some individuals, substantially diminish deviant sexual preoccupation to the point that CSAM use ceases. Meta-analyses of sex-offense treatment show lower sexual recidivism among treated versus untreated groups, supporting the conclusion that evidence-based

17

interventions change risk-relevant behavior at the group level (Hanson et al., 2002; Schmucker & Lösel, 2017). For CSAM users specifically, a randomized, placebo-controlled trial with anonymous Darknet-recruited participants found that therapist-supported, internet-delivered CBT ("Prevent It") led to significantly greater reductions in weekly CSAM viewing time than psychological placebo (Lätth et al., 2022). Pharmacological approaches recommended in international guidelines (e.g., SSRIs for impulse/compulsivity; testosterone-lowering agents for high-risk cases) also reduce deviant sexual preoccupation. In a randomized clinical trial, the GnRH antagonist degarelix significantly reduced a composite risk score, driven by decreases in pedophilic-disorder symptoms and sexual preoccupation, within two weeks versus placebo (Thibaut et al., 2020; Landgren et al., 2020).

In short, CSAM use is a serious crime that perpetuates the sexual exploitation of children. The evidence indicates that (a) ongoing CSAM consumption and offense-supportive cognitions are linked to further online sexual recidivism, (b) some individuals broaden or intensify use patterns over time, and (c) a smaller subgroup escalates to contact offending—particularly where disinhibitors and dynamic risks remain unaddressed. Correspondingly, structured assessment and targeted treatment (CBT addressing offense-supportive cognitions/self-regulation, and when indicated, pharmacotherapy) are central to risk management; conversely, lack of intervention leaves the very factors associated with continued and riskier offending intact (Seto, 2019; Babchishin et al., 2023; Lätth et al., 2022; Landgren et al., 2020; Schmucker & Lösel, 2017). As such, while a punitive approach to CSAM use is understandable given the heinous nature of the crime, untreated dynamic risks would persist. Therefore, pairing accountability with evidence-based monitoring and treatment is more likely to reduce reoffending. Given Akiva's low measured risk as determined by Dr, Sheiner, a robust treatment and management program, based

on scientifically validated best practices, has a high degree of probability of addressing the underlying issues. I am happy to furnish a comprehensive treatment plan that would be most consistent with the scientific literature on reducing the chances for recidivism that would include external monitoring, communal and familial involvement, and individual treatment protocols.

## Summary of Mitigation Report Findings

In sum, this report does not excuse CSAM use; rather, it explains context relevant to individualized, accountability-focused sentencing. Akiva is a victim of untreated and unprocessed childhood sexual abuse. This abuse takes on additional significance based on cultural factors. Additionally, the literature shows that exposure to domestic violence in childhood is associated with lasting elevations in anxiety, depression, and behavioral dysregulation, and that in Orthodox Jewish settings community dynamics can delay disclosure and help-seeking, amplifying shame and silence. Independent of violence, consistent, supportive fathering is protective, whereas low-quality/absent fathering and high conflict are linked with modest but reliable increases in maladjustment. Consistent CSAM use has been linked to increased need for more shocking stimuli and higher levels of risk-taking associated with obtaining material. If requested, a separate filing can outline enforceable treatment, supervision and risk-management options.

Gavriel Fagin, Ph.D.   *Gavriel Fagin*
Director, Tikunim Counseling Services, PLLC
Sexual Offender Treatment Specialist
Clinical & Research Member, Association for the Treatment of Sexual Abusers






# References

Admon, R., & Pizzagalli, D. A. (2015). Dysfunctional reward processing in depression. *Current Opinion in Psychology, 4*, 114–118. https://doi.org/10.1016/j.copsyc.2014.12.011

Amato, P. R., & Keith, B. (1991). Parental divorce and the well-being of children: A meta-analysis. *Psychological Bulletin, 110*(1), 26–46. https://doi.org/10.1037/0033-2909.110.1.26

Babchishin, K. M., Hanson, R. K., & Hermann, C. A. (2011). The characteristics of online sex offenders: A meta-analysis. *Sexual Abuse, 23*(1), 92–123. https://doi.org/10.1177/1079063210370708

Babchishin, K. M., Hanson, R. K., & VanZuylen, H. (2014). Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline sex offenders against children. *Archives of Sexual Behavior, 44*(1), 45–66. https://doi.org/10.1007/s10508-014-0270-x

Babchishin, K. M., Lee, S. C., Eke, A. W., & Seto, M. C. (2022). Temporal order of sexual offending is risk-relevant for individuals with child sexual exploitation materials offences. *Sexual Offending: Theory, Research, and Prevention, 17*, e7229. https://doi.org/10.5964/sotrap.7229

Band-Winterstein, T., & Freund, A. (2018). "Walking between the raindrops": Intimate partner violence in the ultra-Orthodox society in Israel from social workers' perspective. *Journal of Interpersonal Violence, 33*(19), 3001–3024. https://doi.org/10.1177/0886260516633218

Band-Winterstein, T., & Tuito, I. (2018). The meaning of choosing a spouse among ultra-Orthodox Jewish women who found themselves in a violent relationship. *Violence Against Women, 24*(6), 727–744. https://doi.org/10.1177/1077801217722236

Barnett, M. E., Brodsky, S. L., & Neal, T. M. S. (2011). Mitigation evaluations: A survey of current practices. *Journal of Forensic Psychology Practice, 11*(1), 21–41. https://doi.org/10.1080/15228932.2011.521724

Cabrera, N. J., Tamis-LeMonda, C. S., Bradley, R. H., Hofferth, S., & Lamb, M. E. (2018). Fathers are parents, too! Widening the lens on parenting for children's development. *Child Development Perspectives, 12*(3), 152–157. https://doi.org/10.1111/cdep.12275

Cardoso, J., Ramos, C., Brito, J., & Almeida, F. (2023). Difficulties in emotion regulation and problematic pornography use: The mediating role of loneliness. *International Journal of Environmental Research and Public Health, 20*(10), 5970. https://doi.org/10.3390/ijerph20105970

Christensen, L. S., Tsagaris, G. S., & Elbert, M. J. (2020). Offenders convicted of child sexual exploitation material offences: Characteristics of offenders and an exploration of judicial censure. *Psychiatry, Psychology and Law, 27*(5), 756–775. https://doi.org/10.1080/13218719.2020.1742240

Evans, S. E., Davies, C., & DiLillo, D. (2008). Exposure to domestic violence: A meta-analysis of child and adolescent outcomes. *Aggression and Violent Behavior, 13*(2), 131–140. https://doi.org/10.1016/S1359-1789(08)00007-4

Fagin, C. G. (2015). The moderating effect of religion and spirituality on the relationship between childhood sexual abuse and negative outcomes among a sample of Orthodox Jewish men (Doctoral dissertation, Yeshiva University).

Finzi-Dottan, R., & Gilerenter, I. (2018). Ultra-Orthodox Jewish fathers in Israel: Predictors of paternal involvement and acceptance. *Journal of Family Issues, 39*(18), 4106–4130. https://doi.org/10.1177/0192513X18761118

Gemara, N. (2023). "The feeling is what counts": Fathers' perspectives on child risk and protection within the ultra-Orthodox context. *International Journal of Environmental Research and Public Health, 20*(5), 4385. https://doi.org/10.3390/ijerph20054385

Hanson, R. K., Gordon, A., Harris, A. J. R., Marques, J. K., Murphy, W., Quinsey, V. L., & Seto, M. C. (2002). First report of the Collaborative Outcome Data Project on the effectiveness of psychological treatment for sex offenders. *Sexual Abuse, 14*(2), 169–194. https://doi.org/10.1177/107906320201400207

Houtepen, J. A. B. M., Sijtsema, J. J., & Bogaerts, S. (2014). From child pornography offending to child sexual abuse: A review of child pornography offender characteristics and risks for cross-over. *Aggression and Violent Behavior, 19*(4), 466–473. https://doi.org/10.1016/j.avb.2014.07.006

Kitzmann, K. M., Gaylord, N. K., Holt, A. R., & Kenny, E. D. (2003). Child witnesses to domestic violence: A meta-analytic review. *Journal of Consulting and Clinical Psychology, 71*(2), 339–352. https://doi.org/10.1037/0022-006X.71.2.339

22

Landgren, V., Lundström, S., Kennerfalk, A., Andiné, P., Jokinen, J., & Rahm, C. (2020). Effect
of gonadotropin-releasing hormone antagonist on risk of committing child sexual abuse
in men with pedophilic disorder: A randomized clinical trial. *JAMA Psychiatry, 77*(9),
897–905. https://doi.org/10.1001/jamapsychiatry.2020.0938

