# AMENDED EXHIBIT A

# Gerald A. Shiener, M. D.
Distinguished Life Fellow, American Psychiatric Association
251 East Merrill
Suite 230
Birmingham, Michigan 48009

(248) 645-5155
Telephone

(248) 645-2665
Telecopier

September 1, 2025

Jack L. Jaffe, Attorney at Law
411 W. 13 Mile Rd.
Suite 150
Madison Heights, Michigan 48071

Re:   Akiva Dovid Shenkman

Dear Mr. Jaffe:

I had an opportunity to conduct a psychiatric evaluation on Akiva Dovid Shenkman on July 3, 2025.  He was referred to me by your office for the purpose of performing a psychiatric evaluation relative to criminal charges that he is facing.

In addition to conducting a psychiatric evaluation, I have had an opportunity to review documentation as follows:

    1.    Discovery packet.
    2.    "Email from friend".
    3.    Extensive conversation from Mr. Shenkman's uncle, Yitschak Shkop.

At the time of the evaluation I obtained the following history.

History:

Akiva Dovid Shenkman was born September 12, 1985.  He is a 39 year-old, white male who is currently working in his own service business in Heating Ventilation & Air Conditioning, and has been doing so for the last 15 years.

He is currently residing in the Milan Federal Correctional Facility after entering a guilty plea for possession of child pornography.  He understands that he is facing a sentence range of 5 to 20 years.

He describes his current circumstance, "I was caught coming in from Canada...I had child pornography on my phone...I ended up here".  He describes that his interest in graphic sexually oriented imagery of prepubescent children goes back "as long as I can remember", and as a child he states he was "always into it".

Re: Akiva Dovid Shenkman
September 1, 2025
Page 2

His background is coming from a "Orthodox family", a strictly observant Jewish family. He was born in Detroit. His father although strictly observant did not come from a family of that orientation. His father's parents were associated with religious organizations. His mother's family was always observant and his mother's maiden name was Lev. His mother was 7th generation observant Jewish of Hasidic sect.

His parents divorced when he was 3 years old. He states that he has limited recollection of the circumstances of their relationship, but understands that they were always "fighting", and that there were numerous episodes where the police were called because of violence in the home. He has a vague understanding of his father's employment, "I think he was in the insulation business", stocks and investments.

He stayed with his mother after the divorce, and he attended a religious school as a child. After the divorce he moved to Chicago at age 5 or 6 studying in a religious school. He states that his school performance was "okay". He describes that in the 4th grade, "I was beaten up by the Principal". He states that it was on a Friday. His mother promised to take him to buy new shoes. The Principal of the school said something to him about staying late and he responded, "I'm not gonna stay late...I'm going to buy shoes with my mother", and the Principal reprimanded him physically.

He moved to New York in the 4th grade. He attended a religious school in New York and then a school in New Jersey. He then went to study in Israel for three to four years and returned to the United States at age 18. His academic career was somewhat limited and he states that he was not really learning or progressing in his education.

He then initially states that he has no recall of the development of this sexuality or his interest in anything that might have provoked sexual arousal. He recalls being a young adolescent at about age 12 having a conversation with one of the Rabbis who was teaching him in the religious school. The Rabbi asked about sexual experiences and masturbation. Mr. Shenkman initially states that he did not participate in the discussion and initially denied everything, and then spoke about masturbation and about an experience watching a neighbor taking a shower. Mr. Shenkman expressed and described his interest at that time as adult females. He describes looking at Sears catalogs and looking at print material with images of women advertising lingerie or underwear as an object of arousal.

He states that although it was "never about kids", later on when he developed an interest in images of children in sexual situations, "I couldn't listen to the sound". He described that on occasion he would cry when he saw the images and that surprised him, but it had an appeal to him. His tears were provoked by seeing an adult harming a child. It appears he was more identified with the child than the adult.

