UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

\- - -

UNITED STATES OF AMERICA,

Plaintiff,

v.

DOVID AKIVA SHENKMAN,

Defendant.

_______________________________/

Case No. 24-20668

Hon. Matthew F. Leitman

SENTENCING HEARING

BEFORE THE HONORABLE MATTHEW F. LEITMAN
United States District Judge

Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan

Wednesday, September 17, 2025

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • robert_smith@mied.uscourts.gov*

APPEARANCES:

For the Plaintiff:

TARA HINDELANG
UNITED STATES ATTORNEY'S OFFICE
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 410-5177

For the Defendant:

JACK L. JAFFE
JAFFE DEFENSE TEAM, P.C.
411 W. 13 Mile, Suite 150
Madison Heights, MI 48071
(248) 588-2297

TABLE OF CONTENTS

MATTER PAGE

SENTENCING HEARING

Resolution to Mr. Jaffe's objections to presentence report....12

Allocution by Mr. Jaffe....21

Allocution by Defendant Shenkman....50

Allocution by Ms. Hindelang

Sentence of the Court....67

EXHIBITS: Offered Received

(No exhibits offered)

Detroit, Michigan
Wednesday, September 17, 2025
at about 9:43 a.m.

_ _ _

(Court, Counsel and Defendant present.)

THE LAW CLERK: All rise.

The United States District Court for the Eastern District of Michigan is now in session, the Honorable Matthew F. Leitman, United States District Judge, presiding.

You may be seated.

The Court calls Case No. 24-20668, United States of America v. Dovid Akiva Shenkman.

Counsel, please state your appearances for the record.

MS. HINDELANG: Good morning, Your Honor. Tara Hindelang on behalf of the United States.

THE COURT: Good morning. Welcome.

MR. JAFFE: Good morning, Your Honor. Jack Jaffe on behalf of Akiva Shenkman.

THE COURT: And I see he's with you. Good morning. Welcome to both of you. Please be seated.

All right. We're here this morning for sentencing in connection with two guilty pleas that Mr. Shenkman offered and that I accepted at an earlier change-of-plea hearing.

Mr. Jaffe, let me start with you and ask, are you and Mr. Shenkman ready to proceed with sentencing?

MR. JAFFE: Yes, Your Honor.

THE COURT: Have you and Mr. Shenkman had a sufficient opportunity to review the presentence investigation report prepared by the Probation Department?

MR. JAFFE: Your Honor, yes. I will just indicate that I met with Mr. Shenkman -- it was either last Wednesday or Thursday. We went over word-for-word in the report, so we've reviewed it.

THE COURT: All right. Were you the one that filed the objections to the report?

MR. JAFFE: I did, Your Honor. However -- however, the objection, notwithstanding, my client had pled guilty.

THE COURT: Hold on.

MR. JAFFE: I'm saying I did --

THE COURT: No. Stop.

MR. JAFFE: Pardon.

THE COURT: Stop.

MR. JAFFE: Okay.

THE COURT: I'm just asking a basic question here.

The -- my question is not going to be about the substance of the objection, it's a temporal question.

I asked you, have you had a sufficient time to review the report with Mr. Shenkman? You said you met with

him last week and reviewed every word of it.

MR. JAFFE: Yes.

THE COURT: My question is, did you meet with him to review it before the objections were due, so that he could have input into the filing of the objections?

MR. JAFFE: No.

THE COURT: Why not?

MR. JAFFE: Well, Your Honor, my -- I received it, and it takes -- it takes an unbelievable -- a herculean effort to make arrangements to see a client.

THE COURT: Mr. Jaffe, I've been doing this job for 11 years.

MR. JAFFE: Yes.

THE COURT: I've not had a single case -- not one, in which a lawyer has been unable to either meet with the client before the objections to the presentence report are due, or ask for an extension. The point, as you know, of the review of the presentence report, it's critical so that the defendant can review it with the lawyer in time to make objections. I'm concerned that that didn't happen.

MR. JAFFE: As you posed the question, it hasn't. But I will again indicate to the Court that I spent almost three hours with my client reviewing the presentence report. And if the Court requires from me a removal of the objection, I've discussed it with my client, and we will.

THE COURT: It's not that. I'm not asking you to remove any objections. I'm concerned about whether objections that would have otherwise been made, if he had had a chance to review the report, were not timely made.

MR. JAFFE: Your Honor, again, I will rely upon what I have said to you that, in this case, I will say to you that if it wasn't four days or five days to get a response from Milan, so I could go and see my client.

THE COURT: All right. Mr. Shenkman, Mr. Jaffe tells me that he had an opportunity to review the presentence report --

MR. JAFFE: Stand up.

THE COURT: You don't have to stand up. I want you to be comfortable.

Mr. Jaffe, can you pull the microphone closer to him, please.

Mr. Shenkman, Mr. Jaffe is telling me he had an opportunity to review the entire presentence investigation report with you last week; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So one of the things that's very important in the sentencing process, the way it works is the probation officer prepares a draft of the report, and the probation officer gives the draft to the lawyer for the defendant, and the lawyer and the defendant have 14 days to

communicate back to the probation officer what are called objections to the report. That's your opportunity, as a criminal defendant, working with your lawyer, to say to the probation officer that you believe there's a mistake in the report, that some of the facts are wrong, that some of the guidelines calculations are wrong, that important information has been omitted. That is the opportunity for the defendant to raise that with the probation officer, and then, if necessary, with the Court.

Mr. Jaffe submitted two objections to the presentence report, which I will take up, but I want to ask you, having reviewed the report with Mr. Jaffe, are there any points that you believe are mistaken, or that you would want to correct, or do you want an opportunity to consult with Mr. Jaffe again, understanding, now, that you two should have an opportunity to present objections to the report?

THE DEFENDANT: I think we're good. I mean, we went over everything. Everything seemed good to me.

THE COURT: So I want to make this crystal clear. Mr. Shenkman, I am willing, today, to adjourn the sentencing and to give you and Mr. Jaffe as much time as you need to do any additional review of this presentence investigation report and to submit any additional objections, corrections or comments on the report. Would you like to have an adjournment to have the opportunity to do that?

MR. JAFFE: Wait. May I confer with Mr. Shenkman first?

THE COURT: Sure. Before you do that, I want to make another important point.

Mr. Shenkman, when I'm imposing sentence, what you will hear me do is, if there are no objections, I will find as true the facts that are set forth in the report, and I will base my sentencing decision, in part, upon the facts set forth in here, that I have found to be true, if I find them to be true.

So I want you to understand that this report plays a significant role in the process. If you feel that you would want additional time to review the report with Mr. Jaffe and to make objections, I will give that to you, and I don't want you to feel any pressure to go ahead today, and I want you to take as much time as you need, right now, to confer with Mr. Jaffe about it.

MR. JAFFE: Your Honor, if I may -- if I just may -- if I may ask the Court one question. I mean, if -- if we are requesting it, how much time would you --

THE COURT: You can -- he's in custody, so you can have as much time as you want.

MR. JAFFE: The reason I'm asking is that we're approaching our religious holidays, Mr. Shenkman's, and next week there are two days, and then following that, there are

ten days followed by another -- another two weeks, so that's --

THE COURT: I will accommodate you and he, however you guys need.

MR. JAFFE: Thank you. And if I may, Your Honor, again, so I'm asking the Court for guidance, and that is, initially I did not file objections to the scoring of the guidelines. I would submit to the Court that the representation of a client is 24/6, I don't work on the Sabbath, but nevertheless, I did file and I filed and relied upon a case from a court, I believe in the Western District of Michigan, and I -- I -- I filed an addendum. And so to the -- to the -- an addendum that is challenging the scoring of the guideline. So I did add that, initially. I just came across this at the end of last week. I found the case and then I filed my objection, if you will, to the calculation of the guideline. It did -- it does affect or impact the guidelines in some respect.

THE COURT: Hold on one second.

(An off-the-record discussion was held at 9:53 a.m. between defense counsel and defendant.)

THE COURT: Okay. Mr. Jaffe, have you had a sufficient opportunity to consult with Mr. Shenkman how you guys would like to proceed?

MR. JAFFE: Yes, Your Honor.

THE COURT: What would you like to do?

MR. JAFFE: My client would like to proceed.

THE COURT: Mr. Shenkman, did you hear what Mr. Jaffe said?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. And, again, I want to make clear that if we proceed today, I will deal with the objections that are before me and no others, and the result of that could be that I would find as true, the facts that are set forth in the presentence report, and that I may well base part of my sentencing decision on the facts and content of the report. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And understanding that, are you freely and voluntarily choosing to go ahead today?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And declining my offer to adjourn the dates?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Okay. So, Mr. Jaffe, in the report that I have, there are two objections that you previously filed, and you noted that you filed this additional sentencing memo. I will take those up in a minute.

But other than the objections that you filed in

writing, two of which are noted on the report, and the third of which is listed in Docket No. 41, do you have any other objections?

MR. JAFFE: None.

THE COURT: Okay. Ms. Hindelang, is the government ready to proceed with sentencing?

MS. HINDELANG: Yes, Your Honor.

THE COURT: Have you had a sufficient opportunity to review the presentence report?

MS. HINDELANG: Yes, Your Honor.

THE COURT: Do you have any objections, corrections or anything that you care to say with respect to the report?

MS. HINDELANG: I do not.

THE COURT: Okay. All right. Then let's take up Mr. Jaffe's objections.

Mr. Jaffe, the first objection that I have from you on the addendum to the report is an objection that is reported to me as follows: "There is no way that Mr. Shenkman knowingly entered into this plea without the Rule 11 agreement."

Do you want to elaborate on that?

Let me ask a different question. Have you have had an opportunity to review the transcript of the change-of-plea hearing?

MR. JAFFE: Yes.

THE COURT: All right. And you see the government's response to the objection. Do you have any thoughts on their response, in light of the content of the change-of-plea hearing transcript?

MR. JAFFE: Your Honor, I have reviewed the transcript, I have reviewed the transcript with my client, and I would just say there was a record that was made that would certainly -- that would be counter to my -- to my -- my reaction to that.

In other words, I mean, I read the transcript. A good record was made, Your Honor, and we are prepared to rest upon the record that was made at the time the plea was taken.

THE COURT: All right. Thank you. I will overrule the objection for the reasons given by the government in its response. The government quoted the part of the transcript of the plea hearing where I think we elicited that Mr. Shenkman was knowingly choosing to plead without a Rule 11 plea agreement, and that he did so after having a full opportunity to discuss it with Mr. Schulman, and an offer to adjourn the hearing so he could further think about it.

Ms. Hindelang, just so I get my head back around this, do you remember, and maybe you don't, so this isn't a trick question, do you remember what, if any, the plea offer was in this case?