Lätth, J., de Blanche, A., Carlbring, P., Arver, S., Dhejne, C., Hietanen, P., … Engqvist, U.
(2022). A randomized, placebo-controlled trial of internet-delivered CBT for people who
use child sexual abuse material ("Prevent It"): Reduced CSAM use versus placebo.
*Internet Interventions, 27*, 100498. https://doi.org/10.1016/j.invent.2021.100498

Marshall, W. L. (1989). Intimacy, loneliness and sexual offenders. *Behaviour Research and
Therapy, 27*(5), 491–503. https://doi.org/10.1016/0005-7967(89)90073-5

Meixner, J. B., Jr. (2022). Modern sentencing mitigation. *Northwestern University Law Review,
116*, 1395–1458. https://doi.org/10.2139/ssrn.3891100

Moylan, C. A., Herrenkohl, T. I., Sousa, C., Tajima, E. A., Herrenkohl, R. C., & Russo, M. J.
(2010). The effects of child abuse and exposure to domestic violence on adolescent
internalizing and externalizing behavior problems. *Child Abuse & Neglect, 34*(10), 734–
741. https://doi.org/10.1016/j.chiabu.2010.03.001

Murugan, V. (2023). Intimate partner violence in an Orthodox Jewish community in the United
States: A qualitative exploration of community members' perspectives. *Violence Against
Women, 29*(6–7), 1368–1390. https://doi.org/10.1177/10778012221120444

Paquette, S., & Brouillette-Alarie, S. (2025). Online sexual offending against children: Recidivism rates and risk factors—A systematic review. *Sexual Abuse, 37*(6), 635–666. https://doi.org/10.1177/10790632241309631

Paquette, S., Beauregard, E., & Lussier, P. (2024). Online sexual offending against children: Recidivism rates and risk factors—A systematic review. *Sexual Abuse.* Advance online publication.

Pizzagalli, D. A. (2014). Depression, stress, and anhedonia: Toward a synthesis and integrated model. *Annual Review of Clinical Psychology, 10*, 393–423. https://doi.org/10.1146/annurev-clinpsy-050212-185606

Ringel, S., & Bina, R. (2007). Understanding causes of and responses to intimate partner violence in a Jewish Orthodox community: Survivors' and leaders' perspectives. *Research on Social Work Practice, 17*(2), 277–286. https://doi.org/10.1177/1049731506293727

Sarkadi, A., Kristiansson, R., Oberklaid, F., & Bremberg, S. (2008). Fathers' involvement and children's developmental outcomes: A systematic review of longitudinal studies. *Acta Paediatrica, 97*(2), 153–158. https://doi.org/10.1111/j.1651-2227.2007.00572.x

Schmucker, M., & Lösel, F. (2017). Sexual offender treatment for reducing recidivism among convicted sex offenders: A systematic review and meta-analysis. *Campbell Systematic Reviews, 13*(1), 1–75. https://doi.org/10.4073/csr.2017.8

Seto, M. C. (2019). The Motivation–Facilitation Model of sexual offending. *Sexual Abuse, 31*(1), 3–24. https://doi.org/10.1177/1079063217720919

Sitney, M. H., & Kaufman, K. L. (2020). The impact of disrupted caregiving for juvenile sexual offenders. *Journal of Sexual Aggression, 26*(2), 274–287. https://doi.org/10.1080/13552600.2019.1618933

Sitney, M. H., & Kaufman, K. L. (2021). A chip off the old block: The impact of fathers on sexual offending behavior. *Trauma, Violence, & Abuse, 22*(4), 961–975. https://doi.org/10.1177/1524838019898463

Steel, C. M. S., Newman, E., O'Rourke, S., & Quayle, E. (2021). Collecting and viewing behaviors of child sexual exploitation material offenders. *Child Abuse & Neglect, 118*, 105133. https://doi.org/10.1016/j.chiabu.2021.105133

Thibaut, F., Cosyns, P., Fedoroff, P., et al. (2020). WFSBP 2020 guidelines for the biological treatment of paraphilias. *The World Journal of Biological Psychiatry, 21*(6), 412–490. https://doi.org/10.1080/15622975.2019.1699096

Tsfati, M., & Ben-Porat, Y. (2018). "Spiritual risk": Ultra-Orthodox Jewish parents' perceptions of risk and protection for children in secular society. *British Journal of Social Work, 49*(5), 1198–1216. https://doi.org/10.1093/bjsw/bcy097

Vescan, A. B. N., Flack, M., & Montgomery, A. A. (2024). Loneliness and problematic pornography use: A systematic review and meta-analysis. *Addictive Behaviors Reports, 19*, 100550. https://doi.org/10.1016/j.abrep.2024.100550

Ward, T., & Beech, A. R. (2006). An integrated theory of sexual offending. *Aggression and Violent Behavior, 11*(1), 44–63. https://doi.org/10.1016/j.avb.2005.05.002

Yoon, S., Bellamy, J. L., Kim, W., & Yoon, D. (2021). Patterns of father involvement and child development among low-income families. *International Journal of Environmental Research and Public Health, 18*(24), 13198. https://doi.org/10.3390/ijerph182413198

# EXHIBIT C

## <u>Treatment & Risk-Management Plan</u>

**Subject:** Shenkman, Akiva DOB 09/12/1985

**Purpose:** This plan supports personal growth, accountability and public safety by pairing court-ordered supervision with evidence-based treatment, monitoring, and graduated controls. It is designed for a defendant whose CSAM use occurred in the context of chronic depression/anhedonia and maladaptive coping, rooted in multi-layered childhood trauma. The plan treats the current charge with the seriousness it deserves while providing the highest potentiality for the management of risk drivers in order to prevent re-offense and create the best chances of growth and development for Akiva.

**Treatment Plan Components:** The treatment plan will be comprised of four (4) essential elements: Court ordered supervision, family/community-level supervision, 1–3-month initial inpatient treatment, and continued outpatient treatment. Each of these components will be discussed below.

## I. Court-Ordered Supervision & Internet Restrictions

*Core conditions*

- Akiva will be enrolled in the U.S. Probation program and will comply will all rules and regulations set forth in their policies and procedures. He will install monitoring software to all internet-capable devices and pay directly for third-party monitoring.

- No personal access to the internet or internet-enabled devices unless explicitly approved by the Court/Probation and monitored as described below.

Page **1** of **12**

- No smartphones; basic (feature) phone only.

- No VPN/TOR/proxies, no encrypted messengers, no peer-to-peer or cloud file-sharing, no public Wi-Fi, internet cafés, libraries, or shared terminals.

- Residence & workplace inspections: unannounced digital/media checks (computers, drives, smart TVs, gaming consoles, printers, routers).

- Device controls: whitelisted devices, whitelisted sites, endpoint monitoring with screen capture/URL logging, DNS filtering at router, read-only USB policy, and administrator-only software installs.

- Data-sharing consents: signed releases allowing treatment, monitoring provider(s), and Probation to share compliance information.

- Device audit reports; inspection logs; any violation notices; treatment attendance logs.

**II. 30–90 Day Inpatient Phase (CSAM-Specific)**

*Timing:* Admit within 14 days of release; length 30–90 days, contingent on progress and discharge criteria.

*Program elements (must-have features):*

- Offense-specific CBT for online sexual offending: offense chain analysis, offense-supportive cognition restructuring, sexual self-regulation skills, lapse/relapse prevention planning, and values-based goals.

- Digital behavior & safety curriculum: triggers for online seeking, novelty mechanisms, digital hygiene, stimulus control, and concrete post-discharge device rules.

- Mood & emotion regulation: evidence-based depression treatment; skills for anhedonia and emotional numbing (behavioral activation, distress tolerance, cognitive therapy).

- Trauma-informed care: pacing and stabilization first; trauma processing only when clinically indicated and stable.

- Psychiatric evaluation within 3–5 days of admission for medication optimization.

*Suggested Features:*

- Cultural/Religious accommodations as applicable (e.g., kosher meals, prayer times, modesty needs, Shabbos needs).

- Family/supervisor orientation: training for designated community supervisors on boundaries, documentation, and escalation pathways.

*Discharge requirements:*

- Written Relapse Prevention & Safety Plan (triggers, warning signs, coping steps, people to contact).

- Signed Technology Access Agreement consistent with court conditions.

- Baseline ACUTE-2007 and STABLE-2007[1] assessments completed with scores explained to Probation.

- Confirmed outpatient appointments (individual therapy, psychiatry).

*Selected Program Options:*

**Paradise Creek Recovery Center (Malta, ID)** — Residential, sex-specific

- Program specializes in problematic sexual behaviors, sexual addictions, and *sexual offending behaviors*; pages explicitly reference online sexual offenses and child-pornography cases, and discuss working with court-mandated/legally involved clients.