He has a recollection of having a toy gun that would vibrate and he would use that to

stimulate himself. He also described coming out of the shower and tying a towel around his neck "like Superman". He would dry off over a heating vent and play with a towel and put it on like a diaper when he was a young adolescent.

He was then asked about a childhood experience with a babysitter that he described occurring when he was a child - that he had been stimulated by a babysitter when he was a small child. He states that that was "not real" and that he was just "talking to someone to get more stuff".

Mr. Shenkman then describes that when he came from visiting a friend in Canada, coming through Customs in the United States at the Detroit entry point, he was on a "watch list". He states that it may be due to an app that he was using for about 10 years looking at graphic sexual material of children. He states that he found them fascinating and arousing, but associated with strong ambivalent feelings of shame and embarrassment.

Mr. Shenkman describes his activities of daily living. He will get up every morning. He would watch some graphic sexual material "to get out of bed", attend to his personal hygiene, do morning prayers, work for a full day, watch television in the evening. His television viewing was somewhat varied - Reacher (an action series mystery), Family Guy and South Park (adult cartoon satires), Simpsons (adult cartoon satire), Resident Alien (a situation comedy), and Super Hero movies.

His social contacts were limited, and he would meet people on-line using a dating app called Tinder or J-Swipe, sometimes Facebook. He would meet adult women and "hang out", watch movies, and occasionally having intimate contacts. He was not particularly discriminating in seeking out those contacts "whoever answered".

His preference was for a woman who was "decent looking", not overweight, not sloppy, smaller breasts. He prefers longer hair - either red or dark hair. Most of the contact would last for one or two encounters. One encounter lasted for a few months. She was a nurse, Asian with black hair. He described her as nice, smart. They would watch movies together and occasionally have sex. His preference on sexual encounters was missionary position, occasionally oral performed on each other "if they want it".

He describes his longest relationship as "on and off" for two to three years. He is somewhat guarded as providing any personal information about this particular partner. They were of the same religion. They would observe the Sabbath together, have meals together, and he states, "I didn't want it to be serious". He could not explain why, but he was very limiting in the degree of disclosure and intimacy that they experienced.

He has an interest in marrying, but can't articulate his intentions. He states that he has never acted on a child or an adolescent, that his object choice in real human contact is adult females. When explored his image of marriage is very traditional, but he admits that

he is somewhat confused by this because he had no basis for seeing a traditional marital relationship.

He describes ongoing disturbances with sleep "not well at all", and he describes racing thoughts at night. He has worries, "I'm getting older". He looks at his life with some regrets "that I do everything right". He describes difficulty falling asleep and frequent wakening. He has dreams but can't remember the content of his dreams. He is 5 ft. 8 inches tall and weighs 190-195 lbs. His usual weight was 220 lbs. before entering custody. He denies problems with his bowels.

In terms of his intimate relationships, he has never had a "real girlfriend". He states that the lengthy relationship that he had became more of a friendship than that of an intimate partner, and he is somewhat ashamed or embarrassed in some of the connections that he made through dating apps.

He states that he attempted to masturbate to some of the graphic pictures that he had downloaded, but "it didn't really work too well". Most of the videos were underage females but "not all of them", and he describes a "broad range" of graphic material. He describes that as he progressed he was looking for "more", and when asked why he felt that he was looking for "more weird stuff" his response was, "I wanted to feel something", and he describes a sense of detachment in situations that demanded intimacy.

Personal History:

By way of personal history, Mr. Shenkman was born in Detroit. He attended religious schools in Detroit, New York, New Jersey, Chicago, and Israel. He has never earned a formal high school diploma or a GED.

He is the fourth in a sibship of five. He has two older brothers - one of whom drives a school bus, and one of whom speculates in real estate and has a CBD marijuana business. An older sister is a homemaker, and a younger sister lives in New Jersey and is a homemaker. His oldest brother was a kidney donor. His second oldest brother may have been in psychiatric treatment for "anger issues". He denies any substance abuse history in his siblings. He is not particularly close to them, although with his criminal charges his siblings have been supportive of him and he is ambivalent stating he is not certain that he wanted them to know about what happened to him.