MS. HINDELANG: Your Honor, I believe it was a plea to Count 1, dismissing Count 2, with a recommendation -- I don't remember if it was a midpoint or the top of the guideline recommendation, but with an appellate waiver and a collateral review waiver, except for the certain claims. A fairly standard Rule 11.

I believe we discussed it -- I believe I placed the terms of the plea offer on the record at the plea hearing. If you give me a second, I can look at the transcript.

THE COURT: That's okay. If it's there, it's there. I'm still going to overrule the objection for today. I think the portions of the transcripts that are included in the addendum here that you quoted, satisfy me that this was a knowing decision to plead without a Rule 11.

Mr. Jaffe, I don't understand there to be a motion to withdraw the plea. Are you making that sort of a motion?

MR. JAFFE: No, Your Honor. And if I may, just to elaborate, this was discussed with my client. I -- I've had conversations with the district attorney. All of these conversations were conveyed to my client. I have addressed all of his questions with respect to that. That, number one, if there was a motion to vacate the plea, the possible consequence -- first of all, even assuming that the Court would do that, I discussed that with him, the potential consequences if the Court did, how he might benefit or not

benefit if the motion was filed, and the Court granted the motion. So it was discussed with him. And, again, my client, today, based on everything that we have discussed, remains firm in the sense that he is asking the Court, again, to reaffirm the Court's acceptance.

If I just may, I have one other thing. The question that my client had when I met with him last week, that was regarding forfeiture of property. He didn't recall when I spoke to him, but I had the transcript with him, and I reviewed that with him, and this Court was very specific in terms of advising or informing my client that there was a forfeiture aspect of this, and that my client readily acknowledged that he understood that property that was seized would be forfeited.

So a long-winded answer, perhaps, to your question, Your Honor, but the fact is, yes, we did discuss it. My client does not want to move this Court to consider vacating the plea.

THE COURT: Mr. Shenkman, did you hear what Mr. Jaffe just said?

THE DEFENDANT: Yes, Your Honor.

THE COURT: He's indicated that you are not -- he's indicated that you do not want him to file motion to withdraw or vacate your guilty pleas. Is that your desire here, that he not file that motion?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. All right. The next objection from Mr. Jaffe is objection number two, and this is an objection to paragraphs 20 through 22 of the PSR and provides as follows: "The details of what exactly was on the phone or in the messages is unduly prejudicial to the defendant. The information would be satisfactory, simply stating that images and video which were child pornography. This would meet the elements of the crime without needlessly indicating prejudicial information."

So, Mr. Jaffe, I appreciate the objection. At this stage, at the sentencing stage, there is no jury, it's just me, and I think that the description of the images, as disturbing as it is, is quite relevant for sentencing, for me to understand exactly what was going on here. So I don't think it's unduly prejudicial. It's prejudicial, but it's prejudicial because they are so disturbing. And I think -- I trust in my own ability to understand the damaging nature of what was on the phone and in the contents and give it appropriate weight in the sentencing decision, and I will listen to your arguments about it, but I'm not going to remove it from the presentence report.

MR. JAFFE: If I may briefly, Your Honor?

THE COURT: Sure.

MR. JAFFE: There are -- there are, I believe, two

text messages, in particular, that are referenced, and my hope is that, you know, my client will be given an opportunity, I believe, to address the Court before you impose sentence.

THE COURT: Absolutely.

MR. JAFFE: That he'll be given a chance to address those.

THE COURT: Absolutely.

MR. JAFFE: Because I think that they're based upon -- based upon what my client will tell the Court, I believe what he will say to you, and then also what Dr. Shiener, in particular, because he addresses this. And, again, I understand it's up to this Court, Your Honor, to accept this either as a statement of fact or an admission, if you will, or it is subject to other factors that the Dr. Shiener has discussed in his report, so --

THE COURT: So the bottom line is --

MR. JAFFE: Thank you.

THE COURT: -- with respect to the objection, I'm going to overrule it. With respect to anything that you want to say, or Mr. Shenkman wants to say, about the contents of the phone, the images, you are absolutely free and invited to make any argument or statements you want. All I'm saying at this very moment is, I'm not going to remove the details from the PSR.

MR. JAFFE: I understand.

THE COURT: Okay. All right. Mr. Jaffe, the last objection that you make is one that was filed in Docket No. 41, and you are objecting to the scoring of offense levels under guideline 2G2.2(b)(6), that increases the offense level two levels, for use of a computer. And I see that you are citing me to Judge Neff's decision in a case called *United States v. Benedict*, where she indicates that she doesn't score those offense levels.

It seems to me that -- I say this, with respect to Judge Neff, that's not how I would approach this guideline. It seems to me that there's no doubt it's technically scored correctly. He used a computer device, and so the scoring is correct. Whether the scoring of these points warrants a variance on the basis that this somehow overstates his culpability, that's the way I would pose the question, not as a scoring of the guidelines point.

I understand I have the discretion to vary downward for the reasons Judge Neff gave, but I think, as an initial matter, my obligation is, first, to technically score the guidelines correctly, and as a technical scoring matter, it seems to me the two points should be assessed.

Do you disagree with that?

MR. JAFFE: I -- certainly -- the variance aspect of it, yes, I do agree, Your Honor. I mean -- I'm sorry,

tongue-in-cheek. Yes, I agree with your statement. I will urge the Court to consider that when exercising your discretion to vary or not vary.

THE COURT: Okay. So thank you.

So I'll overrule the objection for the reasons stated in the objection, which are the Judge Neff reasons that she doesn't score that point initially, but I will entertain any argument that you want to make, that I ought to vary downward because, in your view, the assessment of those two points results in an artificially high guideline range. Okay.

MR. JAFFE: Your Honor, just one last in this regard. I understand that this objection, rather, was filed beyond the time, but, again, I -- I've continued to work this case as I would do any case; for certain, I hope the Court will accept that statement, but I just came across this last Thursday or Friday, and as soon as I was able to get it, I submitted it.

THE COURT: Look, I appreciate that. In 2015, the Sixth Circuit issued a published case dealing with this exact guideline. I read it this morning, because I was thinking about this issue myself. The Sixth Circuit doesn't necessarily share Judge Neff's view of the guideline. The Sixth Circuit explains why, in its view, it's appropriate to assess two points for use of a computer. That a computer

image stays around longer than a noncomputer image. So there's authority going both ways, and the published Sixth Circuit authority, to me, is obviously more persuasive here than Judge Neff's opinion. I have great respect for her, and I will listen to any argument that you want to make about a variance, so you can do that.

MR. JAFFE: Thank you.

THE COURT: Okay.

MR. JAFFE: Thank you.

THE COURT: So that dispenses with all of the objections. And given my ruling on the objections, I calculate the guidelines as follows: A Total Offense Level 34, Criminal History Category 1, for a guideline range of 151 months to 188 months.

Mr. Jaffe, do you agree that in light of my rulings on the objections, that is a technically accurate guidelines calculation?

MR. JAFFE: Technically accurate, Your Honor.

THE COURT: You agree with that?

MR. JAFFE: Yes.

THE COURT: Thank you.

Ms. Hindelang, do you agree that's a technically accurate guidelines calculation?

MS. HINDELANG: Yes, Your Honor.

THE COURT: Okay. All right. Then I will adopt

the presentence investigation report as written. I will find as true the facts set forth in the report, including those that were used to drive the guidelines calculation. Again, I will find the Total Offense Level to be 34, a Criminal History Category I, and a guideline range of 151 to 188 months.

In preparation for the sentencing, I have received and reviewed a sentencing memo from Mr. Jaffe, with a number of exhibits; a sentencing memo from the government; and a supplemental report from Dr. Shiener, which is a reaction, in part, to the government's sentencing memo; and I've also reviewed this objection that Mr. Jaffe filed at Docket No. 41.

The way I like to proceed is to first have a discussion with Mr. Jaffe, then with Mr. Shenkman, if he wishes to speak to me, and then hear from the government.

MR. JAFFE: Your Honor, yes, if I just may. Did the Court also have the opportunity to read a mitigation report from a Dr. Gavriel Fagin.

THE COURT: Yes, that is an exhibit that --

MR. JAFFE: I'm sorry if you said that. I didn't get that. That's fine.

THE COURT: I did not say that, specifically. The Fagin report and the original Shiener report and the letters of support were exhibits to your original sentencing memo, so

that's where I read those.

MR. JAFFE: Okay.

THE COURT: Okay. So, Mr. Jaffe, do you mind coming to the podium? If you have all of your stuff there and rather stay there, I don't really have strong feelings. It's up to you.

What I'd like to do, Mr. Jaffe, is start with a couple questions, if I could. Do you mind that?

MR. JAFFE: Your Honor, I serve at your pleasure.

THE COURT: All right. Mr. Jaffe, one of the points that you make in your sentencing memo, this is at page 7 of your sentencing memo.

MR. JAFFE: Your Honor, if I may, I'm going to get it?

THE COURT: Sure.

MR. JAFFE: Page 7.

THE COURT: Do you have it? Do you have the exhibits to the report, too?

MR. JAFFE: Your Honor, I have page 7.

THE COURT: Do you also have the exhibits to your sentencing memo?

MR. JAFFE: Is there one that you are referring to, specifically?

THE COURT: I'm going to refer to two of them.

MR. JAFFE: Pardon.

THE COURT: I'm going to refer to the Shiener report and the Fagin report and your sentencing memo.

MR. JAFFE: I have those, Your Honor.

THE COURT: Okay. So, Mr. Jaffe, on page 7 of your sentencing memo, this is Docket No. 38, pageID.305, you inform me that -- these are your words -- Mr. Shenkman experienced sexual abuse by a babysitter within the context of an Orthodox Jewish upbringing. And as I understand it, that is one of the arguments that you are making as to why his adverse childhood experiences that you identify on pageID.317, weigh in favor of a below-guideline sentence. Do I understand that that's one of the things you want me to think about?

MR. JAFFE: Well, Your Honor, yes, I understand, but whether -- whether my client -- he is an Orthodox Jew, but the --

THE COURT: I'm not --

MR. JAFFE: -- the arguments that are being made, Your Honor, are not, in any way, should be construed as criticism of the Orthodox community. It's just by way -- just by way of informing you this is how he grew up, that's all.

THE COURT: That's fine. When -- you will see where I'm going, my question has nothing to do with that part of the quote.

MR. JAFFE: Correct.

THE COURT: I could have left out the Orthodox Jewish part. I'm setting up a line of questions here.

One of the arguments I understand to you be making is that Mr. Shenkman had adverse childhood experiences, and you want me to consider those experiences in thinking about a below-guideline sentence, and one of those important experiences I understand you to be saying, is the sexual abuse by a babysitter. Do I understand that right?