  Website: <u>Paradise Creek Recovery Center+2Paradise Creek Recovery Center+2</u>

**Keystone Center – Extended Care Unit (Chester, PA)** — Residential, sexual-compulsivity track

- Long-running men's residential program for sexual compulsion/CSBD. Admissions vary case-by-case for justice-involved clients, so family must call to confirm CSAM acceptance and court coordination.

  Website: <u>Keystone Center ECUIITAP</u>

**Sańté Center for Healing (Argyle, TX)** — Residential with Compulsive Sexual Behavior Disorder track

---

[1] ACUTE-2007 and STABLE-2007 are structured, evidence-informed dynamic risk measures used to track short- and longer-term change; in this plan they guide supervision intensity and clinical targets, and are not used as stand-alone predictors of individual recidivism.

- Hospital-level continuum with a dedicated CSBD/sex-addiction program; accepts complex co-occurring presentations. Family must verify legal-status acceptance (they do not state CSAM explicitly online).

  Website: Sante Center+1

**Pine Grove – "Gratitude" Program (Hattiesburg, MS)** — Residential sex-addiction program for men

- Nationally known sex-addiction track. Admissions are individualized**; confirm willingness to accept clients with CSAM-related legal histories and coordinate with supervision.**

  Website: Pine Grove Behavioral Health+1

### III. Mandated Individual Therapy and Psychiatric Care (Outpatient/Post Inpatient)

#### A. CSAM Specific Therapy

Frequency & duration: 1×/week (60–90 min) for 24 months minimum, then step-down if criteria met.

Therapist qualifications: Licensed clinician with specialized training in sexual behavior problems/online sexual offending; willing to coordinate with Probation and use ACUTE/STABLE.

*Primary treatment themes:*

1. Offense chain & cognition: map antecedents; challenge offense-supportive beliefs; differentiate urge vs. anxiety and apply pause/label/allow skills.

Page **5** of **12**

2. Sexual self-regulation: stimulus control, arousal reconditioning where indicated, competing responses, and coping plans for high-risk contexts (e.g., late-night, isolation).

3. Mood/anhedonia: behavioral activation, rumination reduction, reward scheduling to reduce "use to feel something."

4. Shame & secrecy: build disclosure skills and responsibility taking without global self-condemnation; compassion-focused work as appropriate.

5. Attachment/skills: social skills and intimacy competence; expand pro-social routines that reduce isolation.

6. Technology boundaries: reinforce device rules, rehearse scripts for refusing access, and address rationalizations.

7. Relapse prevention 2.0: early-warning signs, red-flag thresholds, and specific escalation steps (who is called, what gets restricted).

Documentation: Brief progress note to Probation monthly: attendance, homework compliance, any concerning events.

## B. Trauma Informed Care

Frequency & duration: 1×/week (60–90 min) for 24 months minimum, then step-down if criteria met.

Therapist qualifications: Licensed clinician with specialized training in trauma informed care.

Primary treatment themes:

1. Impact of Childhood Sexual Abuse (CSA)

2. Impact of early domestic violence on development

3. Impact of lack of father figure, especially in light of Orthodox upbringing

   **C.  Psychiatric Care**

Initial evaluation: within 2 weeks post-discharge from inpatient program.

Core Targets: Depression/Anxiety management and libido control. Either maintain medication that was begun in Inpatient program or adjust as needed.

Follow-up cadence: monthly until stable; then every 8–12 weeks.

   **D.  Dynamic Risk Monitoring: ACUTE-2007 and STABLE-2007**

- Baseline: at inpatient discharge.

- ACUTE-2007 (short-term change items): monthly for 6 months, then quarterly if stable. STABLE-2007 (longer-term traits): every 6 months.

- Triggers for step-up (e.g., ACUTE elevation, non-attendance, device anomaly): immediate notification to Probation; temporary tightening of conditions (remove devices, increase therapy frequency, curfew, consider short stabilization admission).

### E.  Reporting & Accountability

- Monthly to Probation/Court: treatment attendance summary, ACUTE snapshot, device/inspection logs, any violations and corrective actions.

- Quarterly case conference (therapist + psychiatry + Probation; add supervisors as needed) to review progress and adjust controls.

- Violation protocol: immediate notice; automatic step-up (device confiscation, increased contact restrictions, added sessions, consider brief inpatient stabilization). Repeat or serious violations → notify Court for sanctions.

### F.  Polygraph (Optional, Court's Discretion)

- Purpose: adjunctive deterrence and disclosure support, not a stand-alone truth test.

- Timing: no sooner than 3–4 months post-discharge (after stabilization); then quarterly if Court orders.

- Scope: narrowly tailored compliance questions (e.g., "Since your last exam, have you accessed any internet-enabled device not approved by Probation?" "Have you viewed traded or possessed CSAM?").

- Due process: counsel aware; results contextualized with clinical and monitoring data.

### G.  Success Criteria (18-24 Months)

- No CSAM or illicit content/access detected.

- ACUTE trends stable or improving; STABLE unchanged or improved.

- Full attendance and homework compliance in therapy.

- Mood/anhedonia symptoms improved; social isolation reduced (documented schedule, activities).

- If used, polygraph exams without deception indications on compliance items.

## IV. Familial/Community Supervision (External Controls)

**A.** Supervisors: two same-gender adults (not cohabiting) approved by Probation; trained on boundaries and documentation, will be identified to:

1. Perform accompaniment to high-risk settings (synagogue, family weddings).
2. Perform spot checks for technology compliance.
3. Coordinate COSA (see below).

**B.** Circles of Support and Accountability (COSA)

Website for additional information: https://csgjusticecenter.org/publications/circles-of-support-and-accountability/?utm_source=chatgpt.com

*Model & Evidence*

- COSA (developed and researched by Robin J. Wilson, PhD) pairs a justice-involved "core member" with trained community volunteers, family members, therapists and

Probation to support safe reintegration; studies associate COSA participation with reduced recidivism among high-risk sexual offenders (See Wilson, Cortoni, & McWhinnie, 2009).

*Purpose in This Case*

- Provide structured, pro-social support and real-time accountability for Akiva during community reentry, in coordination with Court/Probation and treatment providers.

Circle Composition

- 3-5 vetted community volunteers trained for COSA through an therapist-guided COSA training program.  Volunteers are not parole officers or therapists; rather, they represent community interests while remaining mindful of Akiva's needs. These individuals can be lay-people, Rabbinic figures, and/or Civil/Auxiliary patrol community members.

- Any therapist that Akiva will be seeing

- The 2 family members identified as Supervisors

- Probation Officer, as per U.S. Probation Department policy

*Core Functions*

- Offer nonjudgmental guidance and practical support for safe community integration (e.g., job search, daily structure).

- Reinforce adherence to Court conditions and treatment recommendations (devices/Internet rules, curfew, attendance).

- Encourage ongoing participation in recovery resources (e.g., 12-step meetings, sponsor contact, individual therapy).

- Serve as a liaison for community concerns—receiving feedback, addressing complaints, and escalating risks per protocol.

*Boundaries & Safety*

- Clear role definitions; no clinical advice, no legal promises, no secrecy agreements.

- Clear rules regarding mandatory reporting to Probation/treatment for risk-relevant information or non-compliance.

*Meeting Cadence & Reporting*

- Start with weekly circle meetings (first 90 days), then taper to biweekly/monthly as stability is demonstrated.

- Maintain brief contact logs (attendance, themes, action items); monthly summary sent to Probation/treatment.

Training & Onboarding

- Initial training for volunteers on COSA principles, risk factors, boundaries, and escalation steps.

- Written agreements: confidentiality limits, mandatory reporting, communication channels.

*Integration with Supervision*

- COSA complements (does not replace) Court-ordered supervision, device restrictions, and clinical treatment.

- Circle lead coordinates with Probation and therapist for aligned messaging and swift response to warning signs.

The above plan represents my professional and clinical opinion about what best-practices could be to balance community safety and Akiva's treatment needs. This plan follows a containment model in which supervision, treatment, and monitoring operate in coordinated alignment, with shared information and swift, proportionate responses to risk indicators.

*Gavriel Fagin*

Gavriel Fagin, Ph.D.