Mr. Shenkman's mother is 70 years old and in good health. She owned a dress shop in Detroit. He describes her as a good mother. She worked hard and she was a good cook and took good care of him. When asked about the divorce, he states that he heard that his father had "anger issues", and that his paternal grandparents were "not easy to deal with", although he can't characterize what that meant.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 5

His father is currently in his late 70's. he suffers from kidney stones, gout and is overweight, and was hospitalized for a bowel obstruction. Mr. Shenkman took care of him while he was in the hospital for 1-1/2 weeks. He owns a company called City Service Insulation and lives in New Jersey. They have never been close.

He does have male figures in his family, an uncle who lives in Chicago and his maternal grandfather who lived in New York. He describes them as very traditional and that they may have been "born in the wrong century", and that learning and studying religious matters were "everything". He characterizes his grandfather stating, "Whenever you asked him a question he always knew the answer".

He described himself as struggling with the educational system "I just floated through", and he had trouble understanding what was expected of him by authority, and was picked on by his peers. His social circles were quite limited.

Prior Employment History:

By way of prior employment history, when he returned to the United States from studying in Israel he spent about one year withdrawn and watching television without structure, and then learning Heating Ventilation & Air Conditioning and worked in that business. He sold cell phones for "an Israeli guy", worked as a locksmith, and installed low voltage lighting systems. He speculates that he may have been fired from the cell phone job and he doesn't remember why, perhaps he had trouble with sales. He has never collected Workers' Disability Compensation benefits. He has never been arrested before, although in Israel there was a "public fight" he was in the area as an observer when taken into custody and released. He has never been a plaintiff in litigation.

Past Medical History:

By way of past medical history, Mr. Shenkman has no primary care physician. He was hospitalized for a kidney stone. He takes no medicines. He had been prescribed Flomax after his kidney stone and pain medication when he passed the stone.

He smokes cigarettes "on and off". He drinks alcohol rarely, only on ritual occasions. He denies the use of drugs of abuse or marijuana "never". He saw a therapist in New York. He is uncertain as to when. He states he entered treatment "because my mother forced me". He considered it a "waste of time" because he didn't know why he was there. He states it was when he returned from Israel and he "wasn't doing anything", and he had "no energy", and he speculates that he may have been depressed. In Israel his mother also made arrangements for him to see a therapist. He is uncertain as to whether it was helpful. He denies any drug allergies.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 6

REVIEW OF DOCUMENTATION
Review of documentation reveals a Discovery packet that describes the circumstances of his arrest and some of the graphic nature of the material found in his possession. He was interviewed and was initially circumspect and denying any involvement and then acknowledged involvement.

There are text messages where he is seeking graphic material, and where he alleges that he was molested by a babysitter as a child, and that that may have determined his interest in child-adult graphic material. He described encounters where he acted on a female child at the contact with either a "crackhead mother" or when changing the diaper of an infant who was then "calmed down when her mother blew crack in her face." He denied acting on these fantasies. (He reports this as a ploy to obtain additional material) Some of his interactions portray him as an active seeker of this material, and is consistent with his description of an interest that was escalating and non-conventional. (He describes his response to this material was initially arousing, but the response would diminish and he would actively seek mor varied, unconventional graphic material. The material would be arousing at first, and the response would diminish with time.)

A discussion with his uncle, the male figure that he described in the history that he provided me - Yitschak Shkop, who is married to Mr. Shenkman's mother's sister, describes the traditional Orthodox family and notes that Mr. Shenkman's mother suffered from the physical handicap that the marriage was arranged and difficult to arrange.