MR. JAFFE: Yes, and, Your Honor, that there were other factors perhaps --

THE COURT: I'm just asking about one -- let me try to take a step back.

The way I do my hearings is I have some specific points that I want to touch on. My questions are often narrow. They are precise. When I'm done, I will turn the floor over to you and invite to make whatever comments you want. But for now, would you just stick with the very narrow thing that I'm asking?

I just want to clarify, I understand you and Mr. Shenkman to be saying that one of the significant adverse childhood experiences he had, that you suggest warrants a below-guideline sentence, is the sexual abuse by the baby-sitter. Do I understand that correctly?

MR. JAFFE: That's -- yes, Your Honor.

THE COURT: Okay. In the report by Dr. Fagin, he again references the sexual abuse by the babysitter. I'm looking at -- in my docket, it's Docket No. 38-2, pageID.341, it's page 6 of Dr. Fagin's report. He says at the bottom of this page, "In short, Akiva's early experience of being sexually abused by his babysitter, as well as the broader context of how sexually" -- I think he means sexuality -- "is framed and discussed in the OJC could be seen as a mitigating factor in this offense."

And then goes on and he says, "As there is no indication that this abuse was ever processed or addressed, it seems highly likely that it contributed to his viewing of CSAM material."

So I read the Fagin report, and I read your sentencing memo, and those things are talking about the potentially significant role that this abuse could have played, as not an excuse, but as an explanation for what happened here.

MR. JAFFE: Yes.

THE COURT: Then I read the Shiener report -- I actually read the Shiener report first. And on page 2 of Shiener's report, this is Docket No. 38-2, pageID.325 -- tell me when you're there.

MR. JAFFE: Yes.

THE COURT: Three paragraphs from the bottom, he

writes the following: "He" -- and Shiener here is referring to Mr. Shenkman -- "was then asked about a childhood experience with a babysitter that he described occurring when he was a child. That he had been stimulated by a babysitter when he was small child. He states that was 'not real' and that he was just 'talking to somebody to get more stuff.'"

Can you help me understand what looks to me to be a contradiction in terms of whether this abuse happened.

MR. JAFFE: I would agree with the Court, at first blush, that there is clearly a contradiction, and I will reference -- I will indicate to the Court, when I first read this, I shared the same thoughts that you have.

I mean, it's a difficult thing. It's a difficult thing, because, I mean, if we -- if we read both Dr. Shiener's report, as well as Dr. Fagin's, we have an individual, Mr. Shenkman, an individual that is bringing all of his life experiences to date, today, and, you know, one of the arguments that has been made is, does Mr. Shenkman have the ability to distinguish between what's real and not real? Is Mr. Shenkman doing this for shock factor within -- and I say, within the realm of this community, that is this community of people that share information and however that's accomplished.

THE COURT: Let me try a different question. Was Mr. Shenkman, in fact, sexually abused by a babysitter during

his childhood?

MR. JAFFE: Your Honor, I can just say I have heard it both ways. So that's the best answer that I can -- that I can give you. He made a statement to Dr. Shiener. He made -- there was a statement to Dr. Fagin. I mean, that's the best I can answer. Perhaps -- perhaps that --

THE COURT: I want to share with you my concern and really give you a chance to address this. Okay?

Much of your presentation, and understandably so, rests on the reports of these experts. The experts, in turn, rely on information that was provided by Mr. Shenkman. It appears that on a potentially significant point, he may have perhaps said different things to the two experts. Doesn't that call into question the veracity of the other stuff he told the experts, that they are relying on?

MR. JAFFE: As you frame that, Your Honor, yes, but I would -- in terms of veracity, I would indicate that both experts are well-known and highly regarded in their field.

THE COURT: Look, this question doesn't in any way impugn the veracity of the experts. The question is, was Mr. Shenkman truthful with the experts? And it seems to me to be a fair question to ask, because on a potentially significant point, one that Dr. Fagin focused on in some detail, there seems to be an indication that Mr. Shenkman said precisely the opposite to the other expert. So if

Mr. Shenkman's reports to these experts are not reliable, there's a question about whether their conclusions can be reliable.

MR. JAFFE: Your Honor, I -- I understand your question, also, most respectfully, your analysis of this. But I -- and I don't -- I don't criticize the Court or oppose what the Court is saying, necessarily, but I can't answer that question yes or no.

THE COURT: Can I interrupt for a sec?

MR. JAFFE: Yes.

THE COURT: This is your opportunity -- I'm inviting you to -- the way I do it, Mr. Jaffe --

MR. JAFFE: Okay.

THE COURT: Maybe we don't know each other that well.

MR. JAFFE: All right.

THE COURT: I'm inviting you to say, Leitman, you've laid out a question and you are simply wrong. You, Leitman, can find Mr. Shenkman to be a reliable reporter to the experts for these reasons. I'm inviting you to criticize my thinking and to show me why this thinking out loud is not right. That's the purpose of me trying to ask these questions.

MR. JAFFE: All right. Fair enough.

Your Honor, what I -- what I -- I know if I go

astray, you'll bring me back into the fold.

What I can say is, we have an individual, Mr. Shenkman, he's presenting to you a most complicated set of facts, a most complicated lifestyle up to this point, that has been the product of many, many concerns, both good and bad, and have influenced him in one way or the other. I wish I could say to the Court that it happened, that what is alleged to have happened, as opposed to, again, this was the product of an individual that -- and I will hopefully, with the opportunity, I will get into a bit further -- that he would tell you that numb. A person that -- that is completely out of touch with his feelings. He's doing his best right now to make that connection, but, still, it's something that he's having a very, very difficult time.

So if he made the statement, I mean, it is just as he -- as you have that text message, you have a statement. But what I'm urging the Court to consider that in light of everything else that has been presented to you.

In a narrow sense, yes, I can't disagree with you. In a narrow sense, there's contradiction; it happened, it didn't happen. So I would -- I can best answer that question when Mr. Shenkman is given that opportunity, perhaps he can tell you.

THE COURT: Okay. Next question for you, again, I'm going to give you a full opportunity --

MR. JAFFE: Yeah, but -- so -- so, Your Honor, I -- I appreciate your -- the opportunity that you're providing me, but that's the best answer I can give you to.

THE COURT: Fair enough. It was a hard question. I didn't know if there would be a good answer.

MR. JAFFE: I can handle the hard questions, Your Honor, and I appreciate it.

THE COURT: Next question. Mr. Jaffe, the folks who appear before me a lot have heard this way that I think of criminal cases and criminal sentences, but I don't know if you have heard it. I think of cases on a spectrum. So in my view, not every transportation of child pornography and possession of child pornography case is created the same, I see them on a spectrum. And if we focus for a moment on the transportation offense. It seems to me, any transportation of child pornography is enormously serious and horrible, and I don't mean to minimize it, but they are not all created equal. They are not all equally horrible.

At the lowest end of the spectrum, it seems to me, is somebody who transports child pornography on their own, across a state line, across an international border, then takes it down into their basement and, on their own, looks at it after having transported it. That's a very serious crime, but that seems to me to be maybe the least serious way that you could commit this offense.

The most serious would be somebody who is creating the child pornography, putting hands on the children, and then transporting the child pornography.

You have asked, in this case, for the minimum possible sentence, and it seems to me, one way to think about this is that would be a sentence that, if ever appropriate, is appropriate for the least serious version of this offense.

When I think about Mr. Shenkman's offense, one of the things that I think about -- and you've mentioned this -- are these text messages. I want to talk to you about the text messages in two senses. One, the most concerning is the suggestion in there that he was involved in inducing people to do bad stuff. That's very serious. But even if that's not the case, even if he was just throwing out fluff, my concern about these text messages is they were getting other people revved up. You have Mr. Shenkman and other individuals who have an interest in child pornography, you know, you can just see them getting each other going talking about this erotic experience that they each had.

And so one way to look at this case is that, even if the text messages were just fluff, this isn't at the least serious end of the spectrum, because it was revving up other people to participate in the child pornography space.

What do you say to that?

MR. JAFFE: As to the transportation, I -- I agree

with the Court in a sense that this should fall at the lower end of the spectrum. I mean, there was the allegation my client has pled guilty to, is that it was on his phone, and he came into the United States from Canada, I believe it was through downtown, but probably without -- without a thought that he was coming into the United States and that the phone would be subject to whatever search and further analysis. So, -- again, I would say that knowing, I would say that was not the case.

But I think that the more -- the more difficult question is about revving up other people. As far as I know, and, Your Honor, forgive me, I don't have the date of the text. I mean, was it in '24 or was it before that? Does the Court have that information?

THE COURT: I have some sample texts. There are ones that are set forth in the presentence report, and I think the government has set them forth, too. There were a couple from August of 2024 that are mentioned in the presentence report.

MR. JAFFE: Okay. That's what I thought. Okay. So we're not unmindful and nor is there a failure to recognize that viewing the child pornography has victims, and I'm certainly not making the argument that these are just images and, therefore, no harm, no foul, because I think, as you've already indicated, that there is a lot more to it.

That viewing only triggers further efforts by whomever is doing this, triggering efforts to make more, because there's an unbelievable audience, unfortunately, and the amount of money, I have no idea. So I accept that.

In terms of revving up, if that's -- if the Court -- if the Court accepts or if the Court will accept the fact that most of what my client had done was, again, to -- I won't say, gain stature in this world, but in some way enable him to get more then as you would frame the question, I can't disagree.

However, what Mr. Shenkman said to Dr. Shiener was that given -- given his state of emotion for how long it may have been, he has represented that -- I -- it's at least -- at least as far as I'm able to see myself, who I am, what I've done, who I should be, how I was raised, whatever the case is, I -- I would liken the -- I mean, Dr. Shiener makes references to people that have -- that have expressed similar feelings. Well, they'll do Evel Knievel type of stuff, they will skydive, they will bungee jump, whatever it is, go over Niagara Falls in a barrel, to get the thrill, but yet to somehow puncture this -- to puncture this emptiness, if you will, regrettably, Akiva Shenkman viewed child pornography. And as he said that with the passage of time, the more he saw only created a greater need to see more, perhaps more things that were perverse, if you will, because

it had escalated. You know, the -- the desire would -- his desire to somehow get a sense of something.

So revving up, I get it, Your Honor. I understand the question. But at the same time -- and this is not an excuse, by any means, please don't take it in this way, but this is who he was at the time, and this is what he did in order to, as he said, get more.

THE COURT: Okay.

MR. JAFFE: I mean, I can't -- if the Court -- please, I'm -- please ask me more questions in this regard, but I would just say -- and, again, if I've gone adrift of your question about revving up, I will rest with that.

THE COURT: My question wasn't really why he was revving up or the motivation. I appreciate your comments; they were thoughtful ones.