Director, Tikunim Counseling Services, PLLC

Sexual Offender Treatment Specialist

Clinical & Research Member, Association for the Treatment of Sexual Abusers






# EXHIBIT D

# DEFENDANT'S CHARACTER REFERENCE LETTERS

| LETTER NUMBER | WRITER | DATE |
|---|---|---|
| I | Michal Deutsch nee Shenkman | December 9, 2024 |
| II | Yehoshua Klein | December 10, 2024 |
| III | Hillel M. Shenkman | December 10, 2024 |
| IV | Yoel Mendel Ashkenazi | December 10, 2024 |
| V | Izidor Mikhli, Esq. | December 11, 2024 |
| VI | Johanna Rosenberg | March 26, 2025 |
| VII | Esther M. Shkop, Ph.D. | March 26, 2025 |
| VIII | Avraham Kahn | March 26, 2025 |
| IX | Rabbi Moshe Yosef Unger | March 28, 2025 |
| X | Rabbi Yitzchak Shkop, Ph.D. | March 28, 2025 |
| XI | Marcus Lehmann | March 31, 2025 |
| XII | Dvora (Debbie) R. Shenkman | April 1, 2025 |
| XIII | David Shor | N/A |
| XIV | Yehuda Zirkin | N/A |
| XV | Chaim Shlomo Rothenberg | N/A |
| XVI | Malkie Citrin | N/A |
| XVII | Yosef Abramovitz & Sylvie Farkas | N/A |
| XVIII | Yisroel Shenkman | N/A |

JAFFE DEFENSE TEAM, P.C.
411 W. 13 Mile
Suite 150
Madison Heights, MI 48071

(248) 588-2297
Fax (248) 588-6075

I



**From the Desktop of Michal Deutsch, MSW**
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Author of *Kedushas HaGuf: A Guide for Jewish Parents on Talking to their Sons about Puberty*
Healthcare Compliance Researcher
Community Presenter on Parent Education for the Prevention of Child Sexual Abuse

Hon. Matthew F. Leitman

United States Federal District
Court Magistrate Judge
Easter District of Michigan

Your Honor,

Akiva is my brother. I am 3 years younger than him. There is nobody like Akiva. He is honest, generous, he has integrity, and he is fiercely faithful to his family, his friends and to what he believes.

Let me tell you about him so you understand who he is. One recent example is how Akiva came to NJ and spent the entire Sunday installing two split units in my home. He even gave me the units for free. He didn't charge me for a job that he could make upward to $10,000. Nevermind all the handyman work he does for his parents and his siblings. When Akiva leaves your house, your house is left better than it was before he arrived.

A few weeks ago, I wanted to fly out for a friend's funeral, I didn't have the funds, he loaned me more $700 for my last minute flight. In general, any time I have a large expense, I know that he would loan me money, no questions asked. And he never follows up asking for repayment.

One day I called Akiva to tell him about a friend of mine with 4 children that was drowning in debt and owed her local grocery store over $1k. I asked him if he was willing to give a few hundred dollars to assist toward the debt. He said he could help out without giving a definitive number. It turns out that he called the grocery store and anonymously paid off her entire debt. He didn't tell me. *He never seeks accolades for the good things he does.*

Years ago, Akiva was working as a kosher supervisor in a restaurant. They offered him over $10k to do Passover koshering and supervision. This required more complex knowledge of Jewish law that he didn't feel wholly competent. They increased their offer when he told them he wasn't qualified - to try to convince him to do it. He walked away. He wasn't going to take a job when he felt it would be fraudulent to the consumers.

If you are stuck in a blizzard, stranded, need help - at any hour - Akiva shows up to rescue you. Everyone simply expects it of him because he has conditioned us by his generosity of spirit.

Cont'd next page...

Michal Deutsch, MSW

Director of Research and Development
Compliance Consulting Group, Brick, NJ
ddeutsch@compliancecglic.com - for work-related matters
mdeutsch.mrs@gmail.com - for personal communications
732.569.4670 - cellphone



**From the Desktop of Michal Deutsch, MSW**
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Author of *Kedushas HaGuf: A Guide for Jewish Parents* on Talking to their Sons about Puberty
Healthcare Compliance Researcher
Community Presenter on Parent Education for the Prevention of Child Sexual Abuse

Cont'd

And instead of being depressed and reliant on others because he isn't married with children, he hosts friends for Friday night and Saturday Sabbath meals where he might serve you deep-fried fish, deep-fried beef, and deep-fried ice cream. He gives back by hosting these meals instead of constantly expecting invitations. (These are social norms in our community)

Akiva is non-judgmental. If you are a black person from the projects, a white person from the mountains, a rich person from the city or an immigrant from another country, Akiva will talk to you in earnest and find commonality. He is grateful to his Walmart cashier, kind to the car mechanic assistant, and tips the valet service. He shows *"kavod habriyus"* - respect to all living things.

He may not be charismatic, influential, or rich. And he may still watch cartoons, but everyone likes and respects him. And if you're lucky to be his friend or family - of which he has many - he will travel 16 hours+ to help you move. Like he did for me when I was pregnant more than 12 years ago. He showed up to Chicago, packed my apartment and drove a U-Haul while I was vomiting and my husband was holding my hair. (We took a plane and he drove the truck in sleet during January - no payment requested, no complaints, no resentment).

As a social worker, therapist, community collaborator and abuse prevention educator, I am hyper aware of grooming behaviors in adults. Akiva has NEVER demonstrated any type of grooming behavior to any of my children or his other nieces and nephews. *What I know was that he had very early childhood exposure to terrible sexually explicit material online and sexual abuse.*

I am asking that you allow him to attend a rehabilitation center so that he can begin his journey to healing. He has done so much for me, and we all rely on him. Especially our divorced, aging parents - requiring double the amount of parental assistance.

Michal Deutsch, MSW
**Director of Research and Development**
Compliance Consulting Group, Brick, NJ
ddeutsch@compliancecglic.com - for work-related matters
mdeutsch.mrs@gmail.com - for personal communications
732.569.4670 - cellphone



**From the Desktop of Michal Deutsch, MSW**
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Author of *Kedushas HaGuf: A Guide for Jewish Parents on Talking to their Sons about Puberty*
Healthcare Compliance Researcher
Community Presenter on Parent Education for the Prevention of Child Sexual Abuse

Cont'd

In his first week at Midland County Akiva discovered a 3 hour+ podcast episode on porn addiction, sexual abuse, and childhood trauma - that he asked me to share with our mother. Sharing this podcast was monumental, it is his way of saying "this happened to me". *He has been living in a tortured and silent shame all these years, but now that he was exposed, he is ready to tackle his trauma and his behaviors head on.* This is a good guy who is ready to do the right thing, and as I, and his friends demonstrate - doing the right thing is the nature of his very being.

**Akiva needs therapeutic rehabilitation not retribution.**

Thank you for your consideration.

Michal Deutsch nee Shenkman
Lakewood, NJ
December 9, 2024

**Michal Deutsch, MSW**

**Director of Research and Development**
Compliance Consulting Group, Brick, NJ
ddeutsch@compliancececgllc.com - for work-related matters
mdeutsch.mrs@gmail.com - for personal communications
732.569.4670 - cellphone

# II

Yehoshua Klein
1009 East 29 St.
Brooklyn NY, 11210
(646) 675 6562
Shua@ShuaKstudios.com

December 10, 2024

To the honorable presiding Judge Matthew Leitman,

I have known Dovid Akiva Shenkman for a long time. I was his housemate for several years, and remain his close friend. We lived together at his current residence of 1149 E. 18 Street in Brooklyn until I got married in 2017. Besides living together, I have gone on road trips and weekends with him, I have slept in the same room with him many times, I have camped with him, I have joked with him, gone to social events and parties with him, and prayed with him in synagogue. He has attended my wedding, and he hosted one of my post-wedding ceremonies. We still get together regularly on the Sabbaths and holidays for festive meals, and go on trips. I am writing to testify about his character, my experiences with him, and some observations about his behaviors. I specifically want to highlight that nothing I have seen indicates that he is a danger to anyone, or a risk to the community, or a flight risk.

I am also a fellow firearms enthusiast, I have gone to ranges and classes with him. He has always been safe and treated the firearms with respect and has always been generous with his knowledge and equipment in those situations. I have NEVER seen or heard of him threatening anyone with harm. I have never seem him show a firearm to a child in his home.

Dovid Akiva is always willing to help a friend, or a stranger. Before I met him, I know he used to do volunteer roadside assistance, and when we lived together he was part of an on-call group of people with all-wheel-drive vehicles for winter storms. Dovid Akiva is a well liked member of the community, and has no friction with neighbors. I don't attend the same synagogue as him, but I understand he is well regarded there also. Dovid Akiva helped distribute food to neighbors on his front porch (not inside his home), and during Covid was volunteering with a distribution network of food and PPE (Personal protective equipment).

In our Orthodox Jewish community, singles don't have the same social scene, since going to bars/lounges/clubs and dancing is frowned upon, and many singles have trouble with religiously appropriate social meeting places. (By Orthodox Jews, mingling of the sexes in the synagogue is not permitted.) Dovid Akiva has created his own community of singles (and later marrieds with our children) who socialize at meals at his home during the Sabbaths and holidays, which continues to this day. During my time living together with Dovid Akiva, we hosted many happy Sabbath and Holiday meals in the dining room of the home. I met my wife at a similar Sabbath meal, and after the meal, she asked me if I had ever attended a meal at "the house on East 18th St.", not knowing that I lived there and was one of

the hosts! I last attended a meal on this most recent Sukkot holiday (Oct 16-23, 2024) at his home with my wife and kids.