He characterized Mr. Shenkman's father as unpredictable, angry, hostile, and aggressive in the family - being abusive of Akiva, unpredictable in his behavior, and intimidating to Akiva - emphasizing the ongoing traumatic nature of that relationship and characterizing Mr. Shenkman's mother as being somewhat victimized by her husband before their divorce both physically and emotionally. He characterized the family atmosphere prior to the divorce and even subsequent to the divorce, and Akiva's contacts with his father as being brutalized and intimidated.

A document "from a friend" describes Mr. Shenkman as suffering from "significant trauma related psychological distress". The informant is a physician psychiatrist, and she also describes Mr. Shenkman as suffering from a Neurodevelopmental Disorder with deficits in cognition and communication.

She endorses and describes Mr. Shenkman's childhood as characterized by "instability and trauma" - his father being described as "erratic and violent", and as a child being witness to encounters with the significant physical violence towards family members including children. He was exposed to "sexually explicit material" from a very young age. She also characterized his difficulty in recalling some of his childhood experiences or "details of his upbringing". She invokes "traumatic dissociation" - a defense mechanism often seen in individuals exposed to chronic and early life trauma.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 7

She goes on to describe his social withdrawal from "daily life", and describes the year that he returned from Israel as being spent in "near total isolation" with compulsive watching of television, withdrawing into fantasy, and screen use that continued into adulthood. This is consistent with Mr. Shenkman's characterization of his preferences in television viewing that are at best adolescent and in many respects childish.

This informant also attests to the fact that Mr. Shenkman "does not exhibit a sustained sexual interest in minors", and that there is no evidence of "predatory intent or contact offenses".

RISK ASSESSMENT:
There are several instruments used to assess risk of acting in individuals who have expressed an interest in child exploitative graphic sexual material. These instruments look at actuarial and demographic factors in subjects, and compare the subject to groups of similar offenders who re-offend and those who do not. The statistical demands of the evaluation of these "tests" measure there utility in predicting and assessing the likelihood of re-offending within a threshold of accuracy.

The study of these "tests" must involve large samples of subjects and span time to assess future conduct. All of the instruments have some validated standardized utility. Validity refers to whether the instrument does measure that which it purports to measure. Standardization refers to the application of the instrument to large sample sizes. Reliability refers to the instrument's ability to predict with greater than chance results. Reliability focuses on whether a study's findings can be reproduced when repeated under the same conditions

The Hare Psychopathy Checklist is a group of historical and actuarial factors that indicate a subject lacks empathy and is capable of exploitation of victims without guilt or remorse. It has been studied and is generally accepted in the scientific community and a screening tool for prospective law enforcement candidates. Dr. Hare's work has been used to evaluate candidates for law enforcement agencies and has been applied to large sample s of subjects. The instrument is also used in correctional settings to assist in screening for tendencies toward recidivism in criminal offenders during sentencing and for return to the community. On this instrument, Mr. Shenkman generated 19 of 22 factors in the negative. He had 1 item in "possibly present" - "early behavioral problems." He described that as a child he was bullied and occasionally would respond. He was in a particularly rigid educational milieu with strict external controls. He had 2 "present" responses - Lacking in emotional depth and "alcohol or drugs not a direct cause of antisocial behavior" Overall his profile did not indicate Psychopathy or a tendency to re-offend or exploit victims due to a lack of empathy or inability to experience remorse.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 8

The Child Pornography Offender Risk Tool is another well studied instrument. The CPORT is a risk assessment tool designed to predict any sexual recidivism for men convicted of child pornography offences. It consists of 7 items:

1. Age at time of investigation
2. Any prior criminal history
3. Any contact sexual offending
4. Any failure on conditional release
5. Indicators of sexual interest in child pornography material or prepubescent or pubescent
    a. children
6. More boy than girl content in child pornography
7. More boy than girl content in other child depictions

If present, each item is worth one point.

From the CASIC Developers, the methodology for evaluating validity and reliability fot the CPORT is described (Seto and Eke, 2015):

> It was developed from a sample of 286 adult men convicted of a least one child pornography offences using information available in Canadian police files, meaning that other criminogenic factors could not be examined. The legal definition for child pornography in Canada was used, where images of nude or partially dressed children are not illegal if there is no sexual activity and/or focus on the genital and anal regions.