My question, though, is, when I'm trying to understand the seriousness of the overall course of conduct here, what do you say to the argument that one of the things that makes his course of conduct more serious and one of the things that may make the lowest possible sentence inappropriate, is that his conduct wasn't at the lowest end of the spectrum, it involved more than just looking and more than just transporting, it involved revving up other people to do nasty stuff?

MR. JAFFE: Well, Your Honor, I would say that -- that it -- it flows, you know, as you are making statements, but I think that of relevant concern would be the intent. I mean, was the intent necessarily -- was the intent designed to rev other people up, as opposed to perhaps revving himself up. And if this was a means of doing it, I'm not excusing it, but this is what he did.

THE COURT: Okay. Mr. Jaffe, those are my questions, and I appreciate your answers. I promised you an opportunity to highlight anything else that you want to talk about. I would be pleased to listen very carefully.

MR. JAFFE: Thank you.

Your Honor, particularly at this time of year, this is -- well, it's provided me, and discussions with Mr. Shenkman, a lot of thought. I would ask the Court -- I mean, as perhaps you already have, I would like to indicate to the Court that present in the courtroom is my client's mother and various siblings, and then just support from other people within -- within Akiva's community. I mean, he grew up in Brooklyn, I mean, as an adult. He has some Detroit roots here, and then moved to Chicago for a period of time, and he was in -- you know, in Eretz Yisrael, and then to Brooklyn.

Just on a side note, this has provided me with an unbelievable opportunity to develop a relationship with

Mr. Shenkman's uncle. His name is Yitzchak Shkop. He's not here, he's in Eretz Yisrael. Probably over the last month, I have been in direct communication with him most days, at least two or three times.

And in terms of preparing for today, I've done my best to listen to what everyone has said to me about Akiva, ideas as to how to approach this, and, you know, to some extent, I factored suggestions that were offered. And in that regard, I would indicate that many letters that I attached to my memorandum, some that had been submitted to you previously, when there had been a request for a -- a supervision subject to terms, and then more current letters that speak to the Akiva Shenkman that these people know.

You know, of course, Your Honor, the -- I believe it's the *Tobia* case, the Supreme Court case that I cited in my memorandum, that imposes upon the trial court various criteria to consider when imposing a sentence, and, of course, retribution, if you will, the need to let the client -- the community know that this type of behavior will not be accepted, and a strong message has to be sent, but also there's an element of rehabilitation.

And obviously, the Court has read my memorandum and the results of the objective tests that were performed. I do take slight -- I do take slight objection to the fact that these were paid professionals. I mean, these are -- these

are psychologists that, in my opinion, based on my experience, have stellar reputations, and they have been willing to produce and to be held to public scrutiny, and so they stand by what they've said. So I just -- I don't think -- that's what lawyers are supposed to do when representing a client, to present the best-case scenario for the client, and I think in that regard, to the extent that we have, we have these analyses and the Court's consideration, we've done that.

THE COURT: Let me ask you, and this ties into my earlier questions. You were highlighting, just now, what you called the objective tests --

MR. JAFFE: Yes.

THE COURT: -- that Dr. Shiener and the other, Dr. Fagin, appeared to have administered.

Those tests are objective, but they rely on input and responses from Mr. Shenkman to a number of questions. And the point that I was getting at earlier was, how can the results of those tests be relied upon if -- and I'm just asking, if -- if Mr. Shenkman's responses are not reliable or not accurate?

MR. JAFFE: I understand. I understand completely, Your Honor. But, I mean, the -- yes, the input from the patient, if you will, or the person being diagnosed may be a starting point, but yet there are -- but these tests, the

Hare report, the CPORT, a test, the CASIC report and I believe there's an SRV-20, I believe, also. I mean, they test for -- they test for, among other things, malingering, they test for validity, reliability. And so I understand the Court's inquiries but yet, I mean, I think that even at that, these tests take into consideration, and I think that they have.

Now, if I -- I would just rely upon what Dr. Shiener has indicated that there is a low risk of repeating, and my client is remorseful, and he received a downward departure of three points because I'm assuming that it was accepted, that not only because he pled guilty, but because he accepted responsibility for what he's done, and he'll indicate to you that he does, in the degree of remorse that he has. The accountability of his actions, he will also speak to.

But all of these things have been considered, Your Honor, and I would just say to you that -- and I'm not suggesting that you are, but I don't -- notwithstanding your questions regarding two conflicting statements -- think that we can or we should disregard the results of these tests. So in that regard, mindful of your concerns, Your Honor, I've anticipated, if you will, these types of questions and my best responses to you.

So, again, no prior record, by the way, no prior

record, I should add that as well. My client was gainfully employed. For many years, he had his own business in Flatbush, as a heating and air-conditioning technician, if you will. And I think all of these -- all of these factors, again, I know that the Court will consider, but I think should definitely be weighed against -- against the need to punish with what the sentencing guidelines say and, again, the concern that you have regarding the two conflicting statements.

I think that -- I spoken to Dr. Fagin about this issue on Monday, and I spoke to him for over an hour. And I kept on coming back to him, what about the statement? What about the statement? How can you -- how can conclude that this was fantasy, or this was fiction, as opposed to he said it? He didn't have to say it, but he said it.

I -- I think that at my young age of 75, I can still play above the rim. You look at me and say you are crazy, and my knees are shot from years or whatever. I'm making a statement, though. I made a statement. Accept it or not accept it. Reality is such that I can't do that, but I made it to whomever, to impress my grandsons, whatever the case may be.

So the balancing act, Your Honor, of all of these factors that I -- that I urge you to consider, the -- the -- and let me -- if I may just backtrack for a

second.

It took me a minute, if you will, to fully appreciate what members of the community have said about Akiva Shenkman. Did they know what was happening over time? Probably not. Are they shocked to hear --

THE COURT: Probably not?

MR. JAFFE: Pardon?

THE COURT: Isn't the answer hell no? You said, did they know what was going on? And then you answered your own question, probably not.

MR. JAFFE: Right.

THE COURT: Isn't the answer, no way in hell did they know what was going on?

MR. JAFFE: I like your answer better than mine. Okay. It's to the point. But nevertheless -- but now -- now that they do know, they're telling you who he was. So can we -- can we discount that, that somehow he was able to maintain, at least on the surface, a -- a -- a productive life? Was he a productive member of society? In some respects, I think the answer is yes. He not only -- not only that, but he remained committed to his religion. He remained committed to the obligations of his religion.

What was happening behind the green doors, Your Honor, only Akiva -- only Akiva Shenkman can tell you. I'm not able to do that, other than to -- to -- to look at

him, not just with blinders on. And I'm satisfied from the questions that you've asked me, that you won't do that. But I'm asking Your Honor to consider Akiva -- Akiva Shenkman as a -- as a whole person. I'm asking you to consider him as he appears before you right now, and, of course, we can't dismiss what happened, but nevertheless, there are aspects.

Your Honor, if I may, if you allow me, I just wanted to quote something from a book that I read at this time of year. It's by Moshe Eisermann. I don't know him personally, but I know his son. He's a prolific writer. He's on in years right now. But there's something that he says -- that he said in this book. It's called, A Machzor Companion, and it's just his ideas regarding the themes of the high holidays, as we approach the high holidays for, you know, the Jewish religion. And there's something in here that I try to hold to, not only at this time of year, but throughout the year; it's most difficult. But in this part, this is -- this seems to serve as the framework of the relationship that I have with Akiva. If I may, it will take two minutes to read?

THE COURT: Go ahead, but one thing I would ask is sometimes when folks are reading, they read faster than when speaking, and I want to make sure I hear you and that Mr. Smith gets it down.

MR. JAFFE: Thank you. Thank you for the

opportunity.

THE COURT: Please read slowly.

MR. JAFFE: I will do my best.

So, Your Honor, the book I'm reading from is a Machzor Companion. It's themes of the high holidays, Machzor. And it is written by Moshe Eisermann, who I believe is still living in Baltimore. He's up in years.

But nevertheless, he says, and that this is an approach that he is recommending that we -- that people take during the last portion of the Yom Kippur service, and how we should look at ourselves. And he says, "Certainly in the call" -- meaning in the community -- "could serve to describe the act of confession as readily as it can take on the meaning to praise or to thank. But it would not, in that voice, do justice to a full implication of what the act of viddui or confession before God requires. Viddui is to be much more than a simple admission. It must entail a gut-wrenching inner-dislocation, a ruthless probing that place havoc with the veneer of big and little frauds, which in ordinary circumstances, we use so efficiently to allay our conscious. It must lay bare the innermost recesses of our being to the harsh and unforgiving light of truth. It must leave us shattered and broken by the sheer enormity of the lie we have been living."

And then just one last paragraph, if I may? He

says, "We do not simply cast ourselves down before God, we undergo a metamorphosis. We become nothing more than deflated relics of our wicked bombast. We have nothing left but our prostration. We define ourselves by only its terms no truth beside our fall. There's nothing left to us but that we are a mass of collapse potentialities, the sorry remnants of high hopes gone sour."

I can say to the Court, Your Honor, that from the first time that I met Akiva Shenkman -- I mean, I saved the best for last, but I hit him over the head, and every time I met with him, I hit him over the head. And I know that in some regard it had impact upon him, because he conveyed it to my confidant in this matter, his Uncle Yitzchak Shkop.

So, you know, it may be argued, yeah, he's going to have a lot of time. He's going to have a lot of time to consider what he's done, to consider the impact upon other people, and to consider the immorality, the illegality of his behavior. We look at it like that. I would submit to the Court, that's looking at this with blinders, and that it clearly -- it clearly does not take into consideration the element of rehabilitation.

I can't say to the Court, positively, that Akiva Shenkman, as he stands here today, has taken that soul-searching inquiry into his guts, into the inner recesses of his soul, but I would submit to the Court that what I have

seen, that to some extent and on his level, he has. Sometimes, you know, when arguing a case before a judge -- a client has a problem with drinking, and judge will say, I have the perfect solution, you're in jail, and I will guarantee that you are not going to drink. Okay?

I would say -- I would ask the Court, though, and I guess this has ultimately been my question throughout. I understand that we have these sentencing guidelines that, in this instance, there is a requirement that there be a minimum sentence of five years. The correlation between the actions that my client has pled to, what information has gone into that when our legislature enacted this law with the accompanying punishments, I can't speak for certain, but I'll accept the fact that before doing so, there was a reliance upon law enforcement, the medical community, the psychological community, so on and so forth, and that this is what they've come up with.