I never really had to take an accounting before of Dovid Akiva's behaviors around kids, but the shocking revelations of this case have forced me to put some serious thought to it. While I am not an expert in this area by any stretch, Dovid Akiva has never shown any signs of being creepy or grooming behaviors near my or other kids as long as I have known him.

I have never seen him to engage with a child in anything related to keeping secrets. I don't recall ever seeing him offer a child treats, and certainly never any form of alcohol or drugs. (While we always owned alcohol in the home, the home is drug free.) Children were never offered alcohol in our house. I have never seen him offering "forbidden" things, even snacks, to my or other kids. I have never seen him separating a child from their parent or the parent from their child under any pretext. He has never expressed or demonstrated any interest in physical contact with children beyond a high five... I have never seen a child sitting on his lap, hugging him, or caressing him, or vice versa, and all of our kids are comfortable around him. Our children are not afraid of him- signs that he never threatened or blackmailed any of them. He seems completely ambivalent to kids being in the house, while he hosts the adults. I have also never seen him acting cool for kids to get them to like him. I have never come into the house to find him alone with a child, or been there when there was a child not accompanied by their parent(s).

Additionally, the 2nd floor (where the bedrooms were of our home) was always strictly off limits to guests.... no children were ever up there (except my son when he was in my room with me when I lived there).

He also doesn't have anything in his home to attract children to visit... the sum of things in his home which kids would occupy themselves with while we were there was a total of one cookie tin of firefighter "action figures" and an old "where's Waldo" book. There is no play equipment or toys on his property... no trampoline, slide, swing, not even an outdoor bench. In short, there is not and was never anything to entice kids into his home.

I also should mention that after going to eat by him, my wife and I (and other guests with kids) often go with our kids to the playground on the next block. I have NEVER seen him enter the park on his corner or the large non-jewish school nearby... he probably has never thought about them as "his neighbors" since he has no connection with them. I take my kids to that playground anytime we are in the neighborhood, and I have never seen him there.

Dovid Akiva is a longtime member of the community, and a fixture of the neighborhood. Has an established business with repeat clients. He has lived in the same home for a long time and is not a transient. He has invested in his business, work vehicle, tools, clients, and equipment. He is well liked by his vendors and fellow tradesmen, who deride his work, which I think is the norm in that industry. Dovid Akiva has family here and a solid social circle. Dovid Akiva has no criminal record. He has never threatened or harmed anyone to my knowledge. I also observe that while verbal skills may not be his strong point, he understands how to live within the additional confines of legal decisions.... I know that

since we both got our permits, he has made sure to comply with the additional limitations which are incumbent upon anyone with a CCW, so if he is released with conditions, I am sure he will carefully comply with them.

The Prosecutors accuse him of being a danger to the community, and are saying that he has been on their radar since 2016, yet no one has EVER accused him of harming anyone since then... he has no history of being a threat to the public that entire time! On the contrary, he has been a friendly neighbor, a model citizen, and never a whiff of inappropriate contact with a minor.

This news has been a shock to all of his friends, we all know him well and trust him, I assume we would all be willing to speak on his behalf.

To be clear, we 100% agree that children are our most precious and vulnerable population, and must be protected at all costs. Children cannot consent to any form of sexual contact. People who harm children should be dealt with in the most severe manner. If you told me that Dovid Akiva had physically molested a child, I would volunteer to plug in the electric chair, personally.

Sadly, the internet and group chats has opened up the doors of shock content and unfortunately desensitized people who are exposed to this regularly. We still see on daily basis videos of crime, death, torture, abuse, and other horrible things, especially on the cutting edge breaking news channels, and the comments sections. Nowadays, it actually takes effort to avoid that. The fact that someone has a video of murder on his phone doesn't make him a murdered, the fact that someone has a video of a gory accident on his phone doesn't make him a mutilator, the videos we all have on our devices now of the war crimes being perpetrated on innocents and combatants does not make us war criminals. Millions of people this week shared the video of the Insurance company executive being shot in NYC, some with great glee, yet none of them are murderers. While I am disgusted that Dovid Akiva would have this content on his phone, I don't think he represents a danger to the public.

Thank you for taking the time to read my letter. I hope that the testimony, anecdotes, and observations I have shared will help guide your decisions dealing with Dovid Akiva in the coming days. May God Almighty continue to guide you in the Pursuit of Justice.

Please feel free to contact me with any questions.

Sincerely,
Yehoshua Klein



Hillel M. Shenkman

206 Martin Ave

Staten Island, NY 10314

December 10, 2024

The Honorable Matthew F. Leitman

United States Federal District Court Magistrate Judge

Eastern District of Michigan


Dear Judge Leitman,

I am writing to you in my capacity as his brother to offer a character reference for Akiva D Shenkman, who is currently before your court regarding a legal matter. It is with great sincerity that I hope this letter provides a deeper understanding of the person he is and the positive impact he has had on everyone fortunate enough to know him.


Growing up in a broken home, my siblings and I faced countless challenges, moving from one place to another, often with no stability or security. We bounced between parents' homes, frequently changing schools, and struggling to find a sense of belonging. Despite these overwhelming obstacles, Akiva remained remarkably grounded. He exhibited a resilience that I can only admire, refusing to allow his circumstances to define him. Where many could have become bitter or lost, Akiva chose a path of grace, perseverance, and hope. Watching him navigate our turbulent upbringing, I saw him time and again make the difficult choice to rise above the chaos, proving that the struggles we faced didn't have to determine who we became.


Despite the upheaval, Akiva remained a shining example of decency and moral integrity. Even when faced with overwhelming difficulties as a family, Akiva was the one who consistently provided support, showing up for others when it was needed most. He never turned to negative outlets like drugs, alcohol, or violence—he consistently chose to put others first.

Whether it was helping a friend, a family member, or anyone in need, Akiva has always been there with a listening ear, an open heart, and a helping hand. I've witnessed this countless times, as he would drop everything to offer his support, never expecting anything in return. Akiva's selflessness is a hallmark of his character, and it is this generosity that makes him truly special.

I remember a time when I was going through a tough period financially, struggling to make ends meet. Without hesitation, Akiva quietly stepped in, offering me financial help. He never sought recognition or credit, but I could see the sacrifice he made. His actions were a testament to the selflessness that defines him. His willingness to give, even when it meant personal hardship, speaks volumes about his character.

I've also witnessed Akiva's incredible willingness to lend a hand in more practical ways. Whether it was fixing broken things around the house or helping with repairs, Akiva has always been the first to step in and offer his assistance. His skill and determination in these situations have been a great source of relief, and his efforts were always given without hesitation or expectation of anything in return.

Akiva is beloved by everyone who knows him. It's not just his family who looks up to him—his friends, neighbors, and even acquaintances can speak to his generosity and integrity. The outpouring of support from those around him during this difficult time has been overwhelming. Many have reached out to express their admiration for him, offering to help however they can. His kindness is infectious, and it's clear that he has touched the lives of so many in meaningful ways.

While I do not have full knowledge of the details of the case before your court, I do know that Akiva is not someone who would intentionally harm another. I am confident that Akiva never intended to cause harm. We are all human, and while mistakes are part of life, they do not define us. The yetzer hora, the inclination to err, is a challenge we all face, but it is through learning

from our mistakes that we grow. Any misstep on Akiva's part was not born out of malice or ill intentions. Instead, his actions throughout life have consistently reflected kindness, generosity, and a deep desire to uplift others. His goodness is evident not only in how he interacts with people but also in the way he approaches challenges, always with an open heart and a helping hand. Whether it's offering support to a friend or family member or rolling up his sleeves to fix something broken around the house, Akiva's character shines through. He is always there for others, going above and beyond to make sure they are taken care of, with no thought of reward. His fundamental goodness and moral strength have been the cornerstone of his life.

A large portion of our family is not even aware of the situation Akiva is facing. I have kept this matter under wraps to protect his dignity and prevent any unnecessary distress for him or our family. While I considered asking other family members to write letters in support of him, I chose not to involve them due to the sensitive nature of the matter. I believe that by respecting Akiva's privacy during this time, I can help preserve his sense of dignity and ensure that he is not further burdened by unnecessary scrutiny. I know that protecting his reputation is of great importance to him, just as he has always done for others.

It is my firm belief that Akiva has the capacity to learn from this experience and grow stronger as a result. He has always been someone who seeks to improve and better himself, and I know that he will reflect deeply on this experience. Akiva has my full support as he works to move forward and continue making a positive impact in the lives of those around him.