> The development study found the CPORT had acceptable predictive accuracy for any sexual recidivism (AUC=.74) and contact sexual recidivism (AUC=.74). The CPORT was found to significantly predict sexual recidivism for internet offenders with other types of offending (bar contact offences) (AUC=.69) and those with histories of contact offending (AUC=.80); although it did not significantly predict sexual recidivism for those with only internet offences. The development samples were amalgamated with a new sample of 80 individuals with internet offences to give an overall sample of 346 men with internet offences.

It is recommended that the CASIC scale developed to assess pedohebephilia, (sexual interest in children) is used in conjunction with the CPORT tool. In the description of the CPORT tool from the authors reporting to the National Institute of Health (Seto and Eke):

> Recent research on a risk assessment tool for child pornography offending suggests that admission of sexual interest in children is a risk factor for any sexual recidivism. Admission is easily vulnerable to lying, however, or to refusals to respond when asked about sexual interests. This may become a particular issue when individuals are concerned about the potential impact of admission of sexual interest on sentencing and other risk-related decisions. In this study, we identified the following behavioral correlates (coded yes/no) of admission of sexual interest in children in the risk tool development sample of 286 men convicted of child pornography offenses: (a) never married (54% of sample), (b) child pornography content included child sexual abuse videos (64%), © child pornography content included sex stories involving children (31%), (d) evidence of interest in child pornography spanned 2 or more years (55%), (e) volunteered in a role with high access to children (7%), and (f) engaged in online sexual communication with a minor or officer posing as a minor (10%). When summed, the average score on this Correlates of Admission of Sexual Interest in Children (CASIC) measure was 2.21 (SD = 1.22, range 0-6) out of a possible 6, and the CASIC score was significantly associated with admission of sexual interest in children, area under the curve (AUC) = .71, 95% CI [ .65, .77]. The CASIC had a stronger relationship with admission in a small cross-validation sample of 60 child pornography offenders, AUC = .81, 95% CI [.68, .95]. CASIC scores may substitute for admission of sexual interest in risk assessment involving those with child pornography offenses.

Mr. Shenkman's score on the CPORT indicated only one risk factor - "Indication of sexual interest in child pornography or children" and all other items were assessed in the negative indication minimal to no risk of re-offending.

The Correlates of Admitted Sexual Interest in Children score had two pertinent negatives - No volunteering in a role with high access to children, and No engaging in online communications with a minor or undercover officer posing as a minor. He was however candid in disclosing his interest in material, and his arousal was quickly extinguished with exposure. This is consistent with his assertion that he was becoming "numb" to the stimuli, and is also consistent with the steady progression of the theme of the material he was seeking as "more shocking" so he could "feel something.

The Sexual Violence Risk Assessment (SVR-20) was indicative of low to no risk, as was the Historical Clinical Risk Management (HCR-20)t.

As regards the SVR-20, its development and standardization is described in:

Re: Akiva Dovid Shenkman
September 1, 2025
Page 10

>a meta-analysis by Hanson and Morton-Bourgon (2009) found that structured judgements made on the basis of the SVR-20 guidelines were the most accurate of all risk assessment approaches for sexual offenders, using three of the studies that had a combined sample of 245.