But what I'm asking the Court, on behalf of Akiva Shenkman, to the extent that you can, within the -- within the discretion that you have, a correlation, be it 20 years or ten years or five years or nine months that he has served, at what point -- at what point can we say that Akiva Shenkman truly understands what he has done and now he can go on to the next step, which is rehabilitation? So to what extent, Your Honor, I'm asking the Court to what extent

does a -- a punishment, without taking into consideration not only the need for rehabilitation, but the capability of Akiva to rehabilitate himself? We have five years up to 20, I understand that. I won't say with conviction, necessarily, that it's arbitrary, that's the law. Just as, for example, in a drunk driving case, it says that you achieve a certain level, you're guilty. Now, of course, in a trial in a case like that, well, okay, okay, you have the results, but how -- what was the person's driving like? How did they do in the field sobriety test and so on and so forth? At least there is that -- that aspect, that consideration.

Do I think that -- that Akiva Shenkman needs the time to truly appreciate the wrongfulness, if you will, of his conduct? I would be naive to say -- if I didn't answer that question, yes, he does. But at the same time, Your Honor, this is where -- this is where your judgment comes into play. At what point can we say -- can we say that he -- that he's appreciated that, he's appreciated what he has done, and that he is able to work toward becoming a -- becoming a law-abiding citizen, and an ability that is able to conform his behavior to that of a law-abiding, productive member of society, and certainly not to engage in this type of behavior.

As -- I don't know if Akiva Shenkman is a righteous person or he's not a righteous person, I'm not here to say

that. But I will say he's a person -- he's a person, and notwithstanding what he has done, that deserves a chance. And I firmly believe, Your Honor, you have within your discretion, based upon the information that has been provided, considering that most difficult question that you had asked, so that, nevertheless, that you error -- I'm not saying -- excuse me, pardon me. That you decide in the favor of rehabilitation and impose a sentence that is close to the minimum guidelines that you can. Thank you.

THE COURT: Okay. Thank you very much for your thoughts. I appreciate them.

Mr. Shenkman, this is your opportunity to speak directly to me. You're not required to say anything, and if you choose to stay silent, I won't hold that against you in any way. But if you'd like to say something, I would be pleased to listen very carefully. Would you like to say something?

THE DEFENDANT: Yes, Your Honor.

MR. JAFFE: Shall he stand, Your Honor?

THE COURT: No. I want him to be comfortable, so he can stay seated.

Mr. Shenkman, I would just ask that you speak slowly and keep your voice up. We've got plenty of time. I know it's very difficult to speak under your circumstances. We will do whatever we need to do to make sure that you have

a full opportunity to share whatever thoughts you'd like to share. So take your time. If you need to pause, that's fine. Whatever you need to do to get through your comments is fine.

MR. JAFFE: Your Honor, with respect, I know that my client -- this is his opportunity. Thank you. He would like -- with the Court's permission, if he may -- he wants to share just one thought with his mother and family in general, with the Court's permission, before he begins to speak to you.

THE COURT: I'm not sure I understand what you mean. Does he -- is -- can he say it out loud?

MR. JAFFE: Yes, of course, just if he could look at them and just tell them that, so he can turn his seat.

THE COURT: He can turn, but the only thing is we need to make sure we are capturing what he says.

MR. JAFFE: Fair enough.

THE COURT: So he has to be close enough to a microphone.

MR. JAFFE: I got it. Okay.

THE DEFENDANT: Sorry. Excuse me.

MR. JAFFE: Take a minute.

THE COURT: Mr. Shenkman, would it be helpful if we took a five- or ten-minute break?

THE DEFENDANT: It's not going to make it any

difference.

MR. JAFFE: What?

Your Honor, there was one other statement I wanted to make. If I may --

THE COURT: Go ahead.

MR. JAFFE: -- if this is the appropriate time to make this request?

When imposing sentence, a couple things, if I may. To the extent that you have the authority or if you have input, we would ask that if my client is going to be incarcerated, that either, if you can do it or recommend it, that he be sentenced to the institution in Otisville or Fort Dix. And I say that because they are on the east coast, they are close to where his family lives, and there will be more of an opportunity to receive religious material, be it to fill in Seders or anything that he needs in order to participate in various religious ceremonies.

Also that -- that also, Your Honor, in that there -- and the prosecutor has been very candid with me on this point, and that is, I've asked whether his original religious property to fill in some Seders, a chalice and so forth. If they are still available, and if they -- I mean, if they are in existence, to the extent that we can accommodate Mr. Shenkman, I would ask the Court to do that as well.

And if the Court is going to impose a period of incarceration, that it be done as -- well, that he be transferred as soon as he can, again, given the religious holidays, and if there can be an accommodation to one of those institutions on the east coast.

THE COURT: I have no problem recommending those two places, but it's just a recommendation. The BOP will place him in the facility they think is most appropriate.

MR. JAFFE: And then just one other thing, Your Honor, and I believe this also can be a recommendation. To the extent that Mr. Shenkman can benefit from the First Step Second Chance Act, that it also be recommended to the Bureau of Prisons.

THE COURT: What are you referring to, specifically?

MR. JAFFE: Pardon?

THE COURT: What specifically?

MR. JAFFE: Well, the -- I have the statutory cite, but it's essentially the First Step Second Chance, and it applies to various offenses. I don't know that this type of offense is specifically mentioned, but it's not -- it's not excluded, either, as far as my research can tell me. And it obviously gives a person, based upon their merit within the institution, it gives them a little bit more freedom within the institution, and also additional credit against any

sentence that may be served.

THE COURT: I've got say I've not had a request like this at sentencing, so I'm not familiar with what it is that you are asking for, so --

MR. JAFFE: I have it in my -- in my binder.

THE COURT: All right. We are going to take a short break before I get to the sentence, so if you have something that you can share with me, that's fine.

MR. JAFFE: Thank you.

THE COURT: Thank you.

Mr. Shenkman, do you think you're in a position to speak right now? I do not mind taking a short break if you think that would be helpful.

THE DEFENDANT: I'm going to try.

THE COURT: Can you, again, try to keep your voice up and speak slowly?

THE DEFENDANT: I love you guys.

THE COURT: You know, let me make a comment. The only stuff that needs to be on the record is stuff that you want me to consider. If you want to turn around and speak to them and say something that won't be part of these proceedings for a minute, you go ahead. But if you are speaking to them and we can get it on the record, it won't be something that I consider, but that's fine, I don't -- I don't have a problem with that.

Do you want to take a minute and look at them?

You tell me when you are ready to talk to me and then we will go back on the record here.

MR. JAFFE: Take a few minutes and collect yourself. Take a few minutes.

Your Honor, could we have a ten-minute recess?

THE COURT: We can. Let's take a ten-minute break. I will see you in ten minutes.

THE LAW CLERK: All rise. Court is in recess.

(Court recessed at 11:05 a.m.)

_ _ _

(Court reconvened at 11:17 a.m.; Court, Counsel and all parties present.)

THE LAW CLERK: All rise. Court is back in session.

THE COURT: Please be seated.

Before our break, we were preparing for Mr. Shenkman to make a statement, if he wishes to say something.

Mr. Shenkman, would you like to proceed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you reading off of a piece of paper?

THE DEFENDANT: Just scribbled notes here and there.

THE COURT: It's totally fine if you do that, but I just want to give you my same thing that I think I said to Mr. Jaffe. Sometimes when folks read, they speak quicker than if they're just speaking without reading, so please be conscious, when you're reading, to please speak slowly. Thank you.

THE DEFENDANT: I just want to say I'm sorry to everybody, my friends, my family, the victims. I know what I did was wrong. I know it was wrong. I know why it was wrong. I have no excuses for that, Your Honor.

Not an excuse, but maybe an explanation; growing up was rough. I have a lot of memories that I don't even know. I can't remember half of my childhood, and not that that's an excuse, like I said, but just to give a background, I guess, or something.

I have no one to blame. I can only blame myself for this. I should have asked for help a long, long time ago. I don't know how I was able to go this far and this deep into this stuff. Into -- it's like sometimes I'm watching myself as a third-party, if that makes any sense? Like, I don't even recognize myself.

I know it's a long road -- it's going to be a long road ahead of me, in a lot of ways. Hopefully I'll be able to be a part -- hopefully I can be a productive part of society one day soon, hopefully. I have a lot of teshuvah to

do.

THE COURT: A lot of what --

THE DEFENDANT: Teshuvah, repentance. I've been doing a lot of that in the last ten months-or-so. I'm doing my best to do that, and learning more, studying more, praying more, saying more Selichot, whatever I can do. It's not easy doing that, being locked up in an FTC, you know. It's hard to do a lot of things there.

I used to think my private life was, you know, just private and just me. The shameful behavior, I didn't think was going to hurt anybody. I didn't think. I didn't think. I was chasing a high, I guess, as you can say. I realize now it has affected me more than I thought it would. It affected my loved ones, my friends, my family, the victims and their families as well.

I'm very sorry to everyone for the unintentional pain I have caused everyone. Hopefully they can forgive me. I know now that I have their support, and that means a lot. It means more than they will ever know.

If Yahweh can forgive me, too, for everything.

I can promise that whatever time -- with whatever time I get it will be to repent, to make myself better. Hopefully I can get into rehab soon and really start to live a life that I haven't been doing.

I hope to get married one day, you know, and build

a family. I got to catch up with my siblings on that one. It will be rough, but I'll try.

I have someone, she's not here today, but she's been a big rock for me in the past ten months. Without her, I don't know how I've been -- how I've -- without her, I don't know how I would have survived the past ten months. I hope she knows that.

I really care about her a lot. My family cares about her. Hopefully she's still sticking around and hopefully she'll be here when I get out, so hopefully we can actually build a family together. It is probably the first time I've actually felt this way towards anybody, ever. The friendship from her, you know, from her and my friends, the love and support I've been getting from everybody, hopefully gives me hope for a future -- a bright future that I can hopefully look forward to. Hopefully, with the help, if I can free myself from these -- from this addiction, from everything.

I hope you show me some mercy or something, you know. All I can do right now is beg for you to give me, you know, the best possible outcome that you can do. You know, I know I have a long road ahead of me. I hope that everyone can forgive me. With Rosh Hashana and Yom Kippur are coming up, I have yavalied (phonetic). Hopefully God can forgive me.

(An off-the-record discussion was held
at 11:27 a.m. between defense counsel and
defendant.)

THE DEFENDANT: I hope God can forgive me, and I hope that the victims can forgive me, hope their families can forgive me, because it's not just them, it's not just that, it starts out with that and then it messes up their life, it messes up their family's lives as well, so I hope that they can also forgive me, because its -- it's not easy for them, what they are going through, as well. So I beg for their forgiveness and for their families' as well.

Thank you.

THE COURT: Thank you very much. I appreciate your thoughts.

Ms. Hindelang.

MS. HINDELANG: Your Honor, is it okay if I remain here?

THE COURT: Whatever is most comfortable to you.

MS. HINDELANG: Thank you.