Thank you for taking the time to consider my perspective. Please do not hesitate to contact me at (347)979-5525 or hlshenkman@gmail.com if I can provide any additional information.

Sincerely,

*Hillel Shenkman*

Hillel M. Shenkman

IV



# Congregation Alesk Linden

## 13 W Elm Street Linden NJ 07036
### 718-781-0408

To Judge Leitman,

Akiva has been a life long friend. We grew up together because he attended my father's synagogue near our homes.

I know him as the most reliable individual and a man of his word.

He volunteeres to help with the synagogue's maintenance and I always see him assisting on other communnal needs on a consistent and emergency basis. He consistently attends the synagogue's Torah classes. And, I've watched how he carefully navigates the sale of chometz (selling of leaven before Passover), for himself and his disabled mother – who he tends to with a sincere devotion. His honesty and meticulousness is what makes him stand out.

I, his friends, and the community know Akiva as a person to rely on. He is an asset to the community and poses no flight risk, as his friends and family are rallying around him to help move forward.

Yours sincerely,

Yoel Mendel Ashkenazi

12/10/2024

V

## THE LAW OFFICE OF IZIDOR MIKHLI, PLLC

3118 Quentin Road, 2nd Floor, Brooklyn, New York 11234
Tel (212) 933-9298 Fax (718) 795-4378
Email: izidor@mikhlilaw.com

December 11, 2024

The Honorable Matthew F. Leitman
United States Federal District Court Magistrate Judge
Eastern District of Michigan

Re: Akiva Shenkman

Dear Judge Leitman,

Kindly accept this letter as a character reference for Akiva Shenkman. I have known Akiva since 2010. I worked with his brother Yisroel and continue to do so until this day. I represented Akiva when he purchased his home as well as when he eventually sold it. Through my relationship with his brother, I have shared many dinners, holiday parties and family celebrations/occasions with the entire Shenkman family. My family and I have also invited him to many sabbath meals in the hopes of setting him up. My entire family adores him. Throughout that time, he has never said or done anything remotely negative to anyone present and has been nothing but kind, respectful and thoughtful.

Akiva works as an HVAC technician and is my first call when I need help in that area. Additionally, I have referred him to many friends and family members who dealt with similar issues and have had nothing but positive feedback from everyone, thanking me for the referral.

He is a very well-liked and respected member of his community and poses no threat as a flight risk whatsoever. Whatever it is that has caused him to end up where he currently is, knowing him the way I do, it would be nothing more than an opportunity for him to correct whatever issue he is dealing with, which is something I am confident he would take upon himself and successfully accomplish.

I thank you in advance for taking the time to read this and in the event any follow up is needed, I can be reached at the number above or on my cell phone at (917) 626-2959. Thank you.

Sincerely,

Izidor Mikhli, Esq.

# VI



To the Honorable Mathew F Leitman.

Dear judge Leitman.

My name is Johanna Rosenberg,  CEO at Billable Advanced Billing, and I have known Mr. Akiva Shenkman for over 9 years, during this time he has been a source of constant support and friendship, to the point where he kindly opened his home to me when I faced Homelessness,  after I got married, he and my husband which he also knew through the years, worked together often, making our friendship and professional relationship stronger, constantly inviting each other to our homes for dinners, birthdays, holidays, and Shabbat meals with other mutual friends and all of our kids, Akiva's house was always open to everyone, and everyone was happy to go to him including my kids, which still remember the last holiday of Succot, it was a very entertaining event for adults and children and like, I can only say that Akiva is not only an exceptional friend and businessman but ab exemplary citizen to whom many look up to.

 Thank you for taking the time to read this, please take Akiva's good character into account when reviewing his case.

*Sincerely,*

Johanna  Rosenberg

March 26th 2025

# VII



WISDOM OF TORAH
INSTITUTE

March 26, 2025

The Honorable Matthew F. Leitman
United States Federal District Court Magistrate Judge
Eastern District of Michigan

Re: Akiva D. Shenkman

My name is Esther Shkop, and I serve as Director of the Wisdom of Torah Institute. I devoted 32 years as Professor and then Dean at Hebrew Theological College, where I taught and guided adult students aged 18 to 80. I have published in academic journals on topics ranging from educational public policy to Biblical analysis. Since then, I have been lecturing primarily for adult audiences throughout the United States as well as in Europe and Israel. Concurrently, I have been serving on the board of Shalva, an organization supporting the victims of domestic abuse.

Outside of the public arena, I am the mother of seven children who are pillars in their various communities, highly accomplished in the professional and personal lives. More importantly, my children and their spouses make significant contributions to the welfare of their neighbors, donating their time and money to the needy and lonely. I am the proud grandmother and great-grandmother of a growing family. I have had ample opportunities to understand the struggles of young adults and have been privileged to help them navigate the challenges of common life, and the fallout of trauma.

Akiva Shenkman is my nephew, whom I've known since his birth. In his early childhood, after his parents' contentious divorce, his mother and family lived in Chicago near our home. When they later moved to the east coast, he would stay with us a few times every year and celebrated most holidays, particularly Passover and Succot, in our home. I had many occasions to observe his demeanor and behavior in the presence of my extended family, as he grew up alongside my own sons.

He always displayed deference and sensitivity to the needs of others. Throughout the years, he was the first to help in the household – cleaning up, making small repairs in the house, running errands to the grocery store. When the whole family comes together, and particularly when neighbors and friends join us, I can always rely on Akiva to assist. There is an especially gentle way about him, as he runs to carry the luggage of arriving guests, ensuring that visitors have a place to sit and are being served. The little ones – my grandchildren and great-grandchildren – love to play ball or go bowling with Akiva.

Like all families, we've gone through rough and sad times, especially when my elderly parents spent their final years in my home. Akiva was incredibly patient and compassionate, caring for my mother who was paralyzed by a stroke and bedridden for nearly four years. In the last year of his life, my father could rely on Akiva to take care of his needs with extraordinary tenderness. He was the first to volunteer to make airport runs, repair broken appliances, and drive the elderly to the doctor's office.

• 6850 North Francisco Avenue • Chicago, IL 60645 •

tel: (847) 423-6016 • fax: (847) 673-1490 • email: eshkop@wisdomoftorah.org • web: www.wisdomoftorah.org

Similarly, his concern for his mother – who is handicapped and living alone – has been exemplary.  Even now, he contacted me to ensure that his mother accompany us to Croatia for Passover and not be left alone – as he continues to offer to pay for her expenses.   Akiva seems to be more concerned with his family and friends than with his own gratification, and his sociability belies the struggles he faced as a child.

Whatever Akiva did – howsoever reprehensible - damaged only his own soul – he did not harm others, and I am confident that he poses no danger to anyone.  I know that he is deeply regretful and ashamed of his behavior.  I ask your honor to give him the opportunity to rebuild his life as soon as possible. He will continue to be a valuable and contributing member to society.

Respectfully,

Esther M. Shkop, Ph.D.



**Avraham Kahn**

**976 E 7th St**

**Brooklyn, NY 11230**

March 26, 2025

To the The Honorable Matthew F. Leitman

Dear Judge Leitman,

I am Avraham Kahn, the Director of Business Development at B&A Food Brokers, and I am writing this letter on behalf of my longtime friend, Akiva, to share my experiences with him and attest to his character.

I first met Akiva when I was single, and between 2008 and 2016, I rented a room from him as a housemate across three different apartments in Brooklyn. For those eight years, we spent nearly every Shabbos (Sabbath) weekend together. Akiva was an exceptional host—he would cook large amounts of food and invite our friends over for meals and board games, ensuring everyone felt welcomed and comfortable. His generosity and warmth made those gatherings a highlight for all of us.

Akiva is a deeply religious individual who consistently demonstrated his commitment to his faith. He prayed three times daily at the shul (synagogue) and adhered to the strictest kosher dietary laws. He also dedicated time to studying Torah with his rabbi several times a week.

His respect for his parents was evident in how he treated them, always with kindness and honor. Beyond that, Akiva's generosity extended to his friends and community. For example, he frequently traveled to Boro Park to assist an elderly man with tasks like shopping or fixing things around his house whenever the man called. He was always willing to lend a hand—whether it was repairing something at the synagogue, driving a neighbor to the airport or grocery store, or lending out his tools and belongings. He gave freely of his time and resources without hesitation.

In all the years I've known him, I have never witnessed any alarming behavior from Akiva that would suggest he poses a danger to anyone, let alone a child. He has always been a compassionate, reliable, and upstanding person in my eyes.

Thank you for taking the time to read this letter. I respectfully ask that you consider Akiva's good character and the positive impact he has had on those around him when reviewing his case.