As regards the HCR-20, it refers to the Historical-Clinical-Risk Management-20, a widely used violence risk assessment tool based on a Structured Professional Judgment (SPJ) approach. The HCR-20 assesses 20 specific risk factors across three domains:

>Historical (past behavior)
>Clinical (current symptoms)
>Risk Management (future concerns)

To guide professionals in predicting and managing future violence risk. It provides a structured framework rather than relying on algorithms, helping professionals formulate risk judgments and develop management plans in forensic and mental health settings. The British Psychiatry Journal Bulletin offers a critical review of the use of this tool. The limitation of the test, as well as the use of tests to assess risk and the possibility of future behavior must be used in a systematic and standardized manner by experienced qualified clinicians. On this test, Mr. Shenkman's history shows only interest without action. His clinical condition is one of a chronic mood disorder that directs him inward, with voyeuristic interest and no history symptoms of acute forms of depression and no history of self harm. Future concerns are determined by a strong will to face consequences, an apprehension about lengthy confinement and a community that can provide close monitoring and firm external controls (an orthodox observant Jewish community).

MENTAL STATUS EXAMINATION: On mental status examination, the patient presents the following picture:

General Attitude and Behavior: He is a well-developed, well-nourished, white male who appears his stated age. He is pleasant in his interactions. His speech is somewhat halting, and when questions are put to him he is pensive. He has difficulty characterizing his childhood, his day to day existence, and his history - having difficulty recalling the names of schools that he attended, or the ages at which he attended particular institutions. He does tolerate confrontation well. He speaks with a well-modulated voice, and makes good use of hand gestures. He is able to maintain eye contact, and when talking about some of the conduct that led to his criminal charges or some of the material that was in his possession, he reacts with appropriate embarrassment and shame.

Stream of Mental Activity: Although Mr. Shenkman is goal-directed, when questions are

Re: Akiva Dovid Shenkman
September 1, 2025
Page 11

put to him his initial answers are vague and brief. With repeated confrontation he is able to generate narrative answers, however the depth of information that he is able to convey is limited and he needs firm encouragement. His thinking is not disordered, but his flow of thought is markedly diminished.

<u>Emotional State and Reactions</u>: The patient's affect is full and rich in depth and constricted in range. The mood appears to be markedly depressed. This is persistent throughout the course of the interview. Affect remains appropriate to thought content.

<u>Mental Trend and Content of Thought</u>: Mr. Shenkman characterizes himself as being somewhat socially isolated, and he experiences great difficulty in reflecting on himself when self-observation is required. He is somewhat concrete in his formulations and understanding, and he speaks of having no feeling or feeling removed from emotional situations. He has experienced a family life where unpredictable impotent rages and physical abuse were common experiences, and he characterized his reactions as either to withdraw into fantasy or to "block out" those experiences. He describes a very isolative social milieu as an adult with random contacts on dating apps for sexual encounters with adult women, and then using adolescent entertainment contact to distract himself. He is compulsive in his work habits. He has experienced weight loss, diminished libido, and disturbed sleep with racing thoughts and ruminative thoughts. He denies any secondary psychotic symptoms and has not experienced any hallucinations, delusions, or pseudoperceptual events.

<u>Sensorium Mental Grasp and Capacity</u>: These are intact to gross testing in that the patient is alert and oriented to time, person, place, and situation. However the depth of his thinking and his ability to engage in self-observation is more limited.

<u>DIAGNOSTIC IMPRESSION:</u>

- Axis I: Persistent depressive disorder as a consequence of childhood trauma.

- Axis II: Neurodevelopmental Disorder.

- Axis III: No physical condition is diagnosed.

- Axis IV: Psychosocial Stressors - Legal difficulties. Cultural and social isolation. Traumatic childhood environment.

- Axis V: Highest level of functioning over the past year - (GAF: 62).

Re: Akiva Dovid Shenkman
September 1, 2025
Page 12

DISCUSSION

Akiva Dovid Shenkman is currently in Federal custody having pled guilty to possession of graphic child pornography.  He describes a history of growing up in a very strict rigid cultural milieu with significant social isolation in a family with a handicapped mother, multiple older siblings, limited social relationships.  His mother was handicapped and preoccupied with caring for the patient and his siblings, and his father was characterized as being unpredictably angry, physically abusive, and engaging in impotent rages.