I know that the Court always takes diligent notes of the items that we submit, so I don't want to belabor points I've already made in my sentencing memorandum. I would rather use this time to kind of respond to some of the things that have been brought up by defense counsel. I also want to acknowledge Mr. Shenkman's apologies and his

recognition of the severity of the harm that he has caused to the victims of his offense and their families. I do appreciate that.

I want to start off by talking about Dr. Shiener's report, quite frankly, because that bothered me the most. And I -- I -- the Court, in some ways, a little bit, took my wind out of my sails on pointing out some of the inconsistencies between the two reports and some of the difficulty with Dr. Shiener's methodologies based on those inconsistencies, and I want to link that back to Mr. Shenkman's history and characteristics, as contemplated by the 3553(a) factors the Court has to consider.

And that is that the most troubling and long-ranging characteristic that we can see belonging to Mr. Shenkman is a deep-seated sexual interest in children. To say that he's not a pedophile because he does not meet the criteria, but does not list the criteria, is just disingenuous. Mr. Shenkman acknowledges his deep-seated sexual interest in children, saying to Dr. Shiener that it has been there as long as he can remember.

So the only point that I wanted to make with regard to that was, I hope that the Court views that report with a skeptical eye, because while some of those tests, and whatnot, that Dr. Shiener might have employed, may indicate certain things, I don't think that the Court can rely on that

report, because of the inconsistencies, and, quite frankly, because this is not something that Dr. Shiener did out of the goodness of his heart or in a disinterested manner. I 100 percent agree with Mr. Jaffe that it's effective and necessary for a defense attorney to seek experts and to get those evaluations and get those reports, to put it before the Court for sentencing. I don't begrudge the defense for doing that at all; I think it makes for effective presentation and important mitigation to present to the court, but when there is such a piece that is so lacking, I think the Court should give it a skeptical eye.

I also think that Dr. Shiener did not include -- after having the opportunity to read the amended report, I did want to note that Dr. Shiener, in an interview in 2017 that he gave to Channel 4 news, that was then published, the article is entitled, "Warning about elaborate schemes behind child pornography." Dr. Shiener is quoted in this interview as saying, "The sad part about sex offenders is that the recidivism rate is very high." He goes on. "They are not often caught, but once they offend, they tend to re-offend."

So even Dr. Shiener, in his public personality, acknowledges the dangerousness that these types of offenses pose to victims and people in the community, and I just want the Court to be -- although I know the Court is, I just

wanted to place that on the record, as a reason for the Court to maybe not give as much weight to Dr. Shiener's report.

I also want to talk about, because I feel like it's incumbent upon me, the dangerous nature of this offense and the wide-ranging consequence that it has.

The Court talked about how it views cases on a spectrum, and I wanted to address that point with this argument, that this is not a case that falls on what I think the Court was saying in its description of the lower end of those cases. Mr. Shenkman's sexual interest in children has been so long-ranging and his involvement in trafficking this material and the type of material, is deep-seated, long-ranging, and in some ways unmatched by -- in the graphic nature and the things that he is requesting and the things he's talking about and the things that he is claiming to have done.

I included some of the chats that were found on one of his social media accounts, and it should be noted that these are end-to-end encryption messages. We were only able to get into one of Mr. Shenkman's two phones. And in that one extraction, there were 521 videos of child pornography and there were 312 images. That's an overwhelming amount. And many of these videos involved babies and toddlers. And much of what Mr. Shenkman was talking about in these chats was the rape of babies and toddlers. It is -- they are

graphic, and they are disturbing, and he represented having done things to infants that are beyond the pale.

I did not include some of these things in my sentencing memo because, quite frankly, they are just too graphic, but Mr. Shenkman asks for, in these chats, "snuff," which refers to killing videos. He talks in detail with another -- with another person about whether that person has any snuff.

THE COURT: Do you have the printouts there?

MS. HINDELANG: I do, Your Honor.

THE COURT: Can I look at those?

MS. HINDELANG: Yes, Your Honor. Do you want me to show Mr. Jaffe first?

THE COURT: Sure. Thank you.

MS. HINDELANG: Some of these were included in my sentencing memo. Like I said, some of them were not.

THE COURT: I've read the ones in the memo, so --

MS. HINDELANG: May I approach?

THE COURT: Please. Okay. Thank you.

MS. HINDELANG: May I approach again?

THE COURT: Yep.

MS. HINDELANG: Thank you. Just a thought on that. Now that the Court has read these, I did not plan on reading all of them into the record, but I do want the record to be complete.

THE COURT: Why don't you just file a supplement to your sentencing memos of the ones that you showed me.

MS. HINDELANG: I will, and I guess I would move, at this time, to file them under seal, at least as it relates to the very graphic ones that involve some discussions of rape. I don't know that those should be available on the public docket. That might be information that Mr. Shenkman would like to keep private.

THE COURT: We will deal with the filing status separately.

MS. HINDELANG: Okay. Fair enough.

THE COURT: Okay.

MS. HINDELANG: But in these -- in these chats, Mr. Shenkman is asking and talking about suffocation, talking about sexual assault of children and of infants. Whether or not he would sexually assault a corpse, and just very vile and graphic things. And he's also making claims about things that he has done to children, saying that his first time involved a three-year-old, and talking about another instance involving a baby.

I understand Mr. Jaffe's argument and what was represented in Dr. Shiener's report and in the other report, that this was all, quote/unquote, fantasy, but how do we know that? We know that because Mr. Shenkman has said it, and I don't know that Mr. Shenkman is the most reliable historian

of his life, in this sense.

We look at Mr. Shenkman when he was originally interviewed by Pretrial Services, and I know I keep bringing this up, but I think it's important, and it goes directly to the contradiction between those two reports, that the Court brought up. When he was interviewed in that Pretrial Services interview, he maintained that he does not have -- does not volunteer in the community, but he does have minor children from the community over to his home for meals. He doesn't -- he didn't recall how often they visited. He did not involve -- advise whether they were accompanied by adults. He denied that there were parks or daycare centers or schools within the proximity of his residence. We talked about this before, as Pretrial Services verified with his brother, everything that his brother said completely negated those statements. His brother represented that Mr. Shenkman was known for his volunteering in the community, and I think that the letters that the Court received from people who support Mr. Shenkman, also reflected this, that he was a valued member of the community and that he did a lot of volunteer work in the community. The important piece there is that he has access to children, and he had access to children. And I think the Court should take that into consideration, and I think that the Court should consider that inconsistency that the Court pointed out, that he was

just saying that he was sexually assaulted as a child to get more stuff, I assume, for the sentencing memo and for the mitigation package.

So I think that that goes to the nature and circumstances of his offense, but also to his individual history and characteristics, and that is, that he has a deep-seated sexual interest in children and he presents a continued danger to the community, as recognized by Dr. Shiener in that interview, that sex offenders are not often caught, but once they are, they do tend to recidivise, and it happens again.

This is also not one of those cases that's on the end of the lower end of spectrum of transportation of child pornography, not just because of the severity of the material that was being transported and the chats -- or it's because of the chats and because of the fact that Mr. Shenkman took these two phones, that both contained child pornography on them, with him from New York to Canada and back into the United States. And I think the magistrate judge at the detention hearing recognized how deep-seated and how deep this addiction ran, when he noticed that Mr. Shenkman knew that he was going to be crossing the border and he still needed to keep this material with him, and it's because he was so involved and had been so involved in so long.

There was an enormous amount of videos found.

There were these disturbing discussions where Mr. Shenkman is representing that he has done things to children. And I think it's contradictory to say that we should take him at his word when he tells psychologists who are interviewing him, ostensibly for a mitigation package to present to the Court, that he has never acted on these things, but we shouldn't take him at his word when he's talking to other people online about the things that he has done, because those are some very, very serious and disturbing things to represent to somebody online.

The United States, here, is asking for a sentence just below the top of Mr. Shenkman's guidelines, because the 3553(a) factors, and an analysis of those factors requires such. And I do want to note that those factors do take into consideration the types of sentences available, the type of services that would be available, and so, in that way, does take into consideration rehabilitation.

Nobody wants Mr. Shenkman to go back out and re-offend, because every time that Mr. Shenkman talks to somebody else, exchanges videos of child pornography, asks for somebody to send him more videos of child pornography, particularly the brutal and extreme stuff which he asked for repeatedly, that's another child that is being raped, that is being assaulted, and that those images are being sent throughout the world, for the remainder of time, and that

child, as Mr. Shenkman, I respect, acknowledged, that child will have to deal with that for the rest of their life. There is no taking that away, and it's because people like Mr. Shenkman, who drive this market, and that is why children get raped, and that rape is recorded and shared forever, and it can never be undone. And that is why the United States is asking for the sentence that it's asking for, because although Mr. Shenkman does not have a criminal history, that's typical in these cases, and that was what was kind of acknowledged by Dr. Shiener in that news article. This type of offense happens, as we talked about, behind closed doors, on the computer. They are tough to detect. But taking into consideration all of those factors, the guideline range included Mr. Shenkman's history and characteristic, with that defining characteristic being his deep-seated sexual interest in children, and the danger and the continuing danger he continues to present, the United States is asking for a sentence near the top of the guideline range of 180 months.

I would also note that because of the volume of videos, that what happens, usually in an investigation, is once the extraction of a phone is done and there's child pornography that's identified, those videos and images are submitted to the National Center for Missing and Exploited Children to see if those images are part of what's called a series -- a known series, where there's identified victims.

In this case, because of the volume, we have not received -- while the hash values with the uniquely identifying number that belongs to those videos, which is how we identify series victims and series in general, we do not have the full victim information report back from NCMIC. We were able to, just last night, thanks to the assistance of our very competent and wonderful victim assistance coordinator, she was able to pull the victim impact statements from the national database. So we haven't received what we need -- or what we usually receive from NCMIC, but she was able to pull those. I did submit those to the Court this morning. They are of the series victims for the series that were found in Mr. Shenkman's device. There will likely be restitution requests coming. Restitution is mandatory. There will likely be restitution requests coming, because many of those victims are represented by attorneys who make the request. All of this is to say, ultimately, I'm asking the Court to leave the restitution period open for 90 days, for us to get those requests and provide them to defense counsel, and see if we can work out a restitution amount, or else have a restitution hearing.

So with all of that, the United States would ask for a sentence of 180 months, because an analysis of the factors of the 3553(a) factors so dictates. Thank you.

THE COURT: A couple questions.

MS. HINDELANG: Any time.

THE COURT: I fully appreciate the point about Mr. Shenkman repeatedly saying that he did this stuff to children. I also appreciate the point that we would, at least from your perspective, start from the presumption that he's being truthful. I think your view is, it's up to him to prove that it's not true.

But in any event, my question is this: Are you aware of any evidence, beyond his statements, that he's actually put hands on a kid?

MS. HINDELANG: No, just his statements that he has.

THE COURT: On the Shiener report, I guess my question is, why isn't it plausible that with respect to this extreme stuff that Mr. Shenkman is seeking, that the Shiener explanation makes sense in this regard? I understand your point is -- essentially you point to him saying he's had an interest in kids. I get that statement. It seems to me the rest of the argument is, of course, he qualifies as a pedophile, he's always looking at child porn.

Why, though, isn't it plausible that especially with this graphic and horribly disturbing stuff, is he's looking at it for the reasons that Shiener gives, which is to feel something. Why isn't that plausible?

MS. HINDELANG: So I don't think -- well, I don't

think it's plausible, because of Mr. Shenkman's words, and why else you would be talking about getting sexual gratification from viewing images of children in sexually explicit positions, being sexually assaulted. It doesn't seem plausible to me, because it seems like if he's talking about it for sexual gratification, that he's talking about that sexual gratification with others, that he's asking for images for additional sexual gratification, that he's viewing it for sexual gratification, not just to try to feel something. I just don't think that's plausible.

THE COURT: Okay. Thank you.

Just give me a minute.

Mr. Shenkman, when I impose sentences in my criminal cases, I have to consider and apply the factors set forth in the federal sentencing statute found at Title 18, United States Code, Section 3553(a), and I want to walk through with you how I see those factors applying to you and to this case.

The first factor I have to consider is the nature and circumstances of the offense. That's -- there is a second part to the first factor, which is your personal history and characteristics, and in a way, they bleed together in this case.

If we look strictly at the nature and circumstances of the offense, we're focused on what you were transporting.

And as Ms. Hindelang has pointed out, this was some really bad stuff. I see -- I've had a number of child pornography cases, and the way I put it is, all child pornography is horrible, but it's not equally horrible. As crazy as this may sound, some is worse than others. The stuff here, as described in the papers before me, is among the worst of the worst; violence, there's references in this stuff to animals. This is -- this is really difficult stuff, and that makes the transportation of that stuff very serious; and the possession of it.

The chats, I don't know if those were technically part of the transportation or technically part of the possession, but they are certainly part of your history and characteristics. And this is what I was getting at with Mr. Jaffe, in terms of what concerns me; the chats were so graphic and so disturbing and so encouraging of antisocial assaultive behavior, that the nontechnical term I have for this is, getting people revved up. I mean, it's not too far of a leap to say that after one of these spirited text exchanges with you, somebody could have gone out and produced some of this stuff or done some of these acts. This was being encouraged. So even if it didn't actually get to that point, this revving up and creating more of an appetite for this horrible, horrible stuff, and encouraging others to be seeking this horrible stuff, all of that, to me, makes this a

very serious matter.

The next factor I have to consider, and this is, again, part of same one, is your personal history and characteristics. And Ms. Hindelang focuses, understandably, from her perspective, on what she calls -- what she views as your most significant characteristic, which is what she sees is your longstanding interest -- sexual interest in children. I certainly have to take that into account.

But another thing that I have to consider is that there is a lot more to you than this very disturbing component of your background and characteristics. So I certainly will give and have given serious consideration to the part of your characteristics that Ms. Hindelang has highlighted, but I think there are others that have to come into play when I consider the appropriate sentence.

And if somebody could take and silo the part of your life involving this child pornography and silo it off from the rest of your life, the rest of your life wouldn't just look like a decent life; by all accounts, you were an exemplary person. I read letter after letter from people that talked about your selflessness, your generosity, stepping up to help, time and again, your trustworthiness. Again, you were -- apart from this very disturbing piece -- exactly the kind of person that we would want in our community, and that's an important part of your history and

characteristics.

I think that one point that Ms. Hindelang did recognize, and I'm focused on it too, is I think your expression today of shame, guilt and remorse and acceptance of responsibility is very genuine. I sat here as you struggled to compose yourself and come up with words. One of the things I have to ask myself, Mr. Shenkman, in these sentencings is, do I think the defendant is sorry he or she got caught, or do I think the defendant is truly remorseful for what the defendant did? And I think you, based on my observations of you, sitting here today, seeing you struggle to catch your breath, seeing you look at your family with shame and remorse, I think that you actually accept responsibility and are sad for what you did, not just that you got caught.

There are other important, positive parts of your background. Not only did you appear to be a good person, separate and apart from these problems, but you also appeared to be a very good businessperson. Folks talked about the level of service that you provided, and you supported yourself and you were a productive member of the community, adding value.

I think that the religious component of your life is something that is important. You seem to be involved in your religious community, and that, I think, is an important

positive and a source of strength for you.

You have very strong family support. I look out here in the audience, and I'm not great at math, but I would guess there's at least 10 to 15 people here. And I have presided over a lot of these child pornography cases in the 11-and-a-half years I have had this job, and it's not common for this many folks to come to a child pornography sentence. In a lot of these cases, the family has decided that they don't want to be connected to somebody who has done stuff like you've done. The fact that your family is here, I think, is another important positive in a couple senses. These are upstanding, good people, and they still have faith in you, and that sends a message to me. And they are here to support you going forward, in the future. This issue has been surfaced, and you've got a lot of people who I think are going to remain active in your life and help you stay on the right path, and that's an important part of your personal history and characteristics that weighs into the appropriate resolution here.

The next factor I have to consider is imposing a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. And given my view of the seriousness of this offense, I think this factor weighs in favor of a meaningful custodial sentence, no doubt about it to me.

I have to consider a sentence that affords adequate deterrence to criminal conduct. There's two types of deterrence. There's what's called specific deterrence, that means the sentence has to be strong enough to send a message to you that the price to be paid for this is too high. And then there is general deterrence, which means the sentence has to be strong enough to send a broader message to others, that the price to be paid is high.

With respect to specific deterrence, I think that that doesn't require anything near a guideline sentence for you, this particular factor. I've watched you as you come in here, I think this incarceration, the portion you have done so far, has been shocking and enlightening to you, and a real wake-up call, and I think the rest of it is going to be equally strong, in terms of how you feel it. So I don't think that I need to impose a super long sentence to achieve specific deterrence. But for general deterrence, I think the message needs to go out loud and clear, with a serious sentence here, that this type of conduct and as serious as it is, that the price is high.

I have to consider protecting the public from further crimes by you. And I'd like to think, given what you've gone through so far, and what you're going to go through, it's unlikely that you're going to do this again. Ms. Hindelang does make a fair point that your level of

emersion into in stuff seems to be even higher than many other cases we have seen. It's going to take a lot of work to make sure you're not back in this stuff again. But I think that this goal is achieved both through a meaningful custodial sentence and a lengthy term of supervised release, that keeps a close eye on you and provides you with very important support as you are dealing with these issues.

The next factor I have to consider is the need to provide you with educational or vocational training, medical care or other correctional treatment in the most effective manner. I'm not sure this factor is particularly important in this case. You have vocational training. You have a really significant skill. What you need is intensive sex offender treatment, and that is available to you in the Bureau of Prisons and will be provided to you there, and with follow-up care on supervised release.

I have to consider the kinds of sentences available and the sentencing guidelines, and I have carefully considered that, the guidelines, as I found them early on in the case.

I have to focus on avoiding unwarranted sentencing disparities amongst similarly-situated defendants. That's often achieved by imposing a within-guideline sentence. But here, what we call the JSIN information, shows that the average length of sentence for defendants in your position

was 109 months, and the median length was 97, for the same guidelines levels. So I don't think that imposing a guidelines sentence is necessary to avoid unwarranted disparities.

I'm going to go below the guidelines here, and I'm confident that the sentence I'm imposing accounts appropriately for the unique circumstances of your case, which is the uniquely serious part of the case and the uniquely positive features that you bring to the table.

A lot of child pornography defendants don't have a criminal history, that's true. But very few that I have seen have the part of their life not related to child pornography, that is as positive as yours has been, and I think the sentence here has to account for that and recognize that.

I have to provide restitution to any victims of the offense, and as Ms. Hindelang has requested, I will leave resolution open for 90 days, so she can track down the claims for restitution.

Ultimately, my task here is to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing under Section 3553(a).

Mr. Jaffe has asked for a sentence at the bottom of what I have the authority to impose, a sentence of 60 months. And while I appreciate and have great respect for his arguments, I do not think that that is sufficient to account

for the seriousness of the offense, and the other factors that I indicated weigh more in favor of a higher sentence.

Ms. Hindelang has requested a sentence of 180 months, near the top of the guidelines, and while I have the absolutely greatest respect for her arguments and the way in which she presented them, I think that that is greater than necessary to achieve the goals of sentencing under the guidelines.

Ultimately, I think that what we need here is a package of a sentence that imposes what, in my view, is meaningful punishment on you, and also imposes a lengthy term of supervision, again, to provide you with support and to keep an eye on you. And I think the package of those two things is what is the appropriate way to balance out all of the competing interests here, under Section 3553(a).

So the sentence I will formally pronounce it in a moment, but I think the appropriate balance here is a custodial sentence of 95 months and a term of supervised release of ten years, which is double the minimum. Now, I will explain how I break that out, but I've offered my rationale for that.

So let me formally announce the sentence as follows:

On Count 1 of the indictment, the transportation of child pornography, pursuant to the Sentencing Reform Act

of 1984, the Court, considering the guidelines and the factors contained in Title 18, United States Code, Section 3553(a), hereby commits Mr. Shenkman to the custody of the United States Bureau of Prisons for a term of 60 months.

On Count 2 of the indictment, pursuant to the Sentencing Reform Act of 1984, after considering the guidelines and the factors contained in Section 3553(a), the Court commits Mr. Shenkman to the custody of the Bureau of Prisons for a term of 35 months, to be served consecutive to the sentence imposed on Count 1.

Upon release from imprisonment, Mr. Shenkman shall be placed on a term of supervised release of ten years.

It's further ordered that Mr. Shenkman pay a special assessment of $200, which is due immediately.

It's further ordered that Mr. Shenkman pay a Justice for Victims of Trafficking Act assessment of $5,000 per count, which is due immediately.

I will waive the imposition of a fine, the costs of incarceration, the costs of supervision due to Mr. Shenkman's lack of financial resources.

I want to indicate, I understand there's some tension between ordering the $5,000 fine and waiving the costs. I do think, after looking at his assets as set forth in the PSR, that he has the ability to pay the 5,000. I

don't think he has the ability to pay the ongoing costs of incarceration and supervision, so that's how I'm reconciling that.

Again, with respect to restitution, I will order that, but I'm leaving it open for 90 days.

I am suspending the mandatory drug testing condition. I don't think there's a need for it here.

Pursuant to Title 34, United States Code, Section 40702, Mr. Shenkman shall cooperate with the collection of a DNA sample, as directed by the probation officer.

While on supervision, Mr. Shenkman shall abide by the standard conditions as adopted by this Court and with the following special conditions:

He shall not have direct contact with any child he knows or reasonably should know to be under the age of 18, including his own children, without the permission of the probation officer. If he does have any direct contact with any child he knows or reasonably should know to be under the age of 18, including his own children, without the permission of the probation officer, he shall report that contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

Mr. Shenkman shall participate in the Computer Internet Monitoring Program administered by the United States Probation Department. He shall abide by the Computer Internet Monitoring Program participation agreement in effect at the time of supervision, and comply with any amendments to the program during the term of supervision. Due to the advancements in technology, the Court will adopt amendments to the program as necessary.

For the purposes of accounting for all computers, hardware, software and accessories, Mr. Shenkman shall submit his person, residence, computer and/or vehicle to a search conducted by the U.S. Probation Department at a reasonable time and manner. He shall inform any other residents that his premises may be subject to a search pursuant to this condition.

He shall also provide the probation officer with access to financial -- to requested financial information, including billing records for, for instance, telephone, cable, Internet, satellite services.

In addition to that search condition, I'm imposing a general search condition that he shall submit his person, residence, office, vehicles, papers, business or place of employment, and any property under his control, to a search. Such a search shall be conducted by a United States probation officer in a reasonable time and in a reasonable manner,

based upon a reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. He shall warn any residents that his premises may be subject to searches.

He shall not have contact directly or indirectly with any victim or witness in this instant offense, unless approved by his probation officer.

He shall notify anyone he dates or marries, with a minor child under the age of 18, of his conviction.

He shall not sell, view, or possess images in any form of media or live venue, that depicts pornography, sexually explicit conduct, child erotica, or child nudity. He shall not patronize any place where such material or entertainment is available.

He shall have his employment preapproved by the Probation Department and shall not be employed at or participate in any volunteer activities that involve contact with minors under the age of 18, without prior approval from the probation officer.

He shall have all residences preapproved by the Probation Department.

He shall not provide care or live in a residence where children under the age of 18 also reside, without prior approval of the probation officer.

He shall comply with the requirements of the Sex Offender Registration and Notification Act as directed by his probation officer, the United States Bureau of Prisons, or any state sex offender registration agency in which he resides, works, is a student or was convicted of a qualifying offense.

He shall participate in a sex offense specific treatment program, and follow the rules and regulations of that program. The probation officer will supervise his participation in the program.

He shall submit to periodic polygraph testing at the discretion of a probation officer, as a means to ensure compliance with the requirements of supervision or treatment. No violation proceedings will arise solely on the result of a polygraph examination. Based on his ability to pay, he shall pay the cost of the polygraph examination in an amount determined by the probation officer.

To ensure the payment of any restitution that I order within the next 90 days, he shall make monthly payments on any remaining balance of the restitution at a rate and schedule approved by the Court. He shall provide the probation officer with access to any requested financial information, and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office. He shall not

incur any new credit charges or open additional lines of credit without the approval of the probation officer.

Ms. Hindelang, do you have any forfeiture language to use?

MS. HINDELANG: Your Honor, that thought just occurred and I was just checking. I was not sent any forfeiture language. I can follow up with my forfeiture partner on this case and see, but because Mr. Shenkman didn't enter a plea pursuant to a Rule 11, I don't know if that affects the language, so I will --

THE COURT: Well, whatever it is, I think I need to put something on the record now, to make sure it's part of sentence. So certainly, he will be forfeiting the two telephones?

MS. HINDELANG: Yes.

THE COURT: Is there anything else, or any computer storage devices that were seized from him?

MS. HINDELANG: Yes, and, of course, the material containing child pornography.

THE COURT: I thought I was saying -- is there something else, besides the phone and the computer storage devices?

MS. HINDELANG: I don't believe so.

THE COURT: All right. So we will put in the judgment that he will forfeit the phones, any computer

storage devices, anything else containing child pornography.

But I do think that Mr. Jaffe's point, this won't go in the judgment, but if we have the ability to return his items of religious significance, that would certainly be a nice move, if we can do that.

MS. HINDELANG: Yes. So I have been in contact with Mr. Jaffe about that. I believe that we did that and provided what was taken from his car, with former defense counsel. I have asked the agents to double check, and they represented that's what was done. I believe that Mr. Schulman met with one of the agents and exchanged property. They have double checked to see if there was any additional items, and they are not aware of anything.

THE COURT: So bottom line is, from your perspective, as far as you know, after double checking, the government does not have anything other than phones and the computer storage devices?

MS. HINDELANG: That's correct, and I'll just check one more time now to make sure.

MR. JAFFE: Your Honor, thank you. I would just ask that they go the extra yard, that's all, to see whether or not. I have made efforts to speak with the other attorney, he won't return my phone calls, so I don't know. I have asked him, and he won't return a phone call.

THE COURT: Mr. Schulman won't return --

MR. JAFFE: Won't return phone calls, e-mails, no communication, none.

THE COURT: We will call Mr. Schulman's office and ask him to return your call.

MR. JAFFE: Thank you.

THE COURT: All right. Mr. Jaffe, do you have any objections to any aspect of the sentence imposed?

MR. JAFFE: Your Honor, no -- well, perhaps I do, and that's in terms of the payment of the $5,000 forthwith. I mean, reasonable time, assuming that Mr. Shenkman has the assets to do so, but I think forthwith would be an impossibility.

THE COURT: I've got to say I don't know the mechanics for how this works. We always put due immediately.

Ms. Hindelang, do you know how your office imposes collecting this stuff? I mean, it's not held against him if he doesn't pay it today, right? How does that work in the real world?

MS. HINDELANG: Most of the cases that I have had, there has been no fine ordered. I do know that when there is a restitution amount assessed there is usually an order from the Court that the defendant would participate in the payment program regarding, like, the garnishing of wages while in BOP to pay restitution. I assume that's fine under the JVTA.

THE COURT: All right. I'm not going to put him in the inmate financial responsibility program. But with respect to the JVTA fines, I'll give him -- I'll give the family six months to figure out how to get those funds out of his account.

MR. JAFFE: Thank you. Thank you.

THE COURT: Okay.

MR. JAFFE: Your Honor, the credit for time that my client has already served.

THE COURT: So he will automatically get that. The Bureau of Prisons will credit him. He's only been in federal custody, so he will get full credit for all the time that he's already served, against the sentence that I just imposed.

MR. JAFFE: Lastly, to the extent that you could make a recommendation consistent with my request for either the Otisville or Fort Dix or somewhere on the east coast, that would be greatly appreciated.

THE COURT: I will put in the judgment that the Court recommends placement at Otisville or Fort Dix, if the Bureau of Prisons deems those to be appropriate places.

MR. JAFFE: Thank you.

THE COURT: Mr. Jaffe, I want to say one point. One of the obligations that I have is to make sure I respond to any basis on which you requested a downward variance. You

had requested one based on the use of the computer, the two-point assessment. I'm not departing downward or varying downward on that basis. I gave all of my bases for the downward variance. You know, I tied it to, very much, his personal history and characteristics, the ability to secure the public and protect us with a lengthy term of supervised release. I explained the whole reasons for my sentence. I appreciate the objection based on Judge Neff's point, but that will not be the basis of my downward variance. But I did consider it.

MR. JAFFE: I have been asked, Your Honor, to make one last request, and that is that my client would ask that he be permitted to observe the religious holidays with his family, and upon completion of the holidays, then self surrender.

THE COURT: No. I appreciate that request, but I do not believe that's appropriate. At this point, I could only order his release if I found, by clear and convincing evidence, that he did not pose a threat to the public, and certainly, at this point, before he's received any intensive therapy, I could not make that finding in good faith but thank you for the request.

MR. JAFFE: Thank you.

THE COURT: All right. So, again, are there any other objections that you want to put on the record at this

point, Mr. Jaffe?

MR. JAFFE: Any other objections we have to what he's done?

(An off-the-record discussion was held at 12:19 p.m. between defense counsel and defendant.)

MR. JAFFE: Your Honor, there's no other objections.

THE COURT: Ms. Hindelang, any objections from the government beyond the positions that you've already placed on the record?

MS. HINDELANG: No.

THE COURT: All right.

Mr. Shenkman, you have the right to take an appeal from your conviction and the sentence that I impose. In order to take an appeal, you would need to have Mr. Jaffe file, on your behalf, a written notice of appeal with the Clerk of this Court within 14 days. Do you understand that, sir.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Shenkman, do you have any questions or concerns about anything that happened here today, that you would like to discuss with me before we adjourn?

MR. JAFFE: Do you have anything else that you want to discuss with the Judge? All your requests have been

known, as far as release, and he said no. Okay. They are going to call Schulman to find out what he has, if anything, as far as your materials, so that's pretty good. Anything else?

THE DEFENDANT: Is it possible to get me to a religious facility?

THE COURT: That will be up to Bureau of Prisons, Mr. Shenkman. They're dealing with all sorts of security concerns, and my sense is that they will make every effort to accommodate your religious beliefs.

THE DEFENDANT: They haven't.

THE COURT: They are dealing with a lot of other things, so I can't tell them how to run the prison, I can just make the recommendations that I made, which is to get you to the facilities that you requested. Anything else?

THE DEFENDANT: No. They just told me I won't be able to observe the holidays coming up, that's what they told me, the Chaplin. We do not do that here in this facility. So I was just hoping that I can do that somewhere, if possible. I don't know. They said there will be no Seders there for me.

THE COURT: I don't know how the Bureau of Prisons handles religion --

THE DEFENDANT: With religion, they do a very, very bad --

THE COURT: -- or religious services.

MR. JAFFE: Your Honor, most respectfully to the Court, can you recommend -- perhaps suggest that where Akiva is going to go, that it be done expeditiously, so perhaps he can observe the holidays.

THE COURT: I will put in the judgment that I recommend he be transferred as soon as the Bureau of Prisons deems appropriate to a facility where he can observe the upcoming religious holidays. Again, that's a recommendation. Some things federal judges can order, some things they can't. This is one I can't. I will put that language in the judgment and see what they do.

Anything else, Mr. Shenkman?

THE DEFENDANT: Thank you.

THE COURT: Mr. Jaffe, anything else for the record from you?

MR. JAFFE: Nothing further.

THE COURT: Ms. Hindelang, did I ask you if you have any objections?

MS. HINDELANG: You did. I said no.

THE COURT: Anything else for the government?

MS. HINDELANG: No. Thank you.

THE COURT: Thank you very much.

We are adjourned.

THE LAW CLERK: All rise. Court is in recess.

(Proceedings concluded, Court recessed at 12:22 p.m.)

\- - -

CERTIFICATION

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of UNITED STATES OF AMERICA v. SHENKMAN, Case No. 24-20668, on Wednesday, September 17, 2025.

*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: 11/07/2025
Detroit, Michigan