Sincerely,

Avraham Kahn





בס"ד

# קהל שארית ישראל ד'וייטצען
## Congregation Shearis Yisroel

March 28, 2025

The Honorable Matthew F. Leitman
United States Federal District Court Magistrate Judge
Eastern District of Michigan

Your honor,

I serve as the spiritual leader of Congregation Shearis Yisroel, attended by Akiva and his family when they moved to Chicago shortly after his parents divorced. At that time, Akiva enrolled in the third grade, and I recall a sweet, very quiet and anxious child. I established a rather close relationship with Akiva at that time and over the years whenever he visited Chicago.

Akiva had difficulty adjusting to all the radical changes in the home, and he frequently seemed withdrawn. He was lagging in school, and it seems he had problems in reading – both in Hebrew and English. Interestingly, when I gently spoke to him about religious studies, his responses indicated he could comprehend the material. I guided his mother in finding a tutor to help him keep up with schoolwork.

Over the years, I've observed Akiva emerging as a kind and socially competent adult. He was always a welcome guest in the synagogue, admired for his courteous and warm demeanor. My family was especially grateful that he extended hospitality to our son, whom he frequently hosted when he was going through a difficult time in his life. Akiva had finally found a professional outlet and developed a reputation for reliable and honest HVAC installation and service. He opened his heart and home to other single young men in the Jewish community in Brooklyn – frequently hosting Shabbat meals. His early learning and social struggles made him especially sensitive and kind to the plight of the lonely and unfortunate, and at the same time I found him very humble and perhaps a bit sad.

I am confident that he poses no danger to anyone – young or old – and my experience has proven that young men drawn to self-corrosive behaviors usually suffered some serious trauma which can be healed. He is already bearing the punishment of stigmatization and shaming. Akiva needs – and will surely get – loving familial support and professional therapy.

Thank you.

Rabbi Moshe Yosef Unger

X



PROSPECT RESOURCES
ENERGY PROCUREMENT REDEFINED

March 28, 2025

The Honorable Matthew F. Leitman
United States Federal District Court Magistrate Judge
Eastern District of Michigan

Your honor, I am writing this reference for Akiva D. Shenkman, whom I've known since his birth.

My name is Yitzchak Shkop. After many years of study leading to rabbinic ordination, I came to the United States where I completed studies for a Ph.D. in Business Administration, specializing in Organizational Behavior, after which I was accepted as a faculty member at the University of Illinois in Chicago. After several years in academia – teaching and engaging in research, I went into the practice of business. Concurrently, I have engaged in Judaic teaching and have written several well-received books focusing on Judaic perspectives on interpersonal ethics.

Akiva and his siblings were very close to me - a bond that was forged when his mother moved to Chicago after her divorce. I always observed that Akiva was exceptionally gentle, avoiding contention and any quarrel. He always reached out to help – and even as a young child he seemed particularly empathetic. He was fun-loving and played well with our children and has since become the favorite "big cousin" to our grandchildren. I can emphatically state that Akiva would not – could not – hurt anyone.

Since his incarceration, Akiva and I have communicated. He is deeply remorseful and will never repeat his shameful lapse into immoral ideation. He feels defiled and is determined to dig himself out of the morass into which he fell. He is surrounded by many loving friends and relatives who have witnessed and come to adore his kind and gentle disposition.

We ask that he be given a chance to rebuild his life as early as possible so he can return to being the productive and generous member of the community and society at large.

Thank you.

Rabbi Yitzchak Shkop, Ph.D.

# XI

M.I. Lehmann
**1097 East 8 Street**
**Brooklyn, N.Y. 11230**
**917.309.1171**

March 31, 2025

**The Honorable Matthew F. Leitman**
**United States Federal District Court Magistrate Judge**
**Eastern District of Michigan**

My name is Marcus Lehmann and I reside with my wife and family in Brooklyn, NY. As a side note, my wife is originally from Detroit and we got married in 1989 in Dearborn, Michigan.

I work for Lehmann Engineering - a company that my father started over 50 years ago - doing primarily building inspection work.

I also volunteer as a mentor for the youth in our community and try to imbue in them the beauty of religion.

I have had the privilege to know Akiva Shenkman for over 10 years - as a neighbor and a friend - and **I have told him many times that he is my mentor!** I have told Akiva on numerous occasions that I don't know anyone as level headed and patient as him and I have never seen him loose his cool or be angry - regardless of the situation.

Akiva has also done air-conditioning repair work for us and his positive "can-do spirit" always impressed me as a breath of fresh air!

I have also reached out to Akiva many times to help out a large family in our neighborhood who are struggling financially and his generosity was always above and behind generous.

I was totally taken and in fact very emotional when Akiva's mother, Debbie, called me a few weeks ago and told me that Akiva - despite his difficult predicament - wanted to make sure the family was being properly supported and he offered the same monies that he previously offered - during better times!

I told this incident over to our common friends in the neighborhood and they were also quite taken by his magnanimity.

I always look forward to seeing Akiva and talking with and our conversations are always upbeat and inspiring.

Sincerely,

Marcus Lehm

Marcus Lehmann



April 1, 2025

Dvora R. Shenkman

22C Carnation Drive

Lakewood, NJ 08701

347-893-6843


The Honorable Matthew F. Leitman

United States Federal District Court Magistrate Judge

Eastern District of Michigan


As Akivas Shenkmans mother, I imagine that my letter will be taken with a grain of salt.  Despite a difficult childhood, his difficulties in learning to read, and his struggles with encopresis (soiling his pants), which lasted until the age of 10 or 11, leading to anxiety and shame.  Akiva developed into and a kind and considerate young man-know for generosity and compassion for family and friends and his community.

This is what I have witnessed over the years.

1.  On Shabbat and Holidays, he hosts friends and sometimes strangers that don't have where to eat
2.   Calls neighbors and friends before going to Costco and shops for them
3.   Has been secretly paying the debts of some destitute friends and helping his siblings with outstanding bills (paid his sisters midwife bill of $5,000.00)
4.  Never loses his cool, abundantly patient even when provoked
5.  Sponsoring a community member whose family doesn't celebrate the holidays for Passover Program
6.  Generously donating to a bride whose family struggles to pay for her wedding

There is so much that I can write about the Chesed (kindnesses) he shows..giving rides at very inconvenient time...helping others that need help in so many different ways.

Moreover, he has been particularly considerate of my handicap(I contracted polio as an infant and wear a full leg brace and us a cane and sometime crutches), particularly as I have aged and suffer chronic backpain.  He always walks at my pace and makes sure there is a wheelchair for me when we travel.  He insists on paying my travel expenses, carries my luggage and prepares extra headphones for me.  When I relocated to a 55+ community he moved my belongings and helped renovate my unit.  He has been paying my phone and insurance bills.  He is always on the lookout for ways to make me more comfortable-special pillows for my back and heating pads for my leg(por circulation)

Akiva could not hurt another human being.


Respectfully,

*Dvora R. Shenkman*

Dvora (Debbie) R. Shenkman



To The Honorable Matthew F. Leitman:

My name is David Y. Shor. I live in Brooklyn, NY. I'm a husband, and a father of five wonderful children.

Professionally I am certified by the FDNY to inspect Fire Sprinkler and Standpipe systems. I oversee the inspection of thousands of such systems.

I'm writing on behalf of a party before you, Akiva D. Shenkman. I have known Akiva for more than a decade, both professionally and personally.

When I needed an emergency repair in my home, Akiva was there and worked diligently to solve the problem. When my tenant's AC stopped working in the heat of August, Akiva did all he could to fix the machine so that they can be comfortable, and my bank won't break.

Akiva was always decent, and appropriate. Never did anyone feel uncomfortable in his presence. Akiva should not be defined by mistakes he deeply regrets. They don't define him.

I'm confident Akiva can be given another chance and he'll be an admirable member of society. Please give this matter your consideration.

Sincerely, David Shor

# XIV

# HVAC DEPOT

✳ 1227 McDonald Ave Brooklyn, NY 11230 (718) 874-1566 ✳
✳ 785 Vassar Ave Lakewood, NJ 08701 (732) 426-3428 ✳

The Honorable Matthew F. Leitman
United States Federal District Court Magistrate Judge
Eastern District of Michigan

My name is Yehuda Zirkin and I proudly serve as the coordinator for Staten Island Shmira Public Safety. I am dedicated to ensuring the safety and well-being of our community. I am also the founder and CEO of HVAC Depot Inc. a leading distributor of HVAC equipment in Brooklyn NY. Beyond my professional endeavors, I am deeply committed to education and I am honored to be the founder and CEO of Yeshiva Bais Haleivi, where 59 boys engage in daily learning.

I have known Akiva for about 10 years now and I got to know him through his work as an HVAC contractor. Over the years I have recommended him for numerous jobs, and the feedback from his customers have been nothing but positive. His professionalism, reliability, and expertise in the field have consistently impressed those he has worked with as well as myself.

Akiva is a person of exceptional character and I have witnessed his integrity and kindness firsthand. He is incredibly honest in business, always dealing with customers and colleagues with fairness and transparency. The feedback from his clients is consistently positive, reflecting his dedication to quality and customer satisfaction. Beyond his professional life, Akiva is always the first to step up in times of need, even when it's inconvenient for him. His willingness to help others, whether in business or the community, truly sets him apart as a dependable and selfless individual.

Yehuda Zirkin

*Yehuda Zirkin*

03/26/2025



**XV**



Yeshiva
Chachmey
Lublin

ישיבת
חכמי
לובלין

בס״ד

**Horav Moshe Rothenberg**
HONORARY ROSH YESHIVA
ראש ישיבת חכמי לובלין
דקרלויז נפש משנ״ה תש...

**Horav Chaim Shlomo**
**Rothenberg**
ROSH YESHIVA

ENDORSED BY
**Horav A. Brck**
רב בקהי חיים בגוון פאבן...
**Horav P. Hirschprung**
מורה אנ...
**Horav A. Pam**
ראש ...אישיבת תורה...
**Horav M. Stern**
רב ...דעברויא

SPONSORING COMMITTEE
Abish Brodt
Rabbi Michel Chill
Boruch Deppelt
Rabbi Binyomin Freidler
Chaim Gruenberg
Shlomo Landau
Hershel Landau
Josef Ostreicher
Rabbi Mayer Frienick
Yehudah Leib Puritz
Shlomo Hersh Spitzer
Rabbi Nisson Widman

Honorable Judge Leitman,

I have known Akiva since he is a young boy and have been in touch with him all these year. I knew his mother and his esteemed grandfather, as we were neighbors and I was second cousins with Akiva's grandmother

While I am getting on in years and am no youngster, I can tell you that Akiva is a good boy and a very religious boy.

He go to daven (pray) and keeps the Sabbath according to the laws. He is always doing favors for people. We learned Torah together for many years where he would come to my house at night to learn with me. I have been a widower for many years, and Akiva would always run if I need help. He fixes things around my house and stops and does chessed whenever he is needed.

He often gives me handy advice and is patient on the phone with me even though I don't always understand what he is saying right away

Another thing about Akiva is that he never raises his voice or says bad things about people. And his job is physically very tough. I saw how he had customers who didn't pay him. While I knew he was frustrated, he never got angry at them and he didn't talk bad about them. He is relaxed and calm and always says please and thank you.

He is too dedicated to the community and the people he helps, like me, to abandon us. Also, he will always try to do what's right.

Sincerely,
Chaim Shlomo Rothenberg
718-926-8953

Office 411 Avenue F, Brooklyn, N.Y. 11218 • Tel. (718) 436-0529



*Malkie Citrin*

404-435-2222
565 Greenland, Sandy Spring GA
reallygreatsite.com

......................................................

To the Honorable Judge Lightman,

I am the older sister of Akiva Shenkman.

I have 7 children and have always felt completely safe with them in Akiva's presence.  My husband is a lawyer and we often have guest in our home.  We are overprotective of our children and do not allow questionable people into our home.  We don't see Akiva often because we live in Atlanta, GA, but when myself and my children get to visit, it is always a great time, with his calm and practical demeanor.

This past summer my oldest son got married and my little boys clambered to dance with Akiva at the wedding. They love interacting with him. He is a very good sport. He  displays healthy boundaries always. The day after the wedding he kindly took them to Goodwill and bought them a bunch of toy cars and airplanes. As an overprotective mother, I trust my instincts and if Akiva came for a visit next week, I would feel comfortable with him in my home and hanging out with my kids.

I have a 16 year old daughter who is in boarding school in Toronto. When he went there to visit his friend, he thoughtfully asked me if she would like to be taken out to a restaurant, which is a treat for high schoolers who board. I had zero qualms about agreeing to his offer and my daughter, who rarely sees him, was thrilled. She didn't hesitate for a second to jump on the offer for dinner out with her uncle, and neither did I - nor would I in future.

Akiva is a person who all his friends know they can count on. I will never forget the story he told me about one particular friend who, upon graduating his bartending course, went with his fellow graduates to a bar in Manhattan to celebrate. Later that night, this friend found himself drunk, unable to even make out the street sign closest to him, no less find his way home. He knew the person to call though. Akiva took his call in middle of the night and guided him to help figure out where he was.

*Malkie Citrin*

404-435-2222
565 Greenland, Sandy Spring GA
reallygreatsite.com

Akiva jumped in his car, pumped up the heat and raced to rescue his friend. He found him on the street corner freezing and shivering terribly due to the cold winter temp. Akiva put his finger down his throat to make him vomit to save him from the potential of choking on his own vomit. He placed him in his warm car and saw him safely into his home. Akiva is always thinking about how he can help others. He has connections at his local markets who give him their old produce. He hand delivers it to people in his community who he knows could use it.

In his business of heating and cooling, he goes above and beyond for his customers. He will stop at nothing to fix their equipment so they are not suffering from heat or cold, and to prevent them from having to invest in new expensive units if he can help it.

Akiva believes that everyone deserves to spend Shabbos surrounded by friends and regularly hosts meals for anyone looking for somewhere to go.

I can confidently assure you that Akiva is not a flight risk or danger to the community. I believe that his behavior is an expression of unresolved pain stemming from a challenging childhood. I know that he wants to have a fulfilling productive life and needs the support and guidance of professionals to help him heal and grow.

Thank you for reading this letter.
Sincerely,
Malkie Citrin

# XVII

Yosef Abramovitz & Sylvie Farkas
46 Dell Park Avenue
Toronto, ON, M6B 2M6
Canada
6479966704

To the honorary Judge Leitman,

I am writing this letter to provide my support for Akiva Dovid Shenkman and to share my perspective on his character, his strong ties to his community, and his trustworthiness. I have known Akiva for 30 years in my role as a close friend, and I can attest to his dedication to his responsibilities and the positive contributions he has made to those around him.

I firmly believe that he is not a danger to society. In my time knowing him, Akiva has consistently shown kindness, respect for others, and a calm and rational demeanor. For example, when Akiva helped a struggling neighbor during a difficult time. Akiva noticed that his elderly neighbor, who lives alone, was having trouble keeping up with yard work and grocery shopping. Without being asked, Akiva stepped in and began mowing their lawn, shoveling snow during the winter, and even running errands to ensure they had food and supplies.

This level of compassion and selflessness is not uncommon for Akiva. His willingness to go out of his way to assist someone in need, without expecting anything in return, is a clear testament to his strong moral character and commitment to helping others.. His actions have always reflected a deep respect for others and a commitment to doing what is right.

Moreover, Akiva has significant ties to his community - specifically the Gerrer Shtiebel (Jewish Synagogue) where he prays daily; as well as to his family - his mother, 2 brothers and 2 sisters. They provide his grounding and his "home base". His connections there display dedication and stability. Akiva maintained a Heating/Cooling company within his community for the last 12 years. He is the "go to" contact for HVAC Services and is well known within his community as a reliable trustworthy business owner. These connections show that Akiva is deeply rooted and invested in this community, making him highly unlikely to flee.

My husband and I have known Akiva for years and the first impression he leaves with everyone he meets is that he would give you the shirt off his back and that he has a heart of gold. That hasn't changed in the many years I've known him. We trust him implicitly and are his biggest cheerleader.

I respectfully ask that his character, history, and strong ties to his community be taken into consideration. I firmly believe that he can remain safely within society without posing any harm or risk.

If you have any questions or require further information, please do not hesitate to contact me at 6479966704 or shaindyabramovitz@gmail.com

Thank you for your time and consideration.

Sincerely,
Yosef Abramovitz & Sylvie Farkas



Yisroel N. Shenkman

1505 East 17th Street

Brooklyn NY 11230

The Honorable Mathew F. Leitman

My name is Yisroel Shenkman. Akiva Dovid Shenkman is my younger brother we are three years apart in age.  I am married with eight children and live two blocks away from my younger brother. Akiva has been a guest of our home for over 18 years and is the greatest brother a man can ask for. Akiva is not and has never been a threat to anyone in any society in any way. Akiva is honorable individual and a man of his word. Akiva will show up when needed and will not run away from dealing with any issues regardless of the surrounding conditions. Knowing there's a problem is already half the solution. We as a family will assume responsibility that Akiva will get the assistance he is in need of and assume responsibility for his actions as a grown man. Akiva is a good person and he is not a flight risk. Please allow Akiva the opportunity to be released and do right.

Yisroel Shenkman