Mr. Shenkman grew up as an intimidated child withdrawn into fantasy with repressed emotions and repressed memories, professing to have limited recollection of his childhood experiences, and only being able to produce them when actively and aggressively confronted with the demand that he do so.  This is a common reaction in individuals who grow up in a traumatic environment, and the most primitive line of defense is that of denial or "blocking out" memories of unpleasant experiences and uncomfortable affects. This tends to create an emotional "numbing" as described in the trauma literature. In an effort to overcome the emotional numbing, victims often become attracted to experiences of excitement - skydiving, auto racing, extreme sports, risk taking, and graphic sexual material. In the latter, excitement is not as closely associated with the risks of harm associated with other extreme physical endeavors. The arousal of graphic sexual material occurs remotely, without risk and in isolation.

He has never had a model of an appropriate adult reciprocal relationship, and his attempts at engaging in such relationships are limited and conducted at a distance.  He states that he was exposed to graphic images when he was quite young, and his quest was for graphic  images that were more and more unconventional "so I could feel something", which appears to be an attempt to block through the repression and denial that he used to deal with the chaotic environment in which he was raised.

He does not meet the diagnostic criteria for paraphilia or pedophilia, and by his descriptions all of his intimate contacts have been adult and heterosexual, and he has never acted on any of his interests.  His interests do not seem to be specific or preoccupied in a paraphilic manner, but only the result of a quest to find material that would be "shocking" to arouse some feelings and to break through the defensive repression and denial.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 13

Based upon the examination I have performed and the documents I have reviewed, I would conclude that Akiva Dovid Shenkman is a chronically depressed victim of a rigid subculture with an unpredictably violent father who engaged in impotent rages and physical abuse. He has no history of violence, and no history of harm to others. He has never used his fists, an automobile, or a weapon to harm another person. He has never had a physical encounter in the "real world" with a sexually inappropriate object, and his primary goal in his limited attempts to establish intimacy have always been with adult women.

He represents no risk to the community if provided the opportunity to engage in a therapeutic relationship. It is clear that he would benefit from such. His ability to tolerate aggressive confrontation during the course of his evaluation with me is also a good prognostic sign, and indicates that he is not likely to lose his composure or resort to violence when confronted or in a situation of desperation. His participation and involvement in a community that has close integration within the group as well as firm external controls that have to some extent been internalized by Mr. Shenkman is also a positive prognostic sign.

His chronic depression has affected his cognition and his ability to access memories of his childhood and take in information and record it, and engage in the educational process. His ability to function in a very traditional educational system such as is found in Orthodox Judaism was very limited, and he described that he only "floated through" these educational experiences as a child. As an adult, he is more capable of forming a mentoring relationship within his community.

I believe these are all representations of his reaction to the traumatic family life that he experienced as a child, and have led to him being chronically withdrawn, experiencing problems with low energy, and difficulty initiating activities. This would be the opposite of a Paraphilic Disorder with any predatory risk. My findings in this area are consistent with his performance on risk measurement tools. The validity and reliability of those tools is discussed at length above. His assessment on those tools is encouraging and a positive prognostic sign.

Re: Akiva Dovid Shenkman
September 1, 2025
Page 14

If he were returned to his community which would be supportive of him, he would be a candidate for an ongoing intensive therapeutic experience, and if he were in such a situation I believe that he could benefit. I do not believe that Mr. Shenkman or the community would benefit from prolonged confinement.

If you have any further questions regarding my evaluation, diagnosis, or recommendations, please feel free to contact me at my office address.

Very truly yours,

Gerald A. Shiener, M. D.
Diplomate of the American Board of Psychiatry and Neurology
Added qualifications in Addiction, Forensic and Geriatric Psychiatry, Psychosomatic Medicine and Brain Injury Medicine

Medical Director Integrated Care and Consultation Liaison Services
Wayne State University Physicians Group

Chief of Psychiatry
Sinai Grace Hospital of Detroit

Professor of Psychiatry and Behavioral Neurosciences
Wayne State University School of Medicine

GAS/